# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JENNIFER BROWN,

     Plaintiff,

  v.

DIRECTV, LLC,

     Defendants.

)
)
)
)
)
)
)
)
)
)

Case No. CV 13-1170 DMG (Ex)

**ORDER RE PLAINTIFF'S MOTION FOR CLASS CERTIFICATION [222]**

This matter is before the Court on Plaintiff Jenny Brown's motion for class certification or, in the alternative, to set aside the discovery ruling of Hon. Charles Eick, United States Magistrate Judge. [Doc. # 222.] Having duly considered the parties' written submissions, and the arguments at the hearing on the Motion for Class Certification, the Court renders its decision.

## I.
## PROCEDURAL BACKGROUND

Plaintiff Cheryl Swope originally filed this action on May 9, 2012 in the Eastern District of Missouri against Credit Management. [Doc. # 1.] Plaintiff Jenny Brown joined the litigation on November 21, 2012. [Doc. # 45.] On February 3, 2013, Brown (hereinafter "Plaintiff") moved to sever her claims from Cheryl Swope and transfer them

to the Central District of California.  [Doc. # 69.] Plaintiff's case was transferred to this Court on February 27, 2013.   [Doc. # 80.] DirecTV was added as a defendant in Plaintiff's fourth amended complaint ("Fourth Am. Compl.") on October 1, 2013.  [Doc. # 122.]  Plaintiff stipulated to dismiss her claims against Credit Management and other debt collectors on December 31, 2013 keeping DirecTV (hereinafter "Defendant") as the sole defendant in this action.  [Doc. # 142.]  This Court stayed this action on December 12, 2014 pending resolution of the petitions pending in *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018).  [Doc. # 198.]  On March 27, 2018, subsequent to the ruling in *ACA Int'l,* the stay was lifted.  [Doc. # 216.]  Plaintiff filed her motion for class certification on May 25, 2018.  Mot. [Doc. ## 222-223, 225-227.]  The pending class certification motion has since been fully briefed and is ready for decision.  [Doc. ## 256, 258, 265- 266, 268-274.]

## II.

## FACTUAL BACKGROUND

### A.   The Parties

Plaintiff is an individual who, at all pertinent times, resided in the St. Louis, Missouri area.  Fourth Am. Compl. ¶ 9.  In 2011, Plaintiff received automated telephone calls on her cellular phone from the debt collector, CMI, calling on Defendant's behalf. *Id.* ¶¶ 46-47.  Plaintiff has no relationship with Defendant and there is no contract between Plaintiff and Defendant, for arbitration or otherwise.  *Id.* ¶¶ 49-50.

Defendant is "a leading provider of digital television entertainment throughout the United States" that acquires, promotes, sells, and distributes digital entertainment programming primarily via satellite to millions of residential and commercial customers. *See* Fourth Am. Compl. ¶ 10 [Doc. # 122]; Answer ¶ 10 [Doc. # 154].  During the proposed class period, after Defendant disconnected a customer's service for non-payment, Defendant would refer that account to one of 20 collection agencies (also known as third-party vendors) if the unpaid balance exceeded a certain amount.  *See* Husman Decl. ¶¶ 3–9 [Doc. # 256-1].  These third-party vendors would then make debt

collection calls to these customers and attempt to collect the customer's debt on Defendant's behalf. Fourth Am. Compl. ¶ 34.

**B.    Defendant's Customer Information Databases**

Defendant provided third-party debt collectors with certain customer contact information and the amounts owed through a computerized system called the Receivables Management System ("RMS"). *See* Husman Decl. ¶ 12. The customer contact information included in the RMS comes from Defendant's primary Subscriber Transaction Management System ("STMS"), which takes a snapshot of certain customer information, including telephone numbers, at the time a customer's account is written off (but before placement with a debt collector). Husman Decl. ¶ 13. The STMS-sourced information is maintained in a fixed field within the RMS and is designated as both having been customer-provided and the most recent contact information for that customer at the time the customer's account is written off. *Id.* ¶ 14-15. Phone numbers in the STMS are overwritten (and not archived) whenever a customer updates his or her number. *Id.* ¶ 16. The RMS does not contain a field that reflects the telephone number provided by a customer on an application or upon activation. *Id.* If a customer's initial equipment order was placed directly with Defendant, then the phone number the customer initially provided on an application or upon activation can be searched in a separate database, the Order Management System ("OMS"). Martin Decl. ¶ 21 [Doc. #256-2]. The OMS contains information regarding all equipment orders and upgrades during the customer's tenure. *Id.* ¶ 21. Besides using the telephone numbers in the RMS, collection agencies can independently obtain different numbers via skip-tracing[1] to contact a delinquent customer and some collection agencies may have used prerecorded calls as a means of contacting those customers. Husman Decl. ¶ 17, 19.

---

[1] Skip-tracing is "the process of developing new telephone, address, job or asset information on a customer, or verifying the accuracy of such information." *Meyer v. Portfolio Recovery Assoc., LLC*, 707 F.3d 1036, 1040, n.1 (9th Cir. 2012).

**C.      Plaintiff's Allegations and the Proposed Class and Subclass**

Plaintiff alleges that Defendant violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, and the Federal Communications Commission ("FCC") rules promulgated under 47 C.F.R. § 64.1200 numerous times and in some cases knowingly and/or willfully.  Fourth Am. Compl. ¶¶ 67, 73.

Plaintiff asserts that debt collectors made debt collection calls on Defendant's behalf using an "artificial or prerecorded voice" to cellular telephones of consumers, who had not, during the transaction that resulted in the debt, previously given the debt collector express consent to receive such calls.  Fourth Am. Compl. ¶ 33.  Plaintiff maintains that she, along with Class and Subclass members, were harmed by Defendant's acts because many of them were charged money for the cell phone minutes taken up by Defendant's calls, had their privacy invaded, and were inconvenienced by these calls.  *Id.* ¶ 59.

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff moves to certify a **Nationwide Class** ("Class") of:

> All persons residing within the United States who, on or after four years prior to the filing of this action, received a non-emergency telephone call(s) from DIRECTV and/or its third-party debt collectors regarding a debt allegedly owed to DIRECTV, to a cellular telephone through the use of an artificial or prerecorded voice and who did not provide the cellular phone number called on any initial application for DIRECTV service.

Mot. at 8–9.  Plaintiff also seeks certification of a **Nationwide Subclass** ("Subclass") of such persons in her proposed class who are not DIRECTV customers.  Mot. at 9.  The proposed class period is May 9, 2008 to the present.

# III.

## LEGAL STANDARD FOR MOTION FOR CLASS CERTIFICATION

**A.    Substantive Requirements of Rule 23**

A district court has broad discretion in making a class certification determination under Rule 23.  *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979) (district courts "have broad power and discretion vested in them by Fed. Rule Civ. Proc. 23").   Nonetheless, a court must exercise its discretion "within the framework of Rule 23." *Navellier*, 262 F.3d at 941.

The following prerequisites must be met before a court may certify a class under Rule 23:

> (1)    the class is so numerous that joinder of all members is impracticable;
>
> (2)    there are questions of law or fact common to the class;
>
> (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).   These prerequisites "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).

If the Rule 23(a) requirements are satisfied, a class action may be maintained pursuant to Rule 23(b)(3) if (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  In order to meet

the superiority requirement, a class action must be superior to any other methods of resolving the case. Fed. R. Civ. P. 23(b)(3).

**B.     Burden and Standard of Proof**

"The party seeking class certification bears the burden of establishing that the proposed class meets the requirements of Rule 23." *Edwards*, 798 F.3d 1172 at 1177; *see also Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 321 (C.D. Cal. 2015) ("More than a pleading standard, Rule 23 requires the party seeking class certification to affirmatively demonstrate compliance with the rule[.]") (internal quotation marks and alterations omitted). Certification is properly granted only after "a rigorous analysis [determining] that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 564 U.S. at 350–51.

Neither the Supreme Court nor the Ninth Circuit has definitively set forth a specific standard of proof for Rule 23 determinations. *See Dukes*, 564 U.S. at 350–51 (setting forth a "rigorous analysis" requirement without discussing a specific standard of proof); *Edwards*, 798 F.3d at 1178 (Rule 23 determinations "will inevitably touch upon the merits of plaintiffs' underlying . . . claims" but cautioning that a class certification should not become a "mini-trial on the merits") (internal quotation marks omitted). Rather, the Ninth Circuit has stated that, "[w]hile some evaluation of the merits frequently 'cannot be helped' in evaluating [certifiability], that likelihood of overlap with the merits is 'no license to engage in free-ranging merits inquiries at the certification stage.'" *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)). "[M]erits questions may be considered to the extent—*but only to the extent*—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (quoting *Amgen*, 568 U.S. at 466) (emphasis in original).

IV.

DISCUSSION

**A.    Numerosity**

Defendant does not dispute that the Class and Subclass meets the numerosity requirement.  Plaintiff has met her burden of establishing numerosity for the putative Class and Subclass.  Mot. at 10 (citing Husman Decl. Ex. D ¶ 16 [Doc. # 177-4] (Defendant contracted with 20 debt collection companies and placed 7,074,322 accounts into third party collections from October 1, 2009 to September 30, 2014).

**B.    Commonality**

The commonality requirement is satisfied if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  In determining that a common question of law exists, it is insufficient to find that all putative class members have suffered a violation of the same provision of law.  *See id.* at 350.  Rather, the putative class members' claims "must depend upon a common contention" that is "of such nature that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *See id.*

The TCPA prohibits a non-emergency call to a cellular phone using an artificial or prerecorded voice, without prior express consent.  47 U.S.C. § 227(b)(1)(A).  In the context of debt collection calls, prior express consent is considered granted only if the consumer provided the creditor with the cellular number during the transaction that resulted in the debt being owed.  *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, ¶ 10 (2008) ("2008 FCC Order").  One way a consumer can provide prior express consent is by including the cellular phone

number on a credit application.  *Van Patten v. Vertical Fitness Grp., LLC*, 847 F. 3d 1037, 1045 (9th Cir. 2017).

Plaintiff claims that she received prerecorded non-emergency calls on her cellular phone from a debt collector, CMI, attempting to collect on an alleged debt on behalf of Defendant.  Fourth Am. Compl. ¶ 33.  Plaintiff did not have a business relationship with Defendant.  *Id.* ¶ 50.  Plaintiff's Class and Subclass seek to identify putative class members who also did not consent to be called at their cellular phone number, but who nevertheless received a prerecorded call from Defendant's debt collectors on their cellular phone to collect an alleged debt.  Mot. at 9.  Consequently, Plaintiff and the putative Class and Subclass members share the common contention that they all received similar prerecorded calls without their prior express consent.  Defendant does not contest Plaintiff's commonality argument.  Plaintiff has met her burden of establishing commonality of her putative Class and Subclass.

**C.    Typicality**

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class."  *Wolin*, 617 F.3d at 1175 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Id.* (quoting *Hanon*, 976 F.2d at 508).

The typicality standard under Rule 23(a)(3) is "permissive": "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical."  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *see also Wolin*, 617 F.3d at 1175 ("Typicality can be satisfied despite different factual circumstances surrounding the manifestation of the defect.").  The existence of unique

defenses that "threaten to become the focus of the litigation" can defeat a showing of typicality. *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).

Plaintiff's claims are typical of the class because they arise from the same course of conduct and she suffered the same injury as the putative Class and Subclass members. In 2011, Plaintiff received several automated telephone calls on her cellular phone by one of Defendant's debt collectors. Mot at 12. These calls occurred during the class period. Brown Decl. ¶ 9. [Doc. # 226.] Plaintiff did not give Defendant prior express consent to receive calls on her cellular phone. Mot. at 12. Plaintiff's Class and Subclass is defined to include individuals who suffered the same injury as Plaintiff as a result of Defendant's debt collectors' conduct. Defendant does not dispute Plaintiff's typicality argument. Plaintiff has met her burden of establishing typicality of her putative Class and Subclass.

**D.     Adequacy of Representation**

Defendant does not challenge Plaintiff's ability to adequately represent the putative Class or Subclass or the qualifications of Plaintiff's counsel to serve as Class Counsel. As a result, the Court concludes that Plaintiff and her counsel satisfy the adequacy of class representation requirement.

**E.     Rule 23(b)(3)**

**1.     The Predominance Prong**

There is substantial overlap between the Rule 23(a)(2) commonality test and the Rule 23(b)(3) predominance tests, but "the [Rule] 23(b)(3) test is 'far more demanding.'" *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24). "[T]he common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal quotation marks, brackets, and alteration omitted). The "focus is on the relationship between the common and individual issues." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009) (internal quotation marks omitted).

### a.     Whether Plaintiff's Putative Class is Fail-safe

Defendant argues Plaintiff's class definition is a fail-safe class because it "tracks the elements of a claim for violation of 47 U.S.C. § 227(B)(1)(a)(iii)."  Opp'n at 6.  [Doc. # 256.]  A fail-safe class is "one that is defined so narrowly as to 'preclude[ ] membership unless the liability of the defendant is established.'"  *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1142, n.7 (9th Cir. 2016) (citing *Kamar v. RadioShack Corp.*, 375 Fed.App'x 734, 736 (9th Cir. 2010)).

Although the Ninth Circuit has not ruled directly on the appropriateness of fail-safe classes, it does not look favorably on precluding class certification under the fail-safe class theory.  *See Melgar v. CSK Auto, Inc.*, 681 F. App'x 605, 607 (9th Cir. 2017) ("We further note, though we do not hold, that our circuit's caselaw appears to disapprove of the premise that a class can be fail-safe.") (citing *Vizcaino v. United States District Court*, 173 F.3d 713, 721–22 (9th Cir. 1999); *see also Makaron v. Enagic USA, Inc.,* 324 F.R.D. 228, 235 (C.D. Cal. 2018) ("The Ninth Circuit has yet to opine on the propriety of failsafe classes.").

In any event, Plaintiff's Class is not fail-safe.  The scope and size of the class can be resolved "without a final determination on the merits."  *See* Reply at 6; *Heffelfinger v. Elec. Data Sys. Corp.*, Case No. CV 07–00101, 2008 WL 8128621, at *10, n. 57 (C.D. Cal. Jan. 7, 2008) (citing *Vizcaino v. U.S. Dist. Court for W. Dist. of Wash.*, 173 F.3d 713, 722 (9th Cir. 1999)).   The Class is defined using objective criteria including whether:  (1) putative Class and Subclass members received a debt collection call from Defendant and/or its debt collectors; (2) the call was to a cellular phone; (3) the call included a prerecorded voice; (4) the call was to a cellular phone number provided to Defendant on an initial service application; and (5) Subclass members were former DirecTV customers.  Reply at 6.  These determinations do not require a legal analysis. Instead, members can be identified using debt collectors' call logs and Defendant's OMS, RMS, STMS databases and versions of Defendant's Customer Agreements relevant to

each former or current customer to determine whether a customer consented to being called.

### b.    TCPA Violations

Defendant asserts Plaintiff has not satisfied Fed. R. Civ. P. Rule 23(b)(3)'s requirements because individualized issues predominate over common ones.  Opp'n at 2. "An issue is individual if members of a proposed class will need to present evidence that varies from member to member." *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (citing William B. Rubenstein, *Newberg on Class Actions* § 4:49 (5th ed. 2018)).  As the Court addresses below, individualized issues do not predominate.  Both Class and Subclass membership can be identified and the TCPA violations against putative class members can be resolved by applying common methodology to common evidence.

### i.    Whether Prerecorded Call Recipients Consented to Defendant's Calls

Defendant argues that individualized issues relating to consent predominate. Opp'n at 11.  Specifically, Defendant asserts that an individualized inquiry is required to determine:  (1) whether a cellular phone number was provided on an original service application, *id.* at 12; (2) whether a customer consented to calls on their cellular phones subsequent to opening or activating their account, *id.* at 15; (3) which version of the consent provision in the Customer Agreement a customer assented to, *id.* at 16–17; and (4) whether non-customers (i.e., former customers)[2] consented to receiving calls because the consent provision of its Customer Agreement ("Agreement") survives account termination. *Id.* at 18–19.

---

[2]  Plaintiff's proposed Subclass definition includes individuals "who are not DIRECTV customers."  Part II.C., *supra*.  As the definition is currently written, it can include both those who were never Defendant's customers and Defendant's former customers.  The Court will address this ambiguity below.

### 1.    Prior Express Consent for the Purposes of the TCPA

As an initial matter, parties dispute whether prior express consent to call a cellular number means that a customer had to provide that number on an initial service application or upon account activation. *Compare* Opp'n at 14–15 *with* Reply at 14–15. Defendant's arguments regarding consent presume that customers could consent to being called on their cellular phone subsequent to initial account activation. Opp'n at 14–15. Plaintiff maintains, however, that according to the Ninth Circuit's decision in *Van Patten*, consumers can consent to receiving calls on their cellular phone only if they provide their cellular number on the *initial* service application. Reply at 14–15; *see Van Patten v. Vertical Fitness Grp., LLC*, 847 F. 3d 1037, 1045 (9th Cir. 2017).

The Court agrees with Defendant. The *Van Patten* decision did not cabin prior express consent in the manner that Plaintiff suggests. Instead, the *Van Patten* court determined that simply providing a phone number to a creditor did not amount to consent to receiving calls or text messages at that number for any purpose. The *Van Patten* court's reference to the FCC's *example* of one way a consumer could provide a creditor prior express consent, "e.g. as a part of a credit application," was not an attempt to narrow consent to only that circumstance. *See Van Patten*, 847 F.3d at 1045 (quoting 2008 FCC Order, 23 F.C.C. Rcd. at 564).[3]

Nevertheless, the Court notes that if the putative Class is not limited to individuals who were called on their cellular phones and did not provide their number on their initial service application, the putative Class would be significantly larger and more difficult to

---

[3] In its October 2012 opinion, the Ninth Circuit in *Meyer* concluded, "consumers who provided their cellular telephone numbers to creditors after the time of the original transaction are not deemed to have consented to be contacted at those numbers for purposes of the TCPA." *Meyer v. Portfolio Recovery Assocs., LLC*, 696 F. 3d 943, 948 (9th Cir. 2012) (amended and superseded by *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 (9th Cir. 2012)). However, shortly thereafter, the court superseded its October 2012 opinion and replaced the sentence above to read: "[p]ursuant to the FCC ruling, prior express consent is consent to call a particular telephone number in connection with a particular debt that is given before the call in question is placed." Together, this indicates that for the purposes of the TCPA, the Ninth Circuit did not intend to narrow prior express consent to call a cellular phone to occur only if a customer provided that number on an initial transaction or application for service.

-12-

ascertain than Plaintiff intended.   Therefore, the Court will preserve, "who did not provide the cellular phone number called on any initial application for DIRECTV service" as a limitation in Plaintiff's proposed class definition.

## 2.   Consent of Putative Class and Subclass Members

The Court agrees with Defendant that different versions of its Agreement will likely apply to different putative Class or Subclass members.   The Court disagrees, however, that determining putative member's consent would require an individualized inquiry.   To address Defendant's individualized inquiry argument, the Court must first discuss two provisions in Defendant's Agreement, i.e., the Changes in Contract Terms and the Customer Information provisions.

First, the Changes in Contract Terms provision of Agreement states that to continue receiving Defendant's service, the customer must accept the terms of Defendant's most recent version of its Agreement. Relevant portions of the provision are below.

Between April 24, 2007 and June 29, 2016 the section read:

> We reserve the right to change the terms and conditions on which we offer Service. If we make any such changes, we will send you a copy of your new Customer Agreement containing its effective date . . . . If you elect not to cancel your Service after receiving a new Customer Agreement, your continued receipt of Service constitutes acceptance of the changed terms and conditions. If you notify us that you do not accept such terms and conditions, then we may cancel your Service as provided in Section 5, as we cannot offer Service to different customers on different terms, among other reasons.

Martin Decl. Exs. E–L at § 4. [Doc. ## 256-7 to 256-14.]

Starting on June 30, 2016, the first sentence of the section was amended to read, "We reserve the right to change the terms and conditions on which we offer Service including adding new terms or deleting existing ones.  If we make any such changes, we

will send you a copy of your new Customer Agreement containing its effective date." *Id.* Exs. M–O at § 4.  [Doc. # 256-15 to 256-17.]

According to both versions of the Changes in Contract Terms provision, the Agreement that is effective for a particular customer is the most recent version to which the customer consented prior to account closure.  Defendant knows the date of account closure because Defendant closed the account.  Defendant must also have a record of which Agreement version is operative for a customer because Defendant would need such a record, among other reasons, to determine whether to cancel a customer's service due to a refusal to accept the new terms of service.

Second is the Customer Information provision, of which relevant portions are discussed below.  Between April 24, 2007 and April 23, 2011, this provision was silent regarding whether a customer consented to calls on their cellular phone.  *Id.* Exs. E–G at § 3(b).

From April 24, 2011 and June 23, 2013, the provision regarding customers' consent to being called on their cellular phone read, "If you provide a cellular telephone number, you acknowledge and consent that we may call you on your cellular phone for business purposes, including collections calls." *Id.* Exs. H and I at § 3(b).

Between June 24, 2013 and February 28, 2018, the section was amended to read:

> With regard to all telephone numbers, including cellular numbers, you or an Authorized User choose to provide on your account, you and/or such Authorized User acknowledge and consent to receive business and informational calls relating to your Service to such numbers, including collections calls.  You agree such calls may be prerecorded messages or placed with an automatic telephone dialing system.

*Id.* Exs. J–N, § 3(b).

After March 1, 2018, the section provided:

> With regard to all telephone numbers, including cellular numbers, you or an Authorized User choose to provide on your account, you and/or such Authorized User expressly consent and agree to receive business and informational calls relating to your Service to such numbers, including collections calls.  You agree such calls may be prerecorded messages or placed with an automatic telephone dialing system.  In addition, you agree that we may send non-marketing service or account related text messages to cellular phone numbers provided on your account . . . . You agree that DIRECTV, and its affiliates, agents and service providers may contact you at any email address or any telephone number you provide, now or in the future, or that we otherwise identify as your number, including a number for a cellular phone or other wireless device or service, regardless of whether you incur charges as a result.

*Id.* Ex. O, § 3(b).

Customers did not expressly consent to receiving prerecorded calls on their cellular phone when they accepted Defendant's terms of service that were effective between April 24, 2007 and April 23, 2011.  Customers who accepted Defendants terms of service that were effective February April 24, 2011 onward, however, did consent to such calls on their cellular phone if the customer or authorized user provided Defendant with that phone number.[4]

---

[4] Even if, as Defendant notes, a customer consented to receiving calls under different circumstances than consenting to Defendant's most recent terms of service, Defendant is required to keep records in the usual course of business showing such consent. *See both* Opp'n at 15 and 2008 FCC Order at 565.

Whether a putative Class or Subclass member consented to calls based on the operative version of the Agreement can be determined by looking through Defendant's record of that customer's account to determine the last version of the Agreement the customer accepted.  This analysis does not vary from individual to individual.  Neither does the inquiry differ across individuals to determine whether the cellular number called was provided on an initial service application.   If a customer applied directly to Defendant to receive its services, Defendant concedes the phone number provided is stored in Defendant's OMS database.  Martin Decl. ¶ 21.  Therefore, a phone number search in the OMS can be done to determine whether a customer provided the cellular number during account activation.[5]

### ii. Impact of Defendant's Dispute Resolution Provision on Class Certification

#### 1. Defendant's Dispute Resolution Provision

Defendant's Dispute Resolution provision in its Agreement changed over time. Prior to its merger with AT&T in 2016, it read, in relevant part:

> [A]ny Claim either of us asserts will be resolved only by binding arbitration . . . .   Neither you nor we shall be entitled to join or consolidate claims in arbitration by or against other individuals or entities, or arbitrate any claim as a representative member of a class or in a private attorney general capacity.

Martin Decl. Exs. E–L, § 9.

Post-merger, starting on June 30, 2016, the section was entitled Dispute Resolution by Binding Arbitration and amended to read, in relevant part:

---

[5] Defendant states that, if a customer opened an account through a third-party vendor, the phone number a customer provided upon account activation would not be included in the OMS.  *See* Martin Decl. ¶ 21.  These individuals will likely be excluded from the Class because, according to the Court's understanding of Defendant's databases, there is no other database that would, with certainty, store the number that was provided during account activation.

(1) DIRECTV and you agree to arbitrate **all disputes and claims** between us.  This agreement to arbitrate is intended to be broadly interpreted.  It includes, but is not limited to:  [1] claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; [2] claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); [3] claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and [4] claims that may arise after the termination of this Agreement.

*Id.* Ex. M, § 9.2; Exs. N and O, § 8.2 (emphasis original).

### 2.     The Parties Dispute the Dispute Resolution Provision

Defendant argues that, according to both the pre-and post-merger Dispute Resolution provision, customers (current and former) agreed to arbitrate individually any disputes against Defendant, which is enough to defeat class certification.  Opp'n at 8–9.

Plaintiff argues that Defendant waived its right to compel arbitration because it did not do so in its first responsive pleading and Defendant has taken advantage of procedures only available in court.   Mot. at 12; Reply at 18; Suppl. Br. at 7.  Alternatively, Plaintiff asserts that Defendant's pre-merger Dispute Resolution provision does not prohibit absent class members from participating in a class action.  Reply at 23.  Specifically, Plaintiff argues that the phrase, "any Claim either one of us asserts" only precludes a named plaintiff from litigating in federal court.[6]  *Id.*  Plaintiff maintains that the phrase, "join[ing] or consolidating claims in arbitration" does not prohibit

---

[6] Defendant counters that if the Class is certified, the absent members will become parties to the case and Defendant will then enforce its right to compel arbitration.  Resp. to Suppl. Br. at 9.  Further, Defendant asserts that a class action is only an aggregation of individual claims and does not alter parties' legal rights and duties.  *Id; see also* Def. Suppl. Authority at 2 [Doc. # 271].  The Court will not address whether absent parties "assert" a claim once they become a part of the Class because that would be premature at the class certification stage.  *See Amgen*, 568 U.S. at 466.

-17-

Defendant's customers from joining claims outside of arbitration.[7]   Plaintiff does not contend that the post-merger version suffers from the same limitations as the pre-merger version. *See* Suppl. Br. at 4 and Reply at 23. The Court notes, however, that the post-merger provision purports to sweep within its purview "claims that arose before this or any prior Agreement," such that there may not be much of a distinction between the two versions as a matter of practical effect, except for those class members who never became subject to the post-merger version at all.

Defendant does not appear to have waived its right to compel arbitration. Plaintiff was not subject to an arbitration defense as she was a non-customer. Moreover, the parties jointly stipulated that Plaintiff would not oppose Defendant's motion to compel arbitration, should it file one, based on Fed. R. Civ. P. 15 grounds. *See* August 3, 2018 Order [Doc. # 263].

At the class certification stage, merits questions are considered to the extent required to determine whether a proposed class meets the Rule 23 prerequisites. *Amgen*, 568 U.S. at 466. The Court's consideration of the arbitration and class waiver clauses pertains to whether those clauses are defenses that create individualized issues sufficient to defeat the predominance requirement. *See id.* at 465. Because the enforceability of the pre-merger and post-merger Agreements is a common issue as to all putative Class members who were or are Defendant's customers, the determination of their enforceability does not preclude class certification. *See id.* at 470. Because the enforceability of the arbitration provisions may be case dispositive and have not been the subject of full briefing based upon a motion to compel arbitration, the Court will establish

---

[7] Plaintiff cites *Bickerstaff* to support her argument that a named plaintiff not subject to an arbitration clause can represent absent class members who are subject to an arbitration clause. Reply at 22 and 23 (citing *Bickerstaff v. Suntrust Bank*, 788 S.E.2d 787, 791 (Ga. 2016). Plaintiff later withdrew its argument based on *Bickerstaff* because the Ninth Circuit in *O'Connor* concluded the decision in *Bickerstaff* was unpersuasive, in part, because it relied on Georgia state law and did not refer to the Federal Arbitration Act. Pl. Suppl. Authority at 1 [Doc. # 269.]; *see also O'Connor v. Uber Tech., Inc.*, 904 F.3d 1087, 1093 (9th Cir. 2018).

a briefing schedule that permits the parties to expeditiously litigate the arbitration defense, before the expenditure of further litigation resources.

### iii. Plaintiff's Proposed Method for Identifying Class and Subclass Members[8]

Defendant asserts there are several issues regarding Plaintiff's methodology for identifying Class and Subclass members. Opp'n at 13–14, 17–18, 20. First, Defendant maintains that to determine whether a phone number called by a debt collector was a number a customer provided on an initial service application is an individualized inquiry. *Id.* at 13. Defendant asserts this is because Defendant would have to cross-reference each debt collector's call logs and match each number called to a DirecTV account and then determine if that number is in the OMS. *Id.* at 13. Defendant also argues an individualized inquiry across all 20 debt collector call logs would be required to determine whether a call placed was prerecorded. *Id.* at 20.

Second, Defendant contends Plaintiff's suggestion to identify Class members by cross-referencing call logs to Defendant's RMS is flawed, because, among other things, its RMS database does not necessarily include the number provided at account activation. *Id.* at 13. Furthermore, the use of Plaintiff's procedure would have excluded her, a non-customer, from the Class. *Id.* at 13–14. Specifically, Defendant searched Plaintiff's cell phone number in its STMS. Martin Decl. ¶ 3; *see* Brown Decl. ¶ 8–9. Plaintiff's phone number did not appear after searching the STMS but her number was located in an OMS search. Martin Decl. ¶ 4–5. According to Defendant, this means that the phone number provided on an initial DirecTV account application that eventually became Plaintiff's phone number must have been overwritten in its STMS at some point when the account

---

[8] Defendant and Plaintiff both offer supplemental legal authority to support their respective positions regarding the veracity of using wrong number disposition codes to generate a class. *See* Def. 2nd Suppl. Authority, Ex. [Doc. ## 272, 272-1.] and Pl. Suppl. Authority, Ex. A [Doc. ## 273, 273-1.]. Both cases are unpublished district court cases. Neither case is binding on this Court. Neither case impacts the Court's position regarding using the wrong number codes to identify potential Class or Subclass members in the instant case.

was active.  Martin Decl. ¶ 3.  Defendant concludes that the appearance of Plaintiff's phone number in Defendant's OMS would have been interpreted as her consent to being called, thus resulting in her exclusion from the Class.  Opp'n at 13–14.

Third, Defendant maintains Plaintiff's proposed strategy of identifying Subclass members by "wrong number" disposition codes on debt collectors' call logs is ineffective because: (1) customers will falsely tell debt collectors they have reached a wrong number to avoid the debt collection call, *id.* at 18; (2) Plaintiff has not offered proof that all of the debt collectors use the same disposition code, *id.* at 17; and (3) the "wrong number" notations are rank hearsay, are not a business records exception under the Federal Rule of Evidence Rule 803(6), and therefore are inadmissible.  *Id.* at 18. Defendant further maintains that the admissibility of evidence is material to the predominance inquiry.  Def. Suppl. Authority at 2.

The Court concludes that the identification of Class and Subclass members does not require an individualized inquiry.  Plaintiff offered CMI's call logs, in which prerecorded calls CMI allegedly made to Plaintiff's cellular phone were highlighted. Hutchinson Decl. ¶ 61 and Ex. D [Doc. # 247-3].  Calls with a non-zero call duration likely indicate that the call was accepted, thus suggesting a prerecorded message was left. *See* Hutchinson Decl. Ex. D at 247.  There is nothing to indicate that the content in a call log would substantially deviate across debt collectors.  Additionally, there is evidence that Defendant requires all its debt collectors to label a phone number gathered through independent means using the same nomenclature when updating the RMS.  Specifically, Defendant's Vendor Guide ("Guide") includes customer contact information record-keeping instructions for debt collectors.  *See* Hutchinson Decl. Ex. C [Doc. # 247-2].   In Defendant's Guide is an "Agency Download Detail Comment Record Format" table, which lists certain codes that are assigned to particular information that a debt collector retrieves.  *Id.* at 194–195.  In the RMS, a debt collector assigns the appropriate comment code to a phone number it retrieved and that information is shared with Defendant.  *Id.* at 172–173, 194.  According to the Guide, the codes define, among several things, whether

a phone number a debt collector called was retrieved via skip-tracing ("Skip Tracing"), whether that skip-traced number is a phone number of a customer whom the debt collector is attempting to contact ("Good Phone"), or if the number called was a "Bad Phone" because it was a "[d]isconnected phone number or other." *Id.* at 195. To begin identifying putative Class members, cellular phone numbers from debt collector call logs can be compared against phone numbers in the RMS encoded with the relevant comment code.[9] Phone number matches can then be cross-referenced against Defendant's STMS and OMS to determine the operative Agreement and consent for that customer. Therefore, the same steps using the same databases would be used to determine each putative Class member.

Subclass member identification will also use common evidence and methods. Even though Plaintiff only offered evidence to show CMI uses the "wrong number" disposition code in their call logs, Defendant's Guide indicates it requires all its debt collectors provide that same type of documentation. *See* Opp'n at 17 and Hutchinson Decl., Ex. C at 195. Therefore, it appears likely that all debt collectors have a similar coding scheme to record wrong numbers, as instructed by Defendant. Defendant's databases can also be used to determine whether a phone number with a "wrong number" notation is a result from a customer falsely telling a debt collector it called a wrong number. Together, each Class and Subclass member will be identified using a common procedure that utilizes Defendant's databases and debt collectors' call logs.[10]

Contrary to Defendant's assertion that Plaintiff's proposed plan would have omitted her as a putative Class member, Plaintiff's proposed method for identifying putative members could have identified her as a Subclass member. If Plaintiff's phone

---

[9] The "Bad Phone" comment code may indicate a phone number that belongs to a non-customer, and therefore may be useful for identifying Subclass members.

[10] At the class certification stage, a plaintiff is not required to satisfy a stand-alone "administrative feasibility" prerequisite separate from assessing manageability under the superiority inquiry. *Briseno v. ConAgra Foods, Inc.*, 844 F. 3d 1121, 1133 (9th Cir. 2017).

number was not in the RMS/STMS as Defendant asserts, then CMI did not receive her number from Defendant, which suggests CMI retrieved it through skip-tracing.

At this preliminary stage, the Court need not rule on whether the "wrong number" notations are admissible evidence in order to consider that evidence for the purpose of class certification. The Ninth Circuit recently concluded that a district court is not constrained "to consider[] only admissible evidence in evaluating whether Rule 23's requirements are met." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1005 (9th Cir. 2018) (citing *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 612–13 (8th Cir. 2011)). "As class certification decisions are generally made before the close of merits discovery, the court's analysis is necessarily prospective and subject to change, and there is bound to be some evidentiary uncertainty."[11] *Sali*, 909 F. 3d at 1005. Additionally, at least according to CMI's training materials in the current record, agents were instructed to note "wrong numbers" with a specific code, contrary to Defendant's assertion that these notations were not made during the regular course of business. Hutchinson Decl. Ex. G at 322 [Doc. # 247-6], Ex. G [sic] at 398 [Doc. # 247-7], Ex. H at 422 [Doc. # 247-8], and Ex. I at 423. [Doc. # 247-9.]

### c. Defendant's Vicarious Liability

Defendant acknowledges that, under the TCPA, a creditor can be liable for an entity that makes autodialed or prerecorded debt collection calls to a cellular phone number without prior express consent. Opp'n at 20; *see* 2008 FCC Order at 565. Nevertheless, Defendant argues that the debt collectors are independent contractors and determining Defendant's vicarious liability is an individualized inquiry into whether each debt collector was acting within the scope of their employment agreement with Defendant. Opp'n at 20–21.

---

[11] The Court acknowledges Defendant's reliance on *In re Asacol Antitrust Lit.*, --- F.3d ----, Case No. 18–1065, 2018 WL 4958856 (1st Cir. 2018), for its assertion that admissibility of evidence is relevant to the predominance inquiry. *See* Def. Suppl. Authority at 2. Nonetheless, the Court is bound by Ninth Circuit, not First Circuit, authority, and the *Sali* court directly addresses the issue of potentially inadmissible evidence at the class certification stage.

Determining Defendant's vicarious liability for debt collectors' prerecorded calls without prior express consent does not require an individualized analysis.  Plaintiff does not argue that Defendant is liable for only some of its debt collectors' calling practices directed to Plaintiff's putative Class and Subclass.   Instead, Plaintiff asserts that Defendant is similarly liable for all of its debt collectors' calling practices because it entered into uniform agreements with these debt collectors.  Reply at 12.

Defendant does not contest that it enters into standard collection services contracts with its debt collectors.   Defendant's "Valid Address and Phone Treatment Plan" included in its Collection Services Agreement with CMI evidences that Defendant involves itself in a debt collector's collection methods, including when a collector should skip-trace to find a customer's current phone number and address.   [Doc. # 270-1.] Determination of vicarious liability would be determined through analysis of these contracts, which is similar evidence across each debt collector.  *See Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228, 234 (C.D. Cal. March 13, 2018) (holding that defendant's liability for the calling practices of its distributors was a common question because plaintiff contended defendant was liable for all of its distributors' actions, not just the actions of some of them).

### 2.    The Superiority Prong

The "superiority" prong requires the Court to consider:  (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)–(D).

Defendant argues that a class action is not superior because individualized issues regarding consent and arbitration render the class action unmanageable.  Opp'n at 22. Defendants asserts that if the case proceeds as a class action, then pursuant to 47 U.S.C. § 338(i)(4)(B)(ii) ("STELA"), it must give all putative Class members notice, for which

Defendant would incur a substantial cost and burden.  *Id.* at 23.  Defendant also contends that the $500 TCPA statutory remedy, with the possibility of treble damages provides putative Class members an adequate remedy superior to a class action.  *Id.* at 23–24. Defendant points out that the Northern District of Illinois has more than 60 individual TCPA claims as of 2018 to illustrate that courts are inundated with individual claims. Opp'n at 24 (citing Steinmetz Decl. Ex. A [Doc. # 256-19.]

The Court finds that a class action is superior in this case.  First, as discussed above, the Court is unpersuaded by Defendant's individualized inquiry arguments. Second, the Court recognizes that depending on the number of putative Class members, sending STELA notices to all of them could become burdensome and costly.  Before class notices are sent out, however, the Court intends to have the parties litigate the issue of whether the class members are subject to the arbitration defense.    Therefore, it would be premature to conclude that the STELA notice requirement would be required, let alone unduly burdensome.  Third, the amount available in statutory damages suggests the cost of individual litigation likely outweighs the amount in damages a party would receive individually.  Fourth, without knowing the proper context, Defendant's statement that the Northern District of Illinois has a plethora of individual TCPA cases actually implies that a class action would be superior because it would be more efficient and reduce the burden of many individual TCPA lawsuits on the district courts.

## V.

## CONCLUSION

In light of the foregoing, the Court revises the Class and Subclass definition based on the parties' briefing, the September 21, 2018 hearing, and the Court's analysis here. Plaintiff's Motion for Class Certification is **GRANTED** as follows:

1.  The Court certifies the following Nationwide Class:

All persons residing within the United States who, within four years prior to and after the filing of this action, received a non-emergency telephone call(s) from DIRECTV and/or its third-party debt collectors regarding a debt allegedly owed to DIRECTV, to a cellular phone through the use of an artificial or prerecorded voice and who did not provide the cellular phone number called on an initial application for DIRECTV service.

2.  The Court certifies the following Nationwide Subclass:

All persons residing within the United States who, within four years prior to and after the filing of this action, received a non-emergency telephone call(s) from DIRECTV and/or its third-party debt collectors regarding a debt allegedly owed to DIRECTV, to a cellular phone through the use of an artificial or prerecorded voice and who were never DIRECTV customers.

3.  The Court certifies Jenny Brown as Class Representative and Lieff Cabraser Heinmann & Bernstein, LLP, Meyer Wilson Co., LPA, and Burke Law Offices, LLC as class counsel.

4.  In light of this ruling, the Court need not address Plaintiff's alternative argument to set aside Magistrate Judge Eick's discovery ruling.

5.  If Defendant intends to file a motion to compel arbitration as to class members' claims, it shall do so by no later than April 12, 2019.  Plaintiff's opposition shall be filed by April 26, 2019.  The reply shall be filed by May 3, 2019.  The hearing on any such motion shall be on May 24, 2019 at 10:00 a.m.

**IT IS SO ORDERED.**

DATED:     March 29, 2019

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE