1   John Nadolenco (SBN 181128)
    jnadolenco@mayerbrown.com
2   MAYER BROWN LLP
    350 S. Grand Ave. 25th Floor
3   Los Angeles, CA 90071
    Tel: (213) 229-9500
4
5   Hans J. Germann (admitted *pro hac vice*)
    hgermann@mayerbrown.com
6   Kyle J. Steinmetz (admitted *pro hac vice*)
    ksteinmetz@mayerbrown.com
7
8   MAYER BROWN LLP
    71 S. Wacker Drive
9   Chicago, IL 60606
    Telephone: 312-701-8547
10  Facsimile: 312-706-9178

11  *Attorneys for Defendant*
    *DIRECTV, LLC*

12

13              UNITED STATES DISTRICT COURT

14             CENTRAL DISTRICT OF CALIFORNIA

15                    WESTERN DIVISION

16

17  JENNY BROWN and CARMEN          Case No. 2:13-cv-01170-DMG-E
    MONTIJO, on behalf of herself
18  and all others similarly         **DIRECTV's MEMORANDUM IN
    situated,                        SUPPORT OF ITS MOTION TO
19                                   DECERTIFY THE CLASS**
                Plaintiffs,
20
                                     Hearing
21  v.
                                     Date: November 5, 2021
22  DIRECTV, LLC,                    Time: 4:00 p.m.
                                     Place: Courtroom 8C
23              Defendant.
                                     Hon. Dolly M. Gee
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................... 1

II. STANDARD OF REVIEW ............................................................ 2

III. ARGUMENT ............................................................................... 3

A. Individual inquiries are required because "wrong number" codes do not reliably show a call was made to a non-customer ............................................................................... 3

    1. Testimony from the collection agencies confirms "wrong number" codes do not show the agency called a non-customer ................................................... 3

    2. The agencies' call data and expert testimony confirm the inherent unreliability of "wrong number" codes ........................................................ 7

    3. The "wrong number" notations are inadmissible hearsay ........................................................................ 10

    4. Other courts have rejected similar attempts to certify classes based on "wrong number" codes .......... 12

B. Individual inquiries are needed to determine whether the user of a particular telephone number was not a DIRECTV customer ............................................................ 15

C. In light of this evidence, the class should be decertified because individual issues would predominate, and resolving them would be unmanageable ............................... 19

IV. CONCLUSION .......................................................................... 22

1

2

3

4

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

5

6

**Cases**

7

8

9

*ADT Sec. Servs. v. Sec. One Int'l, Inc.*,
    No. 11-CV-5149 YGR, 2013 WL 4766401 (N.D. Cal. Sept.
    5, 2013).................................................................................... 11

10

11

*Ashland Hosp. Corp. v. Serv. Emps. Int'l Union*,
    708 F.3d 737 (6th Cir. 2013)...................................................... 4

12

13

*Bridge v. Credit One Fin.*,
    294 F. Supp. 3d 1019 (D. Nev. 2018)...................................... 15

14

15

*Brown v. DIRECTV, LLC*,
    330 F.R.D. 260 (C.D. Cal. 2019) ...................................... 12, 16

16

17

*Castillo v. Bank of Am., NA*,
    980 F.3d 723 (9th Cir. 2020)................................................... 20

18

19

*Davis v. AT&T Corp.*,
    No. 15-cv-2342-DMS (DHB), 2017 WL 1155350 (S.D. Cal.
    Mar. 28, 2017)........................................................................ 13

20

21

*Eisen v. Carlisle and Jacquelin*,
    417 U.S. 156 (1974)................................................................ 22

22

23

24

*Gannon v. Network Tel. Servs. Inc.*,
    No. CV 12–9777–RGK, 2013 WL 2450199 (C.D. Cal. June
    5, 2013), *aff'd* 628 F. App'x 551 (9th Cir. 2016) ................ 21

25

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)................................................................. 2

26

27

*Gutierrez v. Barclays Group*, No. 10-cv-1012 DMS (BGS),
    2011 WL 579238 (S.D. Cal. Feb. 9, 2011) ........................... 19

28

*Marlo v. UPS Inc.*,
    639 F.3d 942 (9th Cir. 2011)................................................... 3

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Moore v. Apple Inc.,*
  309 F.R.D. 532 (N.D. Cal. 2015).........................................................20

*Morgan v. Adventist Health System / Sunbelt, Inc.,*
  No. 6:18-cv-1342-Orl-78DCI, 2020 WL 1674307 (M.D. Fla.
  Jan. 15, 2020)......................................................................................15

*Pierce v. County of Orange,*
  526 F.3d 1190 (9th Cir. 2008).............................................................22

*Racies v. Quincy Bioscience, LLC,*
  No. 15-cv-00292-HSG, 2020 WL 2113852 (N.D. Cal. May 4,
  2020).......................................................................................................2

*Revitch v. Citibank, NA,*
  No. C-17-06907 WHA, 2019 WL 1903247 (N.D. Cal. Apr.
  28, 2019)...............................................................................................13

*Rowden v. Pac. Parking Sys., Inc.,*
  282 F.R.D. 581 (C.D. Cal. 2012), *aff'd sub nom. Martin v.
  Pac. Parking Sys. Inc.,* 583 F. App'x 803 (9th Cir. 2014).............21, 22

*Sali v. Corona Reg'l Med. Ctr.,*
  909 F.3d 996 (9th Cir. 2018)...........................................................2, 12

*Shimozono v. May Dep't Stores Co.,*
  No. 00-04261 WJR, 2002 WL 34373490 (C.D. Cal. Nov. 20,
  2002).....................................................................................................11

*Sliwa v. Bright House Networks, LLC,*
  333 F.R.D. 255 (M.D. Fla. 2019)..................................................14, 15

*Tillman v. Ally Financial Inc.,*
  No. 2:16-cv-313-FtM-99CM, 2017 WL 7194275 (M.D.
  Fla. Sept. 29, 2017).......................................................................14, 15

*Tomeo v. CitiGroup, Inc.,*
  No. 13-C-4046, 2018 WL 4627386 (N.D. Ill. Sept. 27, 2018).............15

*Torres v. Mercer Canyons Inc.,*
  835 F.3d 1125 (9th Cir. 2016).............................................................20

1
2

# TABLE OF AUTHORITIES
(continued)

**Page**

3
4
5
*Trenz v. On-Line Adm'rs, Inc.*,
No. 2:15-cv-08356-JLS-KS, 2020 WL 5823565 (C.D. Cal.
Aug. 10, 2020) ................................................................ 2, 3

6
7
*Tyson Foods, Inc. v. Bouaphakeo*,
136 S.Ct. 1036 (2016)............................................................ 20

8
9
*U.S. v. Mitchell*,
49 F.3d 769 (D.C. Cir. 1995) ................................................ 11

10
*United States v. Patrick*,
959 F.2d 991 (D.C. Cir. 1992) .............................................. 11

11
12
*United Steel Workers v. ConocoPhillips Co.*,
593 F.3d 802 (9th Cir. 2010)................................................... 3

13
14
*Warnick v. DISH Network LLC*,
301 F.R.D. 551 (D. Colo. 2014) ........................................... 19

15
16
*Wilson v. Zapata Off–Shore Co.*,
939 F.2d 260 (5th Cir. 1991)................................................. 11

17
**Statutes**

18
19
47 U.S.C. § 227(b)(1) .............................................................. 4

20
47 U.S.C. § 227(b)(1)(A) ......................................................... 4

21
**Other Authorities**

22
23
2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 195–
196 (5th ed. 2012) ................................................................ 20

24
FED. R. CIV. P. 23(b)(3) ................................................. 19, 20, 22

25
FED. R. CIV. P. 23(c)(1)(C)....................................................... 2

26
27
FED. R. EVID. 803(6).............................................................. 11

28
FED. R. EVID. 805................................................................. 11

1

# TABLE OF AUTHORITIES
(continued)

**Page**

Rutter Group Prac. Guide Fed. Civ. Trials & Ev. Ch. 8G–E §
    8:2691 ................................................................................................ 11

# I.    INTRODUCTION

In 2019, before any significant discovery in the case occurred, the Court granted class certification based largely upon Plaintiffs' assurances that discovery would prove the case was amenable to class treatment. Discovery is now complete, and Plaintiffs' theory did not pan out. Instead, discovery confirmed that a central issue in the case— whether prerecorded calls placed by various collection agencies were made to DIRECTV customers or to non-customers—requires an individualized inquiry. As a result, the Court should decertify the class.[1]

In moving for class certification, Plaintiffs asserted that "DIRECTV non-customers can be determined objectively through DIRECTV's own records," because "DIRECTV's vendors maintain call records that require a 'wrong number' disposition code for each call that reaches a non-customer." ECF 223 at 10. Similarly, in their motion for partial summary judgment (ECF 364), Plaintiffs request judgment as to a list of allegedly cellular telephone numbers that the calling debt collection agency had coded as "wrong number."

But apart from the named Plaintiffs, they do not identify a <u>single</u> person who allegedly was not a DIRECTV customer yet received a prerecorded collection call on their cellphone. That is because Plaintiffs have no reliable way of showing that, absent an individualized inquiry. Rather, the evidence shows that Plaintiffs' fundamental assumption—

---

[1] Because of the Court's ruling on DIRECTV's arbitration motion, the class is currently defined as: "All persons residing within the United States who, within four years prior to and filing of this action, received a non-emergency telephone call(s) from DIRECTV and/or its third-party debt collectors regarding a debt alleged owed to DIRECTV, to a cellular phone through the use of an artificial or prerecorded voice, and who has not been a DIRECTV customer at any time since October 1, 2004." ECF 300.

1  that "wrong number" codes reliably and "objectively" show a non-

2  customer was called in error—is wrong. The evidence shows that those

3  codes do not reliably indicate that the collection agency called someone

4  other than a DIRECTV customer, or indeed called anyone at all (as

5  opposed to, for example, a disconnected number). And those codes are

6  inadmissible hearsay.

7        As a result, determining whether a particular call went to a non-

8  customer that had not consented to receive such calls requires an

9  individualized inquiry. Given the many thousands of telephone numbers

10  at issue, those individual inquiries would overwhelm the determination

11  of any common issues. Thus, the Court should decertify the class.

12                    **II.   STANDARD OF REVIEW**

13       A district court retains the power to decertify a class any time

14  "before final judgment." FED. R. CIV. P. 23(c)(1)(C); *Gen. Tel. Co. of Sw. v.*

15  *Falcon*, 457 U.S. 147, 160 (1982) ("[e]ven after a certification order is

16  entered, the judge remains free to modify it in the light of subsequent

17  developments in the litigation"). Further, "the manner and degree of

18  evidence required at the preliminary class certification stage is not the

19  same as at the successive stages of the litigation." *Racies v. Quincy*

20  *Bioscience, LLC*, No. 15-cv-00292-HSG, 2020 WL 2113852, at *2 (N.D.

21  Cal. May 4, 2020) (quoting *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996,

22  1006 (9th Cir. 2018)). In particular, a trial court should decertify a class

23  if, after discovery, additional evidence shows that the requirements for

24  class certification are not met. *See, e.g., Trenz v. On-Line Adm'rs, Inc.*,

25  No. 2:15-cv-08356-JLS-KS, 2020 WL 5823565, at *5-6 (C.D. Cal. Aug. 10,

26  2020) (decertifying a TCPA class after evidence showed need for

27  individualized inquiries on consent). Even on a motion for

28  decertification, the plaintiff retains the burden to show "that the

- 2 -

requirements of Rules 23(a) and (b) are met." *Marlo v. UPS Inc.*, 639
F.3d 942, 947 (9th Cir. 2011) (quoting *United Steel Workers v.
ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010)); *see also Trenz*,
2020 WL 5823565, at *5.

## III.   ARGUMENT

**A.   Individual inquiries are required because "wrong number" codes do not reliably show a call was made to a non-customer.**

In seeking class certification, Plaintiffs asserted that "wrong number" disposition codes would "objectively" show calls that reached a non-customer. ECF 223 at 10. *See also* ECF 258 at 7 (asserting that non-customers "can be readily identified through company records, which clearly identify non-customers with a 'wrong number' disposition code"). However, the evidence establishes that these codes cannot be relied upon to identify class members or to reliably prove, without additional, individualized inquiry, that DIRECTV or a collections agency in fact called someone other than a DIRECTV customer. Further, the wrong number response that triggered the notation in the records is inadmissible hearsay.

**1.   Testimony from the collection agencies confirms "wrong number" codes do not show the agency called a non-customer.**

Plaintiffs assert that "wrong number" codes associated with collections calls necessarily indicate a call went to someone other than the DIRECTV customer who was the intended recipient. From here, Plaintiffs extrapolate that any prerecorded calls to unintended recipients must have been made in violation of the TCPA. But the

evidence exposes multiple fallacies underpinning Plaintiffs' argument.

First, "wrong number" codes can indicate only that a call was not completed. For example, iQor's Senior Vice-President of Technology explains that while iQor uses a "wrong number" disposition code when performing collection work on DIRECTV debts, it "does not necessarily indicate that a call recipient informed our agent that they were not the actual DIRECTV account holder we were attempting to contact," but "can also cover a variety of other situations, including reaching a disconnected number or other technical failure that prevented a call from connecting to its intended recipient." Ex. 1 (6/7/21 Kolosovskiy Decl.) ¶¶ 5-6. Neither of these situations could result in a TCPA violation. The pertinent statutory provision refers to "mak[ing] any call . . . using . . . an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A). A disconnected number is not in service, and hence is not assigned to any cellular telephone service.[2]

Plaintiffs have made no attempt to identify "wrong number" calls that went to disconnected numbers or experienced some technical failure, as opposed to calls that were coded "wrong number" based on feedback from the call recipient.

Second, "wrong number" codes are unreliable. As iQor's representative explains, the code is "based on information provided by

_____

[2] In addition, an attempted call that is never connected (because for example the number has been disconnected) does not "us[e] . . . an artificial or prerecorded voice," nor is it even "mak[ing] any call," as required to establish liability under 47 U.S.C. § 227(b)(1). *See Ashland Hosp. Corp. v. Serv. Emps. Int'l Union*, 708 F.3d 737, 742 (6th Cir. 2013) ("the expression 'make any call' . . . require[s] some form of direct telephone communication between two parties"). And, of course, there is no wireless user with standing to pursue a claim in such circumstances.

the call recipient," but "[o]ur company does not conduct any independent investigation to verify the accuracy of the information provided by the recipient beyond accepting the information provided by the call recipient." Ex. 1 (6/7/21 Kolosovskiy Decl.) ¶ 4. In addition, "even if the call recipient informed a representative that they were not the account holder on the call, or otherwise indicated the same automatically, that information is not necessarily accurate." *Id.* ¶ 7. "It is well known in the collection industry that debtors or consumers will attempt to avoid talking to agencies collecting on debts that they owe, including by telling the agent or otherwise indicating that they are not the person responsible for the debt or that the agency has reached the wrong number." *Id.*

Take, for example, the first telephone number listed in Plaintiffs' summary judgment motion as an iQor call: (201) 208-8369, to which iQor placed a call at 13:08 on September 3, 2015 that was coded as "wrong number." *See* ECF 367-4 (Pl. Ex. 2). From iQor's Declaration, we know that this could mean the call failed for some reason, which—as a matter of law—would not be a violation of the TCPA. Alternatively, it could mean the call was answered and the call recipient said they were not the accountholder. Whether or not the call was completed, and the recipient was in fact a DIRECTV customer, could only be determined through an individualized inquiry.

This is not an isolated example. Other collections agencies that worked on DIRECTV accounts provided similar testimony. AFNI's Director of Business Development, James Hess, explained that AFNI's wrong number codes indicate the customer communicated that AFNI had the wrong person, but AFNI generally would do nothing to independently verify what the consumer said. Ex. 2 (Hess Dep.) at 90-

- 5 -

92. He also testified that in AFNI's experience there are cases "where there are consumers who choose to be less than honest," such as having "meaningful conversations with them and then a week later it's not them or then they after telling us it's not them . . . [they] call us and update their records with the number that they just told us wasn't their number." *Id.* at 91-92. Similarly, TSI's Manager of Regulatory Compliance attested that these "codes are based on information provided by the call recipient," but "[o]ur company does not conduct any independent investigation to verify the accuracy of the information provided by the recipient beyond accepting the information provided by the call recipient." Ex. 3 (July 27, 2021 Podbutzky Decl.) ¶ 4. *See also* Ex. 4 (Aug. 20, 2021 Rivard Decl.) ¶ 15 (NCI used the wrong number code "to indicate when it reached a number that *the recipient* indicated was the wrong number" (emphasis added)).

Notably, not a single collection agency has testified that it verified the accuracy of a reported "wrong number" before entering that code. Indeed, in some cases that code is not even entered by an agency representative, but instead is simply the result of the call recipient pressing a number within an automated prompt to claim the debt collector reached the wrong person. *See* Ex. 5 (Feb. 9, 2021 Wilson Decl.) ¶ 40 ("CMI's IVR prompts allowed a recipient to 'select the "wrong person" option from the Outbound IVR.'"). The bottom line is this: a collection agency's use of a "wrong number" code does not necessarily prove a call was made to a non-customer in violation of the TCPA. Instead, an individualized inquiry must be made to make that determination.

- 6 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2. The agencies' call data and expert testimony confirm the inherent unreliability of "wrong number" codes.

The underlying data and expert testimony also demonstrate that "wrong number" codes are unreliable, making individualized inquiries necessary.

DIRECTV's expert, Dr. Debra Aron, analyzed the call data and identified numerous examples that support the common-sense conclusion that recipients of debt collection calls sometimes falsely indicate the caller reached the wrong person. In particular, some (but not all) of the call data produced by the collection agencies was not limited to calls resulting in a "wrong number" dispositions, but included calls with other dispositions. For example, the data included dispositions reflecting that the "right party" was reached, such as "good phone" and "right party contact," and even dispositions indicating payment was made or promised, such as "promise to pay," "authorized credit cd," and "credit card by phone." *See* Ex. 6 (Aron Report) Ex. 7 (identifying call dispositions by dataset).

Dr. Aron found numerous instances where calls to the same telephone number were first coded as "wrong" but later coded as "right" (or vice versa), including codes indicating that the call recipient paid the overdue bill. In other words, the data itself indicates that the caller reached DIRECTV's customer at the number, and it was in fact not a "wrong number" call at all. *See id.* at ¶¶ 76-88.

By way of a few examples, iQor's data includes the following showing "wrong" and "right" call dispositions to the same telephone

743686122.5

numbers:[3]

| phonenumber | callstarttime | callendtime | callresultcode | extendedcallresultcode |
|---|---|---|---|---|
| 2017903280 | 12/29/2011 9:06 | 12/29/2011 9:08 | WRONG NUMBER | |
| 2017903280 | 1/12/2012 8:29 | 1/12/2012 8:37 | RIGHT PARTY | PAYMENT BALANCE IN FULL |
| 2022134292 | 4/7/2017 8:41 | 4/7/2017 8:42 | WRONG NUMBER | |
| 2022134292 | 5/18/2017 19:03 | 5/18/2017 19:10 | RIGHT PARTY | Trans to Closer |
| 2023612670 | | | WRONG NUMBER | |
| 2023612670 | 3/16/2012 8:50 | 3/16/2012 8:55 | RIGHT PARTY | PAYMENT BALANCE IN FULL |
| 2024455692 | | | WRONG NUMBER | |
| 2024455692 | 4/3/2012 13:40 | 4/3/2012 13:48 | RIGHT PARTY | PAYMENT BALANCE IN FULL |
| 2093270238 | | | WRONG NUMBER | |
| 2093270238 | 6/24/2012 18:55 | 6/24/2012 18:56 | RIGHT PARTY | MAILED PAYMENT |
| 2173208608 | 6/2/2016 21:49 | 6/2/2016 21:50 | WRONG NUMBER | |
| 2173208608 | 5/19/2016 18:52 | 5/19/2016 19:00 | RIGHT PARTY | PAYMENT AND UPDATE CARD |
| 2404175877 | | | WRONG NUMBER | |
| 2404175877 | 4/30/2011 13:25 | 4/30/2011 13:31 | RIGHT PARTY | PAYMENT AUTO BILL PAY |
| 6162849185 | | | WRONG NUMBER | |
| 6162849185 | 4/11/2012 9:50 | 4/11/2012 9:57 | RIGHT PARTY | PAYMENT BALANCE IN FULL |
| 8036296194 | 12/12/2011 17:04 | 12/12/2011 17:07 | WRONG NUMBER | |
| 8036296194 | 2/10/2015 12:29 | 2/10/2015 12:36 | RIGHT PARTY | RIGHT PARTY SCHEDULED PAYMENT |

CMI's data similarly includes examples like the following (where according to CMI the code "OIWN" reflects a wrong number disposition, 235 indicates a "promise to pay," 236 indicates "credit card by phone," 237 indicates "check by phone," and OIXP indicates a transfer to the interactive system for payments):[4]

---

[3] *See* Ex. 8 (Germann Decl.). A number of columns from iQor's data were deleted from this excerpt, in order to fit the page.

[4] *See* Ex. 8 (Germann Decl.); Ex. 6 (Aron Report) at Ex. 7 (listing codes).

| result_datetime | result_code | directv_acct_num | phone_num |
|---|---|---|---|
| 2014-01-10 07:08:55 | OIWN | 036224107 | 3369951379 |
| 2013-12-18 12:37:30 | 236 | 036224107 | 3369951379 |
| 2013-11-05 13:47:58 | OIWN | 036304270 | 8324415095 |
| 2013-10-10 17:52:48 | 235 | 036304270 | 8324415095 |
| 2012-04-02 07:18:59 | OIWN | 038257765 | 8645515532 |
| 2012-03-25 12:20:36 | OIXP | 038257765 | 8645515532 |
| 2011-07-13 10:42:55 | OIWN | 044380392 | 5616331692 |
| 2011-06-28 09:06:17 | 236 | 044380392 | 5616331692 |
| 2014-01-03 18:56:33 | OIWN | 081400454 | 5599605656 |
| 2013-12-28 14:58:42 | OIXP | 081400454 | 5599605656 |
| 2013-09-02 16:24:36 | OIWN | 081508622 | 7736730893 |
| 2013-08-05 09:29:37 | 235 | 081508622 | 7736730893 |
| 2013-09-22 12:43:58 | OIWN | 082610952 | 2144177708 |
| 2013-07-22 15:07:01 | 236 | 082610952 | 2144177708 |
| 2014-02-13 14:30:09 | OIWN | 082975055 | 3343995206 |
| 2013-11-21 16:03:24 | 237 | 082975055 | 3343995206 |

Overall, Dr. Aron found that about 22% of the telephone numbers in iQor's call data that had a "wrong number" disposition *also* had at least one call with the disposition "right party." Ex. 6 (Aron Report) ¶ 81. More globally, analyzing all of the collection agency call data together, Dr. Aron found that about 13% of the telephone numbers associated with a wrong number code were also associated with at least one "right party" disposition code. *Id.* ¶¶ 83-84.[5] And in more than two-thirds of these cases, the calls with a "right" and with a "wrong" disposition were placed within 90 days of one another. *Id.* ¶ 85.

This demonstrated unreliability holds true even in the case of a particular telephone number that was coded "wrong" but has no earlier or subsequent "right" code. That may only mean, for example, that DIRECTV's customer or former customer answered one call and said, "that isn't me," and never answered another call. Or, as Dr. Aron states,

_____

[5] This number is conservative, because as noted above not all datasets included "right party" dispositions, and others contain ambiguous codes that Dr. Aron did not classify as indicating a right party contact. *See id.* ¶ 84 n.89.

- 9 -

"[c]alled parties who intentionally or unintentionally misled the dialer or agent into coding the calls as 'wrong number' calls would not necessarily choose to identify themselves on a later or earlier call to arrange payment or confirm the phone number." Ex. 6 (Aron Report) ¶ 87. The fact that a substantial number of telephone numbers have both "right" and "wrong" number indications (more than 230,000 telephone numbers in the iQor data alone, *see* Ex. 6 (Aron Report) Ex. 6) establishes that those codes cannot reliably be used to avoid an individual inquiry to determine which purported wrong number calls in fact reached wrong numbers.

In short, the call data and expert testimony confirm the inherent unreliability of "wrong number" codes for class treatment. Instead, an individualized inquiry is necessary to determine whether a TCPA violation occurred.

### 3.    The "wrong number" notations are inadmissible hearsay.

The sole evidence Plaintiffs have offered to prove their case on a class-wide basis—the wrong number codes—is inadmissible hearsay and must be disregarded. Without this evidence, Plaintiffs cannot carry their burden of proving the case is amenable to class disposition and the class must be decertified.

The "wrong number" codes are hearsay within hearsay. That is, they reflect the assertion of a call recipient (hearsay) within a collection agency's call records (more hearsay). Even if a collection agency's call records constitute business records, the "wrong number" codes constitute hearsay within those records that cannot be used to prove the truth of the matter asserted—that the agency in fact called a wrong number.

1    Under Federal Rule of Evidence 805, "Hearsay within hearsay is

2  not excluded by the rule against hearsay if *each part* of the combined

3  statements conforms with an exception to the rule." (emphasis added)

4  The assertion of a call recipient that the caller reached a wrong number

5  does not fall under any exception, including the business record

6  exception of Rule 803(6).

7    "'Rule 803(6) does not cover records based on information obtained

8  from an outsider' because such persons have 'no business duty to report

9  accurate information to the record preparer and the record therefore

10 "does not have the presumption of accuracy that statements made

11 during the regular course of business have."'" *ADT Sec. Servs. v. Sec.*

12 *One Int'l, Inc.*, No. 11-CV-5149 YGR, 2013 WL 4766401, at *3 (N.D. Cal.

13 Sept. 5, 2013) (quoting Rutter Group Prac. Guide Fed. Civ. Trials & Ev.

14 Ch. 8G–E § 8:2691 (quoting *Wilson v. Zapata Off–Shore Co.*, 939 F.2d

15 260, 271 (5th Cir. 1991))). Thus, in ADT, the court concluded that "[w]ith

16 respect to the notes made by the ADT representatives of their calls with

17 former ADT customers, the ultimate issue is whether the customers

18 themselves were acting under some business duty to provide accurate

19 information to the callers from ADT." 2013 WL 4766401 at *3. Because

20 the customers have no such duty, the court excluded the notes as

21 hearsay. *See also, e.g., U.S. v. Mitchell*, 49 F.3d 769, 778 (D.C. Cir. 1995)

22 ("If the records contain information obtained from a customer, thus

23 constituting hearsay within hearsay, the information will come within

24 the business records exception only 'if it is shown that [the business's]

25 standard practice was to verify the information provided by [the]

26 customer.'" (quoting *United States v. Patrick*, 959 F.2d 991, 1001 (D.C.

27 Cir. 1992)); *Shimozono v. May Dep't Stores Co.*, No. 00-04261 WJR

28 (AJWx), 2002 WL 34373490, at *13 (C.D. Cal. Nov. 20, 2002) (excluding

1  customer service response cards as hearsay, because they are

2  "statements by third parties" and there was no evidence the business

3  had verified them).

4       In the class certification order, this Court held that "[a]t this

5  preliminary stage, the Court need not rule on whether the 'wrong

6  number' notations are admissible evidence in order to consider that

7  evidence for the purpose of class certification," noting the Ninth Circuit's

8  conclusion that "'[a]s class certification decisions are generally made

9  before the close of merits discovery, the court's analysis is necessarily

10  prospective and subject to change, and there is bound to be some

11  evidentiary uncertainty." *Brown v. DIRECTV, LLC*, 330 F.R.D. 260, 274

12  (C.D. Cal. 2019) (quoting *Sali*, 909 F.3d at 1005). But now merits

13  discovery is complete. There is no longer any such "evidentiary

14  uncertainty": Plaintiffs' proposed class action—including their pending

15  motion for partial summary judgment—rests entirely upon inadmissible

16  hearsay to prove the truth of the matter asserted—namely, that

17  DIRECTV or a debt collector in fact called someone other than a

18  DIRECTV customer. But the truth of this assertion necessarily requires

19  an individualized inquiry that is not determinable on a class-wide basis.

20  Because the only evidence Plaintiffs have offered up to try the case on a

21  class-wide basis is unreliable, inadmissible hearsay, the class must be

22  decertified.

23       **4.    Other courts have rejected similar attempts to**
24       **certify classes based on "wrong number" codes.**

25       Other courts have noted the unreliability of reported "wrong

26  numbers," and hence have refused to certify TCPA classes based upon

27  the use of such codes.

28

For example, in *Davis v. AT&T Corp.*, No. 15-cv-2342-DMS (DHB), 2017 WL 1155350 (S.D. Cal. Mar. 28, 2017), the court rejected a bid to certify a class where "the call recipient indicated that Defendant had reached a 'wrong number' or similar notation in Defendant's customer account records." *Id.* at *2. Among other things, the court concluded, "[t]he parties would still have to go through the 'wrong number' notations to determine whether those call recipients were, in fact, customers of Defendant at or before the time of the calls," as "Defendant has come forward with evidence that a call with a 'wrong number' notation proves nothing because many customers tell callers they have reached the wrong number, though the customer's number was dialed, as a 'procrastination tool' to avoid speaking on the phone." *Id.* at *5. In addition, "if Defendant's customer provided a number belonging to another person, such as a spouse or other family member, an inquiry into that customer's authority to provide consent to call that number would be required." *Id.* at *6. "In sum, a complete analysis of the customer status issue would require an inquiry into each call recipient's individual circumstances." *Id.*

Similarly, in *Revitch v. Citibank, NA*, No. C-17-06907 WHA, 2019 WL 1903247 (N.D. Cal. Apr. 28, 2019), the court denied certification of a putative class based on numbers the caller had flagged as "wrong." "[A] phone number can be flagged as 'wrong' in Citibank's system even when it is, in fact, the customer's correct number. For example, an evasive customer may reply with 'wrong number' when he answers a call regarding his delinquent account." *Id.* at *2. Thus, "the problem is that adjudicating the claims of those who do fall within plaintiff's proposed class would devolve into the tedious resolution of individualized issues based on individualized evidence." *Id.* at *4.

- 13 -

Likewise, in *Tillman v. Ally Financial Inc.*, No. 2:16–cv–313–FtM–
99CM, 2017 WL 7194275 (M.D. Fla. Sept. 29, 2017), the court declined
to certify a similar proposed class. Much like the case here, *Ally* involved
debt collections calls, some of which allegedly went to wrong numbers
based on notations in Ally's call records. *Id.* at *2. The court explained
that there is "a wide variety of circumstances under which the free form
notes 'wrong number' and 'do not call' may be entered into Ally's system
that have nothing to do with the validity of the underlying phone
number," "[n]or do the notes mean that consent is lacking." *Id.* at *7.
"Indeed, defendant has offered evidence that in the debt collection
industry 'wrong number' oftentimes does not mean non-consent because
many customers tell agents they have reached the wrong number,
though the correct number was called, as a way to avoid further debt
collection." *Id.* "Thus, 'wrong number' and 'do not call' notations are
insufficient to establish on a class-wide basis without individualized
inquiry that defendant made a call to a number in violation of the
TCPA." *Id.*

In *Sliwa v. Bright House Networks, LLC*, 333 F.R.D. 255 (M.D. Fla.
2019), the court also refused to certify a class involving prerecorded debt
collection calls that allegedly included "wrong number" calls. While
plaintiff relied upon "BP" ("bad phone") call disposition codes, the court
noted the evidence of "other reasons a number may be assigned a BP
Code," and concluded the case "would require individualized inquiries as
to why each phone number was assigned a BP Code." *Id.* at 271. In
addition, the court "recognized that 'in the debt collection industry
"wrong number" oftentimes does not mean non-consent because many
customers tell agents they have reached the wrong number, though the
correct number was called, as a way to avoid further debt collection.'" *Id.*

743686122.5

DIRECTV'S MEMO IN SUPPORT OF ITS MOTION TO
DECERTIFY THE CLASS
CASE NO. 2:13-CV-01170-DMG-E

at 271-72 (quoting *Tillman*, 2017 WL 7194275, at \*7).

Indeed—as here—records indicated that Bright House "received payments on past-due accounts associated with cell phone numbers . . . 'shortly after a bad phone code appeared . . . .'" *Id.* Thus, "[d]etermining whether these BP Codes indicated a wrong number was called can only be resolved on an individual basis." *Id. See also Tomeo v. CitiGroup, Inc.*, No. 13-C-4046, 2018 WL 4627386, at \*9-\*10 (N.D. Ill. Sept. 27, 2018) (refusing to certify TCPA class based on "wrong number" notations, in part because of the significant number of inaccurate "wrong number" records); *Bridge v. Credit One Fin.,* 294 F. Supp. 3d 1019, 1040 (D. Nev. 2018) (refusing to certify TCPA class relating to debt collection calls, and finding "that the necessity of an individual inquiry to determine consent is further established by Credit One's records that some of its 'wrong number' reports are inaccurate"); *Morgan v. Adventist Health System/Sunbelt, Inc.*, No. 6:18-cv-1342-Orl-78DCI, 2020 WL 1674307, \*1-3 (M.D. Fla. Jan. 15, 2020) (denying certification of class based on wrong number notations because, "[s]imply put, the notation of 'wrong number' . . . in Defendants' records does not equate to a showing of lack of consent.").

The courts in these cases all concluded there is no reliable way to determine, without individualized inquiry, whether an individual was mistakenly reached at a wrong number, and hence denied class certification. The evidence in this case compels the same conclusion.

**B.  Individual inquiries are needed to determine whether the user of a particular telephone number was not a DIRECTV customer.**

In 2019, without the benefit of any significant evidentiary record,

- 15 -

the Court concluded "that the identification of Class and Subclass members does not require an individualized inquiry." *Brown*, 330 F.R.D. at 273. But after three years of extensive discovery, Plaintiffs have yet to identify *any* class members apart from the two named plaintiffs. That is because the evidence shows they cannot identify class members—*i.e.*, persons who used a particular telephone number yet were not a DIRECTV customer—without individualized inquiries.

The proceedings, discovery, and expert analysis since 2019 have demonstrated the need for an individualized inquiry to identify a call recipient. For example, for purposes of class notice, the notice administrator (Angeion) used reverse look-up data to attempt to identify the names and addresses of users of telephone numbers associated with "wrong number" codes, over timeframes corresponding to the calls. However, in *most* cases this returned no name and address information. Ex. 6 (Aron Report) ¶ 96. In other cases, it returned no information for the time of the call in question. *Id.* ¶ 103. And in many cases where information was found, Angeion found *multiple* names and multiple addresses associated with a single number. *Id.* ¶¶ 97-102. Thus, as one example, the "class list" included twelve name/address combinations for a single telephone number that was called by iQor in 2012 and DCI in 2013. *Id.* ¶¶ 99, 104. This data plainly cannot be used to establish who the user of a number was at a particular time.[6]

Plaintiffs also subpoenaed account information from three major wireless carriers. For a number of reasons, this data does not establish

---

[6] More generally, as Dr. Aron explains, historical reverse-lookup information is unreliable and contains a material proportion of errors. Ex. 6 (Aron Report) ¶¶ 106-111. Indeed, Lexis-Nexis (the data vendor used by Angeion) discloses that its reports may contain errors, may be inaccurate, and that it does not warrant the correctness or completeness of its data. *Id.* ¶ 108.

- 16 -

who the user of a number was at a particular time.

First, the data is incomplete, as those three carriers do not account for all wireless services/cellular telephone numbers. For example, while AT&T Mobility and Verizon account for about 68% of wireless connections in the U.S., only 37% of the numbers that Plaintiffs' expert (Ms. Peters-Stasiewicz) identifies as wireless numbers associated with a wrong number code appear in the AT&T Mobility and Verizon data. Ex. 7 (Supp. Aron Report) ¶¶ 18, 23.[7]

Second, even where the carriers did have data, in many cases it contains no identifiable customer name, but merely identifies the line as "pre-paid," or assigned to some "re-seller" of wireless services, or contains a business name. In the AT&T Mobility data, for example, at least about 12,000 numbers lacked any identifiable individual name in the account information, and nearly 9,000 numbers (at least) in the Verizon data lacked any identifiable individual name in the account information. *See* Ex. 7 (Supp. Aron Report) ¶¶ 15, 34, 46.[8]

Third, even where the carriers were able to supply an individual's name from their customer records, that does not show who the actual user of the line was at the time of a collections call (or any other time). In some cases, the wireless carrier data may not correspond to the time of the alleged "wrong number" collections call. *See* Ex. 7 (Supp. Aron Report) ¶¶ 19-21. Further, both AT&T and Verizon have testified that they do not require a wireless account owner to identify the persons who

---

[7] T-Mobile also produced data on August 24, 2021, but Dr. Aron did not have sufficient time to analyze that data before submitting her August 27 report. *See id.* ¶ 23.

[8] These numbers are understated because they are based on a programmatic review for multiple instances of text string, while it would take a manual review to identify every instance. *See id.* ¶ 30.

- 17 -

may use a phone number. *See* Ex. 7 (Supp. Aron Report) ¶¶ 27, 52. T-Mobile has testified to the same. *See* Ex. 6 (Aron Report) ¶ 144. And even if the account owner chooses to supply a name, the carriers do not verify that information or have any way of determining whether it is the actual user. Ex. 7 (Supp. Aron Report) ¶¶ 27, 52. In addition, the data does not indicate which phone numbers are part of multi-line plans (*id.* ¶ 53), though most wireless subscribers are on multi-line plans (Ex. 6 (Aron Report) ¶ 141).

In other words, knowing that Verizon's data shows "John Smith" was the account owner of a particular number (for example) does not establish that John Smith was the user of that number, or whether he was merely the account-holder on a multi-line plan, or whether the user was (for example) someone in his household who may be the DIRECTV customer of record. *See* Ex. 6 (Aron Report) ¶¶ 138-140. Determining that would require an individualized inquiry of the wireless account owner, the DIRECTV customer the call was intended to reach, or both.

More generally, putting aside the fact that neither reverse look-up data nor wireless carrier data reliably identify who the actual user of a wireless number was, even attempting to match names between that data and DIRECTV's customer data cannot be reliably resolved without undertaking individual inquiry. *See* Ex. 6 (Aron Report) ¶¶ 112-134. Dr. Aron identifies a number of types of ambiguities she has seen in attempting to match names across data sets, such as where an apparent nickname is used in one data set, or middle initials differ, or one set has a name with a slightly different (perhaps mistaken) spelling, or the names may be reversed (James Roberts or Robert James), or one set has only an initial listed for a first name, or last names and addresses match but first names differ, or names match but addresses differ, etc. *See id.* ¶

743686122.5

114. And, of course, such a matching process would not establish whether two people with different names are nevertheless associated with one another, such as a spouse or other household member on a family plan. *See id.* ¶ 127.

For similar reasons, in *Warnick v. DISH Network LLC*, 301 F.R.D. 551, 557 (D. Colo. 2014), the court refused to certify a class of persons called by DISH "who were either not a DISH customer or who previously asked DISH to cease making such calls through a suppression request," as reflected in DISH's records. As the court noted, "there are many different scenarios in which the numbers provided to [DISH] may have been associated with someone other than the named account," such as households that subscribe to video service "under one named account holder for a family, friends, or roommates, all of whom may have provided consent to be called." *Id.* at 558-59. *See also Gutierrez v. Barclays Group*, No. 10-cv-1012 DMS (BGS), 2011 WL 579238, at *3 (S.D. Cal. Feb. 9, 2011) (husband can provide consent for subscriber wife, if she "possessed common authority over or other sufficient relationship to the" phone).

## C.   In light of this evidence, the class should be decertified because individual issues would predominate, and resolving them would be unmanageable.

The evidence compels the conclusion that individual questions would predominate over common ones, making class certification inappropriate. *See* FED. R. CIV. P. 23(b)(3) (requiring "that the questions of law or fact common to class members predominate over any questions affecting only individual members").

"The predominance inquiry 'asks whether the common,

aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 195–196 (5th ed. 2012). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, at 196–197 (internal quotation marks omitted)).

As demonstrated above, the "common" evidence Plaintiffs rely on here—wrong number disposition codes—is both unreliable and inadmissible to show a call did not reach its intended recipient, namely DIRECTV's customer or former customer. Instead, only an individual inquiry, using individualized evidence, could establish whether a particular call went to a non-customer.

In addition, "[t]o ensure that common questions predominate over individual ones, the court must 'ensure that the class is not defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct.'" *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) (quoting *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016) (citation omitted)). "If many class members have no claim whatsoever because they 'were never exposed to the challenged conduct to begin with,' the class does not satisfy Rule 23(b)(3)." *Id.* (quoting *Torres*, 835 F.3d at 1136). *See also Moore v. Apple Inc.*, 309 F.R.D. 532, 542 (N.D. Cal. 2015) ("The inclusion of class members whom, by definition, could not have been injured is . . . indicative of the

1  individualized inquiries that would be necessary to determine whether a

2  class member has suffered any injury in the first place.").

3     While the class here is nominally defined in terms of non-

4  customers, Plaintiffs' motion for partial summary judgment makes clear

5  that they are using wrong number dispositions codes as a proxy to

6  identify the purported calls to class members and to make a merits

7  determination regarding liability on a class-wide basis. But, as

8  explained above, those calls include a significant number of persons who

9  were DIRECTV customers and acted accordingly (*e.g.*, made a payment).

10 For example, Dr. Aron found that about 22% of the telephone numbers

11 in iQor's call data that had a "wrong number" disposition also had at

12 least one call with the disposition "right party." Ex. 6 (Aron Report) ¶

13 81. As to the remaining telephone numbers, only an individual inquiry

14 based on individual evidence could establish whether the call recipient

15 was a DIRECTV customer.

16    Finally, because common issues would not predominate, a class

17 action would not be superior to other methods for fairly and efficiently

18 adjudicating the controversy. *See Gannon v. Network Tel. Servs. Inc.*,

19 No. CV 12–9777–RGK (PJWx), 2013 WL 2450199, at *3-4 (C.D. Cal.

20 June 5, 2013), *aff'd* 628 F. App'x 551 (9th Cir. 2016) (holding in a TCPA

21 case that "because Plaintiff fails to satisfy the predominance

22 requirement", in light of the individual inquiries needed "'to determine

23 who received' unauthorized text messages and thus, who is a class

24 member", "the Court finds a class action would not be superior to other

25 methods for fairly and efficiently adjudicating the controversy").

26    "In evaluating superiority, the court must consider the likely

27 difficulties in managing the case, specifically 'the whole range of

28 practical problems that may render the class action format

1 | inappropriate for a particular suit.'" *Rowden v. Pac. Parking Sys., Inc.*,
2 | 282 F.R.D. 581, 584–85 (C.D. Cal. 2012), *aff'd sub nom. Martin v. Pac.*
3 | *Parking Sys. Inc.*, 583 F. App'x 803 (9th Cir. 2014) (quoting *Eisen v.*
4 | *Carlisle and Jacquelin*, 417 U.S. 156, 164 (1974)). "One such
5 | manageability concern is a court's ability to clearly define and ascertain
6 | the contours of the proposed class." *Id.* Where "it appears from the
7 | record that there is no administratively feasible manner to determine a[]
8 | central criterion of class membership," the court appropriately denies
9 | certification. *Martin*, 583 F. App'x at 804.

Here, "wrong number" notations cannot be used to identify class members, for all the reasons explained above. The class thus should be decertified. *See Pierce v. County of Orange*, 526 F.3d 1190, 1200 (9th Cir. 2008) (concluding that the district court did not abuse its discretion in decertifying a class because "Rule 23(b)(3) would not offer a superior method for fair and efficient adjudication in light of expected difficulties identifying class members").[9]

## IV.   CONCLUSION

For the reasons explained above, the Court should decertify the class.

---

[9] "The superiority of a class action also depends on the existence of a realistic alternative to class litigation." *Rowden*, 282 F.R.D. at 585. There is no question that individual TCPA suits are a realistic alternative—indeed they are common.

- 22 -

1

2    Dated: September 10, 2021            Respectfully submitted,

3                                          MAYER BROWN LLP

4                                          By: */s/ Hans J. Germann*

5                                          Hans J. Germann
                                           Attorneys for Defendant
6                                          DIRECTV, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 23 -           DIRECTV'S MEMO IN SUPPORT OF ITS MOTION TO
                                                          DECERTIFY THE CLASS
                                                          CASE NO. 2:13-CV-01170-DMG-E