# EXHIBIT 6

Exhibit 6
Page 1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

JENNY BROWN,

                    Plaintiff,

      v.

DIRECTV, LLC,

                    Defendant.

Case No. CV 13-1170-DMG (Ex)

# EXPERT REPORT OF DR. DEBRA J. ARON

May 21, 2021

Exhibit 6
Page 2

# Contents

I.     QUALIFICATIONS AND ASSIGNMENT .................................................................1

II.    SUMMARY OF OPINIONS ...............................................................................4

III.   CASE BACKGROUND ....................................................................................7
     A. The Parties, Animating Facts, and the Certified Class ................................7
     B. Methods for Identifying Wrong Number Calls and Class Members Suggested by Plaintiff and the Court...............................................................................10
     C. The Calling Process and Call Data in this Case.........................................13

IV.   A DESIGNATED DISPOSITION DOES NOT PROVIDE VERIFIABLE OR RELIABLE EVIDENCE OF A WRONG NUMBER ..................................................................15
     A. Coding Schemes Vary Widely Across Debt Collectors ...............................17
     B. The Meanings of Many of the Designated Dispositions Are Ambiguous or Indeterminable .........................................................................................19
     C. The Designated Dispositions in the DTVRMS Notes Data Are Not Listed in the Vendor Guide and Are Often Ambiguous ..................................................22
     D. Plaintiff's Designated Dispositions in the TSI Data Ignore Contradictory Evidence in the Very Same Text Strings .....................................................24
     E. Data Analysis Indicates That Many Calls Associated with Designated Dispositions Were Likely Made to the Intended Customer, Rendering Unreliable Any Methodology Relying on Dispositions to Identify Actual Wrong Numbers ..............26

V.     MATCHING THIRD-PARTY DATA WITH DEFENDANT DATA CANNOT RELIABLY DISTINGUISH BETWEEN TRUE WRONG NUMBERS AND FALSE WRONG NUMBERS ........29
     A. Angeion Was Unable to Provide Any Identifying Information for the Majority of the Possible Class Member Phone Numbers, and the Information That Was Provided Generally Did Not Identify Unique Individuals ........................................32
     B. Third-Party Data Are Unreliable for Historical Reverse-Lookup of Recipients of Alleged Wrong Number Telephone Calls.......................................................34
     C. Matching Third-Party Reverse-Lookup Data with Defendant Data Would Not Reliably Identify Actual Wrong Number Calls in the Absence of Individual Inquiry 36

VI.   DATA FROM TELECOMMUNICATIONS CARRIERS — EVEN IF PROVIDED — ARE UNLIKELY TO RELIABLY IDENTIFY WRONG NUMBER CALLS WITHOUT INDIVIDUALIZED INQUIRY ...............................................................................44

Exhibit 6
Page 3

CONFIDENTIAL

## I.  QUALIFICATIONS AND ASSIGNMENT

1.  My name is Debra J. Aron.  I am a Vice President at Charles River Associates ("CRA").  CRA is an international consulting and expert services firm that provides, among other services, economic expertise for litigation, regulatory proceedings, policy debates, and business strategies.

2.  I received a Ph.D. in economics from the University of Chicago in 1985, where my honors included a Milton Friedman Fund fellowship, a Pew Foundation teaching fellowship, and a Center for the Study of the Economy and the State dissertation fellowship.  I was an Assistant Professor of Managerial Economics and Decision Sciences from 1985 to 1992 at the J. L. Kellogg Graduate School of Management, Northwestern University, and a Visiting Assistant Professor of Managerial Economics and Decision Sciences at the Kellogg School from 1993-1995.  I was named a National Fellow of the Hoover Institution, a think tank at Stanford University, for the academic year 1992-1993, where I conducted research on innovation and product proliferation in multiproduct firms.  Concurrent with my position at Northwestern University, I also held the position of Faculty Research Fellow with the National Bureau of Economic Research from 1987-1990.  At the Kellogg School, I taught M.B.A. and Ph.D. courses in managerial economics, information economics, and the economics and strategy of pricing.  From 2000 to 2016, I taught a Master's course on competition and strategy in communications markets approximately annually at Northwestern University.  I am a member of the American Economic Association and the Econometric Society, and an Associate member of the American Bar Association.

3.  A significant portion of my consulting and academic work over the past 25 years has particularly focused on the telecommunications industry.  I have published my research on telecommunications-related issues in professional journals and presented it at universities and the Federal Communications Commission (FCC).  I have provided economic consulting services and expert testimony on numerous occasions to firms in the communications industry, on competition, costing, pricing, incentives, and regulation issues in the United States and internationally.  My clients have included many of the largest, and some of the smaller, telecommunications companies in the U.S.  My experience includes conducting economic and data analysis, and providing expert testimony, in class

1

Exhibit 6
Page 4

CONFIDENTIAL

action matters (including class certification) in telecommunications markets and in a variety of other industries.  Throughout the course of my career I have analyzed public, proprietary, and confidential telecommunications data, including customer-specific account data, both as part of my work in litigation and regulatory matters and in non-litigation consulting and research.

4.   Along with and aside from my work related to the telecommunications industry, my professional training and experience as an economist have included the study and use of probability theory, statistics, econometrics, and data analysis in a variety of industries.  I have published my research using these tools in leading professional economics journals, including the American Economic Review, the RAND Journal of Economics, the Journal of Law, Economics, and Organization, the Review of Network Economics, and the Journal of Competition Law and Economics, and I have given expert testimony using these tools in state and federal courts and arbitrations.

5.   I have provided data analysis and consulting support in a number of matters brought under the TCPA.  In addition, in the last five years, I have submitted expert reports or declarations and testified at depositions during the class certification phase of the *Verma v. Memorial Healthcare Group, Inc.,*[1] *Espejo v. Santander Consumer USA, Inc. and Bonner v. Santander Consumer USA, Inc,*[2] *Hossfeld v. Compass Bank, N.A. and MSR Group, LLC,*[3] and *Williams v. Bluestem Brands, Inc.*[4] TCPA cases.  I submitted an expert report in *Krakauer v. DISH Network, LLC,* and testified at trial in that case.[5]

---

[1] *Rajesh Verma, et al., v. Memorial Healthcare Group, Inc., et al.,* in the United States District Court for the Middle District of Florida, Jacksonville Division, Case No. 3:16-CV-00427-HLA-JRK.

[2] *Henry Espejo, et al., v. Santander Consumer USA, Inc.,* and *Arica Bonner, et al.*, *v. Santander Consumer USA, Inc.*, in the United States District Court for the Northern District of Illinois, Eastern Division, Case Nos. 1:11-cv-08987 and 1:12-cv-09431.

[3] *Robert Hossfeld, et al. v. Compass Bank, N.A., et al.*, in the United States District Court, Northern District of Alabama, Southern Division, Case No. 2:16-CV-2017-ACA.

[4] *Waddell Williams, et al. v. Bluestem Brands, Inc.*, in the United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-CV-1971-T-27AAS.

[5] *Thomas H. Krakauer et al., v. DISH Network, L.L.C.*, in the United States District Court for the Middle District of North Carolina, Durham Division, No. 1:14-cv-33.

2

Exhibit 6
Page 5

CONFIDENTIAL

6.    My professional qualifications, including other TCPA cases not listed above in which I have given testimony, are detailed in my curriculum vitae, which is attached as Exhibit 1 to this report.

7.    CRA bills for my time on this engagement at $825 per hour, for the time of the CRA staff that have assisted me in preparing my report, and for any expenses incurred in the preparation of this report.

8.    I was asked by counsel for Defendant DIRECTV, LLC ("DIRECTV") to analyze whether it is possible using the methodologies proposed by Plaintiff and the Court to reliably identify alleged wrong number wireless telephone calls made to individuals in the certified Class without individual inquiry.

9.    I was also asked by counsel for DIRECTV to analyze whether it is possible, given telephone numbers and the date(s) of the call(s) at issue in this case, to identify the names of the Class members accurately and reliably, without individual inquiry.

10.   A list of the documents that I considered in my analysis is contained in Exhibit 2.

11.   My report is organized as follows.  In Section II, I summarize my opinions in this case. Section III sets out my understanding of the relevant facts of the case and the Class definition, the calling process, and the data.  In Section IV, I explain how my analysis of data and documents in this case demonstrates that a) coding schemes used to record wrong numbers varied widely across debt collectors, b) the meanings and use of the "wrong number" dispositions identified by Plaintiff are either ambiguous or indeterminable, and c) in many cases, calls associated with purported "wrong number" dispositions were likely made to the intended DIRECTV customer and did not reach wrong numbers.  Given these findings, it follows that Plaintiff's "wrong number" dispositions cannot reliably identify non-customers.  Section V explains why matching third-party "reverse-lookup" data with data from Defendant cannot reliably distinguish between true wrong numbers and numbers that were falsely denoted as wrong numbers.  Section VI explains why data from telecommunications carriers are also unsuited to identifying wrong number calls in the absence of individualized inquiry.

3

Exhibit 6
Page 6

CONFIDENTIAL

## II.   SUMMARY OF OPINIONS

12. This case pertains to calls allegedly made by DIRECTV and/or its third-party debt collectors for purposes of debt collection to a cellular phone using an artificial or prerecorded voice to individuals who have not been DIRECTV customers since October 1, 2004.[6]

13. Plaintiff has claimed that data and documents from DIRECTV are sufficient for purposes of certifying a previously proposed subclass, arguing that a "wrong number" disposition code is capable of identifying each call to a non-customer.[7]   In particular, Plaintiff has stated:

- Non-customers can be "readily identified through company records, which clearly identify non-customers with a 'wrong number' disposition code."[8]

- "[T]here is no reason to doubt that the wrong number codes mean exactly what they say."[9]

14. The Court certified the previous subclass,[10] in part, based on the following conclusions:

- All debt collectors have a similar coding scheme to record wrong numbers.[11]

---

[6] Order Extending Time to Prepare Joint Class Notice Plan, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, December 18, 2019 (hereafter, *12/18/2019 Order Extending Time*), ¶ 1.

[7] Memorandum of Points and Authorities in Support of Plaintiff's Motion for Class Certification, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, May 25, 2018 (hereafter, *05/25/2018 Memorandum of Points*), p. 10.

[8] Plaintiff's Reply in Support of Class Certification, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case No. CV 2:13-cv-01170-DMG-E, July 6, 2018 (hereafter, *07/06/2018 Plaintiff's Reply ISO Class Cert*), p. 7.

[9] *07/06/2018 Plaintiff's Reply ISO Class Cert*, p. 8.

[10] The "previous subclass" refers to the subclass certified on March 29, 2019 in Order re Plaintiff's Motion for Class Certification, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, March 29, 2019 (hereafter, *03/29/2019 Order re Plaintiff's Motion for Class Cert*), p. 25.  The previous subclass differs from the previously proposed subclass, which is cited in Section III.B of my report.

[11] *03/29/2019 Order re Plaintiff's Motion for Class Cert*, p. 21.

Exhibit 6
Page 7

CONFIDENTIAL

- Defendant's databases can be used to determine whether a phone number with a "wrong number" notation is a result of a customer falsely telling a debt collector it called a wrong number.[12]

15.   However, analysis of the data and documents in this case demonstrates that:

- Debt collectors did not use similar coding schemes to record wrong numbers.

- The meanings and use of the alleged "wrong number" dispositions identified by Plaintiff are either ambiguous or indeterminable.

- The dispositions designated by Plaintiff as identifying wrong number calls are highly unreliable for identifying wrong numbers for the additional reason that they cannot distinguish between calls in which the called party truthfully claimed to be the wrong party and those in which the called party falsely claimed to be the wrong party.   Analysis of the data demonstrates the unreliability of dispositions for identifying true wrong numbers.   For example, upon examining the data belonging to debt collector iQor US, Inc. (iQor), which is associated with the largest number of alleged wrong telephone numbers in this case, I found that approximately 22% of the alleged "wrong number" telephone numbers were also associated with at least one call with the disposition "RIGHT PARTY."   That is, although the telephone number was designated a "wrong number" on one call, at least one call to the same telephone number at another time was identified as a "right party."   The implication is that *none* of the calls with "wrong number" dispositions can be reliably inferred to be wrong numbers because the disposition is demonstrably misleading.

16.   I conclude from my findings that Plaintiff's "wrong number" dispositions do not reliably identify Class members.

17.   It would not be possible to distinguish between phone numbers belonging to DIRECTV customers and those not belonging to DIRECTV customers by reference to third-party

---

[12] *03/29/2019 Order re Plaintiff's Motion for Class Cert*, p. 21.

5

Exhibit 6
Page 8

CONFIDENTIAL

reverse-lookup data, a methodology suggested by steps taken in the Joint Notice of Motion and Motion to Approve Class Notice, dated June 19, 2020 ("Notice Plan").

18. The notice administrator was not able to identify *any* name and address information for the *majority* of purported Class members using third-party reverse-lookup data.  For those phone numbers for which a name was found, the notice administrator identified up to five individuals per phone number, none of which was necessarily identified as an owner of that number at the time of the calls; and in instances in which more than one name was identified for a given phone number, the notice administrator was not able to further refine the results to identify a unique potential Class member.  The third-party reverse-lookup data identify one and only one name for a phone number for fewer than 12 percent of purported Class members, and there is no verification that the given name was correct ever or at the time of the calls.

19. With regard to comparing information in DIRECTV's customer database with the reverse-lookup results obtained by the class administrator as a method of identifying non-customers (should Plaintiff propose to do so), such a process would not reliably distinguish between purported wrong number calls that were in fact to non-customers and those in which the call recipient simply told the call agent that it was a wrong number to avoid talking to a debt collector.  Identifying wrong numbers by attempting to match names across databases is highly unreliable because, among other reasons, and aside from the incompleteness and ambiguities in the third-party reverse-lookup data just mentioned, even a small number of errors in third-party reverse-lookup data can vastly inflate the number of purported Class members by erroneously including non-wrong-number recipients disproportionately to the incidence of errors in the data.

20. With regard to comparing information in DIRECTV's customer database with data that might be produced by wireless telephone companies under subpoena as a method of identifying non-customers (should Plaintiff propose to do so), such a process would also not reliably distinguish between purported wrong number calls that were in fact to non-customers and those in which the call recipient simply told the call agent that it was a wrong number to avoid talking to a debt collector.  Wireless telephone companies record and generally verify the names of the subscribers on their postpaid accounts, but do not

6

Exhibit 6
Page 9

CONFIDENTIAL

necessarily know the names of the users of lines in multi-line accounts, nor do they necessarily know or verify names on prepaid or "burner" accounts.  Identifying wrong numbers by attempting to match names across the DIRECTV data and wireless carrier subscriber databases is therefore highly unreliable because, among other reasons, the subscriber on a DIRECTV account is not necessarily the named subscriber on the DIRECTV customer's cell phone plan, if the wireless carrier has a name on the account at all.

21. If new data and facts become available to me that alter my conclusions I will augment or modify my report accordingly.

## III.   CASE BACKGROUND

### A.   The Parties, Animating Facts, and the Certified Class

22. I understand that this case is brought by Plaintiff, Jenny Brown, as a class action under the Telephone Consumer Protection Act (TCPA).  Plaintiff alleges that Defendant, DIRECTV, LLC, has violated Section 227 of the TCPA.[13]

23. DIRECTV is a subsidiary of AT&T Inc. ("AT&T") and identifies itself as the #1 satellite pay TV service in the country.[14]  As of Q4 2020, DIRECTV had approximately 13 million pay TV subscribers in the United States.[15]  DIRECTV was acquired by AT&T in July 2015.[16]

---

[13] Fourth Amended Complaint for Damages and Injunctive Relief Pursuant to 47 U.S.C. § 227, Et Seq. (Telephone Consumer Protection Act), *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, September 30, 2013 (hereafter, *09/30/2013 Complaint*), ¶ 1.

[14] See "DIRECTV Official Site," DIRECTV, at http://www.directv.com.

[15] "Number of DirecTV video subscribers in the United States from 1st quarter 2014 to 4th quarter 2020(in millions)," Statista, at https://www.statista.com/statistics/497288/DIRECTV-number-video-subscribers-usa/.

[16] "AT&T Completes Acquisition of DIRECTV," AT&T Press Release, July 24, 2015, at https://about.att.com/story/att_completes_acquisition_of_DIRECTV.html.

7

Exhibit 6
Page 10

CONFIDENTIAL

24. Credit Management, LP is a wholly owned subsidiary of The CMI Group ("CMI").[17] CMI, headquartered in Plano, Texas,[18] provides revenue cycle, accounts receivable, and contact center solutions.[19] CMI's accounts receivable management services include first-party and third-party debt collection services for a variety of industries.[20]

25. I understand that DIRECTV engaged CMI during the December 2009–July 2014 period as a collection agency.[21] According to the Declaration of Gail Husman, a Director of Finance at DIRECTV during the relevant time period, CMI was one of more than 20 outside collection agencies with which DIRECTV contracted during the Class period to aid in third-party collection services on DIRECTV customer accounts.[22]

26. Plaintiff Jenny Brown is an individual who, at the times relevant to the case, lived in Missouri.[23] Ms. Brown alleges that she received multiple debt collection calls to her telephone number 314-620-1695 (the "1695 phone number") in July and September 2011 from CMI, which, according to Plaintiff, were made on behalf of DIRECTV.[24] Plaintiff alleges that at least one of CMI's calls used a prerecorded message.[25] According to Plaintiff, the calls to the 1695 phone number were attempts by CMI to contact an individual

---

[17] "The CMI Group acquires The Affiliated Group," The CMI Group Press Release, April 29, 2015, at https://www.thecmigroup.com/news/the-cmi-group-acquires-the-affiliated-group.

[18] "About The CMI Group," The CMI Group, at https://www.thecmigroup.com/about-us.

[19] The CMI Group, at https://www.thecmigroup.com/.

[20] "Accounts Receivable Management, The CMI Group, at https://www.thecmigroup.com/solutions/accounts-receivable-management.

[21] Letter, Hans J. Germann to Daniel Hutchinson, [re: DIRECTV Production DTV-013859 - DTV-013948], March 6, 2020 (hereafter, *03/06/2020 Production Letter*), p. 4.

[22] Declaration of Gail Husman in Support of DIRECTV's Opposition to Plaintiff's Motion for Class Certification, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case No. 2:13-CV-01170-DMG-E, June 22, 2018 (hereafter, *06/22/2018 Husman Declaration*), ¶ 4. According to her Declaration, Ms. Husman was a Director of Finance at DIRECTV working particularly in accounts receivable management and third-party collections. After AT&T's acquisition of DIRECTV in July 2015, she became an AT&T employee and continued to work on the DIRECTV side of the business (*06/22/2018 Husman Declaration*), ¶ 1.

[23] *09/30/2013 Complaint,* ¶ 9.

[24] Declaration of Jenny Brown, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case No. 2:13-CV-01170-DMG-E, May 25, 2018 (hereafter, *05/25/2018 Brown Declaration*), ¶¶ 8-9, *09/30/2013 Complaint,* ¶¶ 46-47.

[25] *05/25/2018 Brown Declaration*, ¶ 10.

Exhibit 6
Page 11

CONFIDENTIAL

unknown to Plaintiff named "D_____ J____."[26] Plaintiff alleges that she is not and has never been a customer of DIRECTV or any member of the CMI family of companies and that neither of these companies had obtained "[Plaintiff's] consent, written or otherwise, to contact [Plaintiff] by phone or any other means."[27]

27. According to the Declaration of Nicole Martin, a Manager and Senior Manager at DIRECTV during the relevant time period,[28] the 1695 phone number "was a number provided by a DIRECTV customer, D--- J---, in regards [sic] to an initial order for DIRECTV service and equipment."[29]   Ms. Martin performed a manual search in DIRECTV's historic equipment ordering database "OMS" (Order Management System) and located Plaintiff's telephone number as the one associated with the initial order by D--- J---.[30]

28. The Court certified a class and a subclass in March 2019,[31] and I understand that the class and subclass were certified without consideration for expert reports or the data discussed herein.   I further understand that on December 16, 2019, in response to the Court's December 2, 2019 order,[32] the parties agreed to modify the certified Class definition to read as:

> "All persons residing within the United States who, within four years prior to and after the filing of this action, received a non-emergency telephone call(s) from DIRECTV and/or its third-party debt collectors regarding a debt allegedly owed to DIRECTV, to a cellular phone through the use of an artificial or prerecorded

---

[26] *05/25/2018 Brown Declaration*, ¶ 9.

[27] *05/25/2018 Brown Declaration*, ¶ 4-6.

[28] Declaration of Nicole Martin in Support of DIRECTV's Opposition to Plaintiff's Motion for Class Certification, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case No. 2:13-CV-01170-DMG-E, June 21, 2018 (hereafter, *06/21/2018 Martin Declaration*), ¶ 1.

[29] *06/21/2018 Martin Declaration,* ¶ 3.

[30] *06/21/2018 Martin Declaration*, ¶ 4-5 and Exhibit A.

[31] *03/29/2019 Order re Plaintiff's Motion for Class Cert*, pp. 24-25.

[32] In Chambers – Order Re Joint Status Report, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, December 2, 2019.

Exhibit 6
Page 12

CONFIDENTIAL

voice, and who has not been a DIRECTV customer at any time since October 1, 2004."[33]

29.   I understand that shortly thereafter, in December 2019, the Court modified the certified Class according to the above definition,[34] again without consideration for expert reports or the data discussed herein.

### B.   Methods for Identifying Wrong Number Calls and Class Members Suggested by Plaintiff and the Court

30.   Plaintiff has claimed that data and documents from DIRECTV are sufficient for purposes of determining on a class wide basis who belongs to a class of individuals who are not and were not DIRECTV customers.  In particular, Plaintiff stated in her Memorandum of Points and Authorities in Support of Plaintiff's Motion for Class Certification, dated May 25, 2018 ("Memorandum of Points"),

> "That [sic] Subclass members that are DIRECTV non-customers can be determined objectively through DIRECTV's own records.  Indeed, DIRECTV's vendors maintain call records that require a 'wrong number' disposition code for each call that reaches a non-customer."[35]

31.   Plaintiff has identified certain key words, phrases, and codes in the produced call data that Plaintiff believes identify wrong number calls.[36]  I will refer to these key words, phrases, and codes identified by Plaintiff as purporting to identify wrong number calls as Plaintiff's "designated dispositions."

---

[33] Joint Statement Regarding the Class Definition and Class Notice, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case No. 2:13-cv-1170-DMG-E, December 16, 2019.

[34] *12/18/2019 Order Extending Time*, ¶ 1.

[35] *05/25/2018 Memorandum of Points*, p. 10.  Note that the "Class" proposed by Plaintiff in the 05/25/2018 Memorandum of Points was defined as: "All persons residing within the United States who, on or after four years prior to the filing of this action, received a non-emergency telephone call(s) from DIRECTV and/or its third-party debt collectors regarding a debt allegedly owed to DIRECTV, to a cellular telephone through the use of an artificial or prerecorded voice and who did not provide the cellular phone number called on any initial application for a DIRECTV service." (pp. 8-9) Immediately following this definition, it is stated, "Plaintiff seeks certification of a subclass of such persons who are not DIRECTV customers." (p. 9)

[36] 2020.06.24 Direct Notice – Final Disposition Codes (737476185_1.xlsx)

Exhibit 6
Page 13

CONFIDENTIAL

32.  As a general matter, key words, codes, and phrases that appear in call data indicating the possibility of a wrong number are not based on objective evidence of a wrong number, such as an industry-wide wireless phone directory that provides names associated with wireless telephone numbers.  Such a directory does not exist.  Instead, these key words, codes, and phrases may be the result of the call recipient answering the phone and indicating (truthfully or not) either to an interactive voice response system ("IVR") or a live agent that the call is a "wrong number."  In some cases, as will be discussed later in my report, the code or phrases may instead be the result of a live agent entering a "wrong number" disposition for reasons unrelated to having reached an unintended recipient.  For example, in some cases a "wrong number" disposition may be entered by a live agent because the phone number is invalid, because the party reached is the intended recipient but the recipient indicated a preference for being reached at a different number, or for other reasons.

33.  The Court appears to have acknowledged that customers may falsely represent to a debt collector that the debt collector called a wrong number.[37]  The Court nevertheless asserted that Plaintiff can distinguish between a false "wrong number" designation and a true one:

> "[…] it appears likely that all debt collectors have a similar coding scheme to record wrong numbers, as instructed by Defendant.  Defendant's databases can also be used to determine whether a phone number with a 'wrong number' notation is a result from [sic] a customer falsely telling a debt collector it called a wrong number.  Together, each Class and Subclass member will be identified using a common procedure that utilizes Defendant's databases and debt collectors' call logs."[38]

34.  The Court did not indicate how Defendant's databases and debt collectors' call logs could be used via a common procedure, or via any procedure, to determine whether a phone number with a "wrong number" disposition is genuinely a wrong number or the result of a customer falsely telling a debt collector it called a wrong number, the result of the disposition being used to identify numbers that the called party asked not to be used in favor of a preferred number, or some other fact pattern.

---

[37] *03/29/2019 Order re Plaintiff's Motion for Class Cert*, p. 21.

[38] *03/29/2019 Order re Plaintiff's Motion for Class Cert*, p. 21.

11

Exhibit 6
Page 14

CONFIDENTIAL

35.     Additionally, the Court concluded that "Plaintiff's proposed method" could identify Ms. Brown as a member of the then-certified class by reference to DIRECTV's Receivables Management System/Subscriber Transaction Management System ("RMS/STMS"), stating, "If Plaintiff's phone number was not in the RMS/STMS as Defendant asserts, then CMI did not receive her number from Defendant, which suggests CMI retrieved it through skip-tracing."[39]  However, while this logic was relevant to the then-certified class, it is not applicable to the currently certified Class as modified.  In the currently certified Class definition, obtaining a phone number via skip-tracing does not qualify the call recipient for Class membership, unless the skip-traced number was incorrect, because the certified Class consists of individuals who were called by DIRECTV but were not customers, regardless of the source of the phone number dialed.

36.     Further, the Court did not indicate what it meant by "Plaintiff's proposed method;"[40] the only "method" that Plaintiff mentioned in her Memorandum of Points was identifying wrong numbers via a "wrong number" disposition code, as quoted above.

37.     Plaintiff did not propose a methodology that involves the RMS/STMS or other DIRECTV databases,[41] nor any method for distinguishing, among the phone numbers with designated dispositions, between falsely reported "wrong numbers" and actual wrong number calls.

---

[39] Prior to the modified Class definition, the Court stated that the "Plaintiff's proposed method for identifying putative members could have identified her as a Subclass member." *03/29/2019 Order re Plaintiff's Motion for Class Cert*, pp. 21-22.  RMS is an abbreviation for Receivables Management System. (*06/22/2018 Husman Declaration*, ¶ 12.)  Also note that STMS is an abbreviation for Subscriber Transaction Management System. According to Gail Husman, "At the time a customer's account is written off (and before any placement with a collections vendor), DIRECTV's primary Subscriber Transaction Management System ('STMS') takes a snapshot of certain customer information at the time of write-off (including telephone numbers)." (underline in the original) *06/22/2018 Husman Declaration*, ¶ 13.

[40] *03/29/2019 Order re Plaintiff's Motion for Class Cert*, p. 21.

[41] In reference to the then-proposed class in the 05/25/18 Memorandum of Points, Plaintiff stated, "Indeed, DIRECTV's RMS system contains an electronic record clearly distinguishing every telephone number 'originally provided to DIRECTV by the customer' from every number obtained through 'Skip Tracing.' Through this common evidence, class membership can be readily determined." (*05/25/2018 Memorandum of Points,* p. 9) However, determining whether a phone number was "originally provided to DIRECTV by the customer," while relevant to the then-certified class, is not relevant to the currently certified Class as modified.

12

Exhibit 6
Page 15

CONFIDENTIAL

38. I understand that in order to identify to whom to send notice, the parties agreed in their Notice Plan that Angeion, a class action notice and claims administration firm,[42] would perform a "reverse-lookup" of each of the telephone numbers associated with any on a list of agreed-upon "wrong number codes" that may have received at least one prerecorded DIRECTV telephone call.[43]  Pursuant to that plan, I understand that the parties provided Angeion with a list of telephone numbers associated with a "wrong number code."[44]

39. The names and addresses that resulted from the reverse-lookup search were compared with records in DIRECTV's Receivables Management System ("RMS"), a procedure I describe in further detail in Section V.  I understand that Angeion then "looked up the email addresses associated with each phone number" and subsequently emailed more than 700,000 potential Class members.[45]

40. I also understand that Angeion implemented a media notice program consisting of digital banner ads and social media ads, in addition to establishing a website and a toll-free hotline for this class action.[46]

## C.    The Calling Process and Call Data in this Case

41. I understand that DIRECTV generally works with two types of outside collection agencies (OCAs) to collect debts.  These are referred to by DIRECTV as first-party and third-party outside collection agencies.[47]

---

[42] Declaration of Danielle Bracy of Angeion Group LLC, *Jenny Brown, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, April 14, 2021 (hereafter, *04/14/2021 Bracy Declaration*), ¶ 1.

[43] Joint Notice of Motion and Motion to Approve Class Notice, *Jenny Brown, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, June 19, 2020 (hereafter, *06/19/2020 Notice Plan*), p. 4.

[44] *04/14/2021 Bracy Declaration*, ¶ 5.

[45] *04/14/2021 Bracy Declaration*, ¶¶ 8-9.

[46] *04/14/2021 Bracy Declaration*, ¶¶ 11-14.

[47] See, for example, *03/06/2020 Production Letter.*

13

Exhibit 6
Page 16

CONFIDENTIAL

42.   First-party outside collection agencies collect in the creditor's name (DIRECTV) soon after an account first becomes delinquent.[48]

43.   I understand that after a delinquent DIRECTV subscriber's service has been disconnected for a certain number of days, the subscriber's account balance is written off by DIRECTV.[49]   If that subscriber's account has an unpaid balance in excess of a certain amount, DIRECTV places the account with an third-party outside collection agency.[50] Third-party outside collection agencies collect in their own name.[51]

44.   When an account is placed with a third-party outside collection agency, DIRECTV provides to the collection agency certain contact information for the customer and information regarding the amounts owed.[52]   This information is provided by DIRECTV to collectors through the RMS interface.[53]   RMS contains a snapshot of customers' then-current contact telephone numbers at the time of the collections activity (i.e., those telephone numbers that were effective immediately before the write-off).[54]   I understand that in some cases, the outside collection agencies uploaded to RMS some information regarding their calling and other collections efforts.

45.   The third-party outside collection agency might use the telephone number(s) provided by DIRECTV to contact the delinquent customer or it might independently obtain telephone number(s) for that customer.[55]   I understand that DIRECTV does not control or oversee the third-party outside collection agencies' processes.[56]

---

[48] See the National Consumer Law Center (NCLC) Digital Library, § 1.3.5.1, at
      https://library.nclc.org/fdc/01030501-0.

[49] *06/22/2018 Husman Declaration*, ¶ 5.

[50] *06/22/2018 Husman Declaration*, ¶¶ 5-6.

[51] See the National Consumer Law Center (NCLC) Digital Library, § 1.3.5.2.1, at
      https://library.nclc.org/fdc/0103050201-0.

[52] *06/22/2018 Husman Declaration*, ¶ 12.

[53] *06/22/2018 Husman Declaration*, ¶¶ 12-15.

[54] *06/22/2018 Husman Declaration*, ¶¶ 12-15.

[55] *06/22/2018 Husman Declaration*, ¶ 10.

[56] *06/22/2018 Husman Declaration*, ¶ 8.

14

Exhibit 6
Page 17

CONFIDENTIAL

46.   I received data that were produced in discovery relating to 26 different OCAs.  Some of the data sets I received were, as I understand, produced directly by OCAs.  I also received data from DIRECTV's RMS system that, in turn, contains information on call results uploaded to the RMS system by some OCAs.  I will refer to the data from DIRECTV's RMS that contain information about OCA calls as the DTVRMS Notes data.  Exhibit 3 summarizes the OCA data that I received.

47.   Plaintiff provided designated dispositions for Transworld Systems, Inc. (TSI), Afni, iQor, Diversified Consultants, Inc. (DCI), Nationwide Credit, Inc. (NCI), CMI, NCO Group, Inc. (NCO), and the DTVRMS Notes data.  Not all of the OCAs' data were analyzable for purposes of this case because, for example, some OCAs' data, while containing call information, did not contain the telephone number dialed.  Exhibit 4 summarizes the data that I analyzed.  The OCAs whose data I included in my analyses are: CMI, iQor, TSI, DCI, Afni, NCI,[57] NCO, and Receivables Management Services, LLC.[58]

## IV.  A DESIGNATED DISPOSITION DOES NOT PROVIDE VERIFIABLE OR RELIABLE EVIDENCE OF A WRONG NUMBER

48.   The data sets I analyzed contain dispositions.  A disposition is a set of numbers, letters, phrases, or keywords intended to describe the outcome of a telephone call, an attempted telephone call, or, in some cases, an unattempted telephone call.[59]  In the data produced in this case by the collection agencies, not all collection agencies' data contain dispositions.

---

[57] NCI produced two data sets, DTV013949 and DTV035708.  These two data sets have different structures and a different set of dispositions.  Plaintiff did not designate dispositions for DTV035708, so I did not include it in my analysis.  According to *03/06/2020 Production Letter* for DTV013949, NCI did not dial wireless phone numbers during the time period covered by this data set.  However, I included the data set DTV013949 in my analysis in case some numbers in that data set are later determined to be wireless.

[58] Note for clarity that Receivables Management Services LLC is an OCA and is not to be confused with DIRECTV's RMS system or data produced by DIRECTV from its RMS system.  I will hereafter refer to the OCA Receivables Management Services LLC as RMSLLC.  RMSLLC data are in DTVRMS Notes.

While the OCA DCI provided data, there are also DCI call data in the DTVRMS Notes data.  The time periods covered by these two sources overlap, and it appears that records for some, but not all, calls in the overlapping period may appear in both sources.

[59] A call may be attempted but not completed if, for example, it received a signal from the network that the number was not in service; a call may have been unattempted if, for example, the phone number was specified as a number not to call.  For example, "Specified Do Not Call (Not Made)" is a disposition in the NCI data.

Exhibit 6
Page 18

CONFIDENTIAL

In addition, of those that include dispositions, different collection agencies use different dispositions.

49. The key words, phrases, and codes in the produced call data that Plaintiff identified as those she believes to identify wrong number calls, which I have termed the "designated dispositions," are shown in Exhibit 5.[60]

50. I have analyzed the data produced in this case and the documents cited by Plaintiff and the Court.  Analysis of data and documents in this case demonstrates that:

- Contrary to the Court's understanding that debt collectors likely have a similar coding scheme to record wrong number calls, coding schemes used to record wrong numbers varied widely across debt collectors.  The designated dispositions identified by Plaintiff in the DTVRMS Notes data are not listed in the "DIRECTV LLC Vendor Guide to DPS and RMS for Third Party Collection Agencies" (the "Vendor Guide")[61] and are often idiosyncratic text strings that are part of a free-form note which would have to be interpreted in context.

- Contrary to the assertions of Plaintiff, the meanings of many of the designated dispositions are ambiguous or indeterminable.

- Plaintiff's designated dispositions in the TSI data are "key words" embedded in narrative comments.  The mechanical nature of identifying purported wrong numbers via key words in narrative comments results in Plaintiff ignoring "right party" disposition information in the same text entries that contain the purported "wrong number" key words, among other defects in the methodology.

- Data analysis indicates that dispositions cannot be relied upon to identify "wrong numbers" because, even aside from the ambiguity of the dispositions themselves,

---

[60] Exhibit 5 is a reproduction of a file produced by Plaintiff (2020.06.24 Direct Notice – Final Disposition Codes (737476185_1.xlsx)).

[61] See Declaration of Daniel M. Hutchinson in Support of Plaintiff's Motion for Class Certification, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, May 24, 2018 (hereafter, *05/24/2018 Hutchinson Declaration*), Exhibit C.  In referring to dispositions in the Vendor Guide, I am referring to information on p. 28 of that document, which has been cited by the Court in *03/29/2019 Order re Plaintiff's Motion for Class Cert*, pp. 20-21.  "DPS" is an abbreviation for "Debt Placement Service." (See *05/24/2018 Hutchinson Declaration*, Exhibit C, p. 172).

Exhibit 6
Page 19

CONFIDENTIAL

people who are called by a debt collector may falsely tell the debt collector that they have a wrong number. The analysis shows that many calls that were purportedly "wrong number" calls according to the dispositions identified by Plaintiff were indeed demonstrably to the intended customer. For example, analysis of data from the OCA with the most unique phone numbers with designated dispositions, iQor, demonstrates that for over 20 percent of purported wrong numbers as identified by Plaintiff's designated dispositions, there was another call to the same number on which the disposition "RIGHT PARTY" was used. This can happen if, for example, the called party claims to be the wrong party on one call but makes arrangements to pay the debt on a later call to the same number.

51.    I discuss each of these conclusions in the subsections that follow.

## A.    Coding Schemes Vary Widely Across Debt Collectors

52.    Dispositions vary widely across the OCAs. This is easily observable from Plaintiff's list of alleged designated dispositions, as shown in Exhibit 5. For example, Plaintiff designated only a single disposition in the iQor data ("WRONG NUMBER") and only a single disposition in the DCI data ("Wrong number"). In contrast, Plaintiff designated more than 90 dispositions in the TSI data. Examples of dispositions designated by Plaintiff in the DTVRMS Notes data are "rmv #," "##:TW:TW:Talked with 3rd party," and "## WND : Wrong Number Discon." These dispositions do not appear in the other analyzed data. Plaintiff designated six dispositions in the Afni data, none of which appears in the other analyzed data sets.

53.    The wide variability of dispositions across OCAs occurs not only with respect to the designated dispositions, but also with respect to other dispositions. For example, dispositions in the data pertaining to NCI include "AGENT – PTP Arranged," "AGENT – PTP Payment in Full," "AGENT – CUST RPC 2," "AGENT – CUST RPC 3," "AGENT – CUST RPC PTP 1" and "AGENT – CUST RPC PTP 2." In my experience analyzing debt collector dialer data, PTP often stands for "Promise to Pay" and RPC often stands for "Right Party Contact." The disposition "Promise to Pay" appears (as that phrase) in data

17

Exhibit 6
Page 20

CONFIDENTIAL

from DCI and TSI.  In the DCI data, records that appear to indicate a promise to pay are denoted "PP."  In CMI's documentation, "Promise to Pay" is provided as an explanation for certain numeric codes.[62]  In contrast, the iQor data, for example, do not contain the dispositions "Promise to Pay" or "PTP."  As another example, TSI contains the dispositions "UNRECOGNIZED LINE" and "GOT MONEY," but these dispositions do not appear in any of the other OCA data sets that I analyzed.  The Afni data have no dispositions that clearly correspond on their face to successful calls with the customer, although undoubtedly Afni, which, as an OCA, is in the business of resolving debts, must have some means of annotating that it achieved its goal.

54.   The Court asserted that Defendant's Vendor Guide indicates that it requires all debt collectors to provide the same type of documentation with regard to dispositions.[63]  I understand that the Vendor Guide purports to apply to how OCAs are to upload information reflecting call outcomes to RMS.  The Vendor Guide describes key fields in the DTVRMS Notes data.[64]  Hence, to the extent the Vendor Guide is applicable, it is relevant to OCA information that appears in the DTVRMS Notes data but not necessarily to the data that the OCAs produced directly, though there are a few codes that overlap.

55.   While the Vendor Guide contains definitions of certain dispositions,[65] the OCAs that I analyzed in the DTVRMS Notes data, DCI and RMSLLC, also used dispositions that are not defined in the Vendor Guide.  For example, DCI uses the disposition "TT" (meaning

---

[62] For example, Exhibit H of *05/24/2018 Hutchinson Declaration*, which is a document titled "System Codes," associates the explanation "Promise to Pay" with certain numeric codes.

[63] The Court cites to the "DIRECTV, LLC Vendor Guide to DPS and RMS For Third Collection Agencies" ("Vendor Guide") *03/29/2019 Order re Plaintiff's Motion for Class Cert,* pp. 20-21.

[64] *05/24/2018 Hutchinson Declaration*, Exhibit C, p. 194.

[65] *05/24/2018 Hutchinson Declaration*, Exhibit C, p. 195.

Exhibit 6
Page 21

CONFIDENTIAL

"Talked to debtor")[66] and RMSLLC uses the disposition "90"[67], neither of which is defined in the Vendor Guide.

56.  I understand from Ms. Leslie Belloso, Lead Credit Analyst at AT&T Credit and Collections, and Mr. Lino Jameal, Manager of Quality/M&P/Process at AT&T Credit and Collections, that prior to 2012, OCAs could send notes to RMS but there was no systematic protocol for doing so.  Between 2012 and 2017 OCAs were expected to upload common dispositions to RMS, but OCAs did so only if they chose to, and the data themselves demonstrate that when they did upload notes the OCAs did not in fact use a common set of codes.[68]

**B.    The Meanings of Many of the Designated Dispositions Are Ambiguous or Indeterminable**

57.  Of the OCA data provided directly to me by the OCAs, documents or data defining or describing the meaning of the dispositions in the data that I analyzed were provided for only three OCAs:  CMI, DCI, and NCO.

58.  CMI produced documents defining some of the dispositions it used.[69]  DCI did not produce a data dictionary, but in the DCI data file itself there is a field labeled "comment" that

---

[66] DTV013919–013921.  DCI records in the DTVRMS Notes data contain in the "note" field the same dispositions and descriptions as in the data produced by DCI.  DCI records in the DTVRMS Notes data that contain the disposition "TT" in the "note" field also contain the phrase "Talked to debtor" or "Talked to Consumer" in the "note" field.  In the data produced by DCI, records that have the value "TT" in the "result" field have the phrase "Talked to debtor" or "Talked to Consumer" in the "comment" field.

[67] DTV033860–9. There are records in the RMSLLC data that have the value "90" in the "code" field.

[68] Phone call with Ms. Leslie Belloso and Mr. Lino Jameal, April 28, 2020.

[69] I received information regarding definitions of CMI dispositions from: 1) Exhibit G of *05/24/2018 Hutchinson Declaration*, which is a document called "System Training" that includes a page entitled "Smart Codes to Learn" (p. 322), which contains definitions that also appear in Exhibit I of *05/24/2018 Hutchinson Declaration*, as well as pages entitled "Information from the Codes" (pp. 319-320, 341, 395-396, 421), which list several one-letter or two-letter alphanumeric codes that do not appear in the data produced by CMI; 2) Exhibit H of *05/24/2018 Hutchinson Declaration*, which is a document titled "System Codes"; 3) Exhibit I of *05/24/2018 Hutchinson Declaration*, which is a document titled "Smart Codes to Learn – Disposition and Hold Codes"; 4) Email, Kyle Steinmetz, to Debra Aron and Olga Ukhaneva, re: FW: CONFIDENTIAL COMMUNICATION and PRODUCTION BY THE CMI GROUP, INC. - Jenny Brown v DirecTV - Information Produced by third-party debt collector - The CMI Group, Inc., June 1, 2020; 5) DTV035718-19, which is a document titled "DIRECTV Dialer Result Extract"; and 6) Affidavit of Nelson Wilson, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case No. 2:13-CV-01170-DMG-E, February 9, 2021 (hereafter, *02/09/2021 Wilson Affidavit*), p. 6.  Mr. Wilson has served as Director of

19

Exhibit 6
Page 22

CONFIDENTIAL

appears to contain descriptions of the dispositions populated in a different field of the data. According to the Declaration of Andy Balthaser in Response to Subpoena, dated March 8, 2021, the "termination code" "BP" in the NCO data is defined as "bad phone."[70]  Neither documents nor data have been produced by any other OCAs to provide definitions of the dispositions used in the data that I analyzed.

59.  Because the dispositions vary widely across OCA data sets, as discussed in the previous subsection, information about the dispositions used by CMI, DCI, and NCO is not dispositive and is not necessarily informative as to the meaning of the dispositions used by other OCAs.  Because DIRECTV does not control or oversee the third-party outside collection agencies' processes, it was also unable to provide me with data dictionaries or other information about the OCA data sets that is normally provided to an expert to explain data produced in litigation.

60.  Plaintiff's assertion that the designated dispositions are unambiguous and determinative of wrong numbers is not consistent with the available information.  Based on my experience examining and analyzing telecommunications call data, including in TCPA cases, along with my examination of the data sets in this case themselves, examples of ambiguous designated dispositions identified by Plaintiff include:

- In the TSI data, the disposition "DIED/PROMISE TO PAY" could be reasonably interpreted as a surviving relative indicating that he or she would pay in the name of a deceased family member, rather than indicating a wrong number.  The disposition "WRONG PARTY SD JST CB AT HIS NUM" could reasonably be interpreted as the call recipient having asked the agent to call back at a different

---

Compliance and Quality Assurance at Credit Management, LP since September 30, 2012 (*02/09/2021 Wilson Affidavit*, ¶ 1).

Some codes appear across multiple sources and others only appear in a subset of sources, and codes that appear across multiple sources are not necessarily defined identically across sources.

[70] Declaration of Andy Balthaser in Response to Subpoena, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case No. 2:13-CV-01170-DMG-E, March 8, 2021 (hereafter, *03/08/2021 Balthaser Declaration*), ¶ 27.  Mr. Balthaser is Vice Present, Compliance & Regulatory Affairs for Alorica Inc. (*03/08/2021 Balthaser Declaration*, ¶ 1).  Alorica purchased EGS Financial Care, Inc., which was formed in mid-2015 and became the successor to the business of NCO (*03/08/2021 Balthaser Declaration*, ¶ 2).

Exhibit 6
Page 23

but specific number, implying that the recipient is acquainted with the debtor and, perhaps, that the number called was provided by the debtor as one number at which he could be reached.

- In the DTVRMS Notes system, examples of designated dispositions include "##:TW:TW:Talked with 3rd party," "## WND : Wrong Number Discon," ".WR," "[0-9][0-9][0-9] is wr," and "is wrn."   The first disposition, ""##:TW:TW:Talked with 3rd party," does not contain any specific content related to a wrong number.  The disposition "## WND : Wrong Number Discon," may suggest that the number was "wrong" in the sense that it was disconnected. The other three dispositions, ".WR," "[0-9][0-9][0-9] is wr," and "is wrn" are ambiguous and are not even necessarily abbreviations for "wrong number," let alone references to a party reached in error.

- In the Afni data, examples of designated dispositions include "DELIVEREDPERSON HP (WRONG NUMBER)" and "TRANSFER AGENT WRONG NUMBER - PHONE 1."  In addition to the fact that the meaning of the phrase "DELIVEREDPERSON HP" is unclear, it is also unclear as to whether such dispositions imply that a number is "wrong" because the wrong individual was reached, because the individual in question indicated that they preferred to be reached at a different number, or for some other reason.

- As noted earlier, I obtained definitions of dispositions for CMI from multiple sources, but some definitions are inconsistent across sources and some definitions are ambiguous.  For example, the designated disposition "241" is defined as "Wrong Number" in a document produced by CMI titled "System Codes,"[71] but as "1 or more 'bad' numbers (including Direct TV accounts)" in a document called "Smart Codes to Learn —Disposition and Hold Codes" also produced by CMI.[72]  According to a third source, the Affidavit of Nelson Wilson, dated

---

[71] *05/24/2018 Hutchinson Declaration,* Exhibit H.

[72] *05/24/2018 Hutchinson Declaration,* Exhibit I.

Exhibit 6
Page 24

CONFIDENTIAL

February 9, 2021 ("Wilson Affidavit"), CMI described "wrong number" calls as "not a good number for Dtr [debtor]."[73]  These definitions are inconsistent and ambiguous because a "bad" number or "not a good number for Dtr [debtor]" may refer to a variety of call outcomes other than a "wrong" number, including a non-working number or a number at which the debtor finds it more convenient to be called.

### C.    The Designated Dispositions in the DTVRMS Notes Data Are Not Listed in the Vendor Guide and Are Often Ambiguous

61.   I explained in Section IV.A that, while the Vendor Guide contains definitions of dispositions,[74] the OCAs whose call results I analyzed in the DTVRMS Notes data, DCI and RMSLLC, also use dispositions that are not defined in the Vendor Guide.  As I also noted earlier, each of the data sets produced by OCAs that I analyzed also contain dispositions that are not defined in the Vendor Guide.

62.   The table of dispositions DIRECTV provides as guidance to the OCAs whose data are relevant to this case appears on p. 28 of the Vendor Guide.[75]  None of the 80+ dispositions designated by Plaintiff in the DTVRMS Notes data are listed on p. 28 of the Vendor Guide, however.  One of Plaintiff's designated dispositions, "Bad Phone Number," is similar in wording to "Bad Phone" on p. 28 of the Vendor Guide, but the Vendor Guide defines "Bad Phone" as "Disconnected phone number or other."[76]

63.   "Disconnected phone number or other" is sufficiently ambiguous to encompass many possible outcomes.  This deficiency affects several of Plaintiff's designated dispositions because Plaintiff designated "Bad N," "Bad #," and "bad#" in DTVRMS Notes as well, as shown in Exhibit 5.

---

[73] *02/09/2021 Wilson Affidavit*, ¶ 44.

[74] *05/24/2018 Hutchinson Declaration*, Exhibit C, p. 195.

[75] Page 28 of the Vendor Guide corresponds to p. 195 of *05/24/2018 Hutchinson Declaration*, Exhibit C.

[76] *05/24/2018 Hutchinson Declaration*, Exhibit C, p. 195.

Exhibit 6
Page 25

CONFIDENTIAL

64. In addition, the dispositions that Plaintiff designated to denote a "wrong number" are often comprised of a collection of words or symbols that can reasonably admit many interpretations and whose use cannot be inferred from their face.

65. For example, as cited earlier, Plaintiff includes as designated dispositions for the DTVRMS Notes data "##:TW:TW:Talked with 3rd party" and "## WND : Wrong Number Discon." At best, these dispositions might form the basis for a start to an individual inquiry, in which it could be probed in discovery whether, for example, the "3rd party" referenced in the disposition (such as a family member or a roommate) answered the phone of the intended called party; whether "WND" refers to a number that was out of service; or whether these dispositions denote some other call outcome.

66. Similarly, most of the other dispositions designated by Plaintiff in the DTVRMS Notes data include the terms "wrong," "wrg," or the letter "w" with some other permutation of letters, or include the terms "remove," "removed," "removing," or a possible abbreviation of those words.

67. For reasons already discussed, the term "wrong" or abbreviations of it cannot dispositively identify that the called party indicated to the agent or dialer that the number was incorrect, let alone distinguish between calls on which such a representation was truthful from those on which such a representation was false.

68. The terms "remove," "removed," "removing," or abbreviations of those terms may apply to a variety of scenarios that do not necessarily indicate that a wrong party was reached. For example, when examining RMSLLC call records in the DTVRMS Notes data, in approximately 75% of the call records that include one of the two designated dispositions "REMOVING OLD #" or "REMOVING OLD#," there is also a row associated with the same call record that contains the phrase "GOOD PHONE" and the two letter code "GP." In the Vendor Guide, the "Comment Code" of "Good Phone" and the "2 Digit Maint Code" of "GP" correspond to a "Description" of "Confirmed Phone number from Right Party Contact Skip Trace other."[77]  These notations suggest that the phone number that was

---

[77] *05/24/2018 Hutchinson Declaration*, Exhibit C, p. 195.

23

Exhibit 6
Page 26

CONFIDENTIAL

called was confirmed as a right party phone number, undermining the interpretation of "removed" and its permutations and abbreviations as indicators of a wrong number.

### D. Plaintiff's Designated Dispositions in the TSI Data Ignore Contradictory Evidence in the Very Same Text Strings

69.  As noted earlier, 1) Plaintiff identified more than 90 dispositions as designated dispositions in the TSI data, and 2) these dispositions are collections of words or symbols that are difficult to discern in many cases.  In the TSI data, there is no disposition field, but rather there is a free-form text field containing comments.  This "comment" field generally begins with text that reflects the call disposition, but with many exceptions and irregularities.[78] The same field also contains text that appears to have been typed in manually by the agent. Plaintiff chose a set of key words that, if found within the comment text, purportedly identify a wrong number.   Some of these search phrases contain all or part of a call disposition, but they often include other text as well.

70.  In addition to the ambiguity of many of these collections of words or symbols identified by Plaintiff, such as the example "WRONG PARTY SD JST CB AT HIS NUM" that I noted earlier, another problematic aspect of Plaintiff's approach toward identifying "wrong numbers" via dispositions in the TSI data is that these collections of words or symbols identified by Plaintiff often comprise just one portion of the text commentary associated with a call.

71.  For example, Plaintiff designated the phrase "BAD NUMBER" as part of a text string in the call comments that identifies wrong number calls.  Consider the call record in the TSI data with the entry in the "comment" field "TEL OTHER/CONTACT MADE, DIALLED NUM 606 738 6901 TT CX MRDTRNSFRD-CANT RELOCATE NUM BEC IT IS TAGGED AS BAD NUMBER ADV COLLCTOR TO RELOCATE."[79]  Plaintiff would

---

[78] One reason for these inconsistencies is that the TSI data contain call records from two different databases that structured the contents of the "comment" field differently and the records themselves do not indicate from which database the record originated. Email, Kyle Steinmetz to Joshua Sherman and Hans Germann, re: Preliminary results and data questions, May 7, 2021.

[79] DTV013952–33830.  This call record is associated with the date June 25, 2013.

24

Exhibit 6
Page 27

CONFIDENTIAL

consider a phone number associated with this entry a "wrong number" because it contains the text string "BAD NUMBER."  However, this entry also contains the phrase "CONTACT MADE."  In addition, the entry contains the phrase "TT CX."  In the DCI data, "TT" is defined alternatively as "Talked to debtor" and "Talked to Consumer."[80]

72.  In another example, the "comment" field states "DEBTOR CALLED/CONTACT MADE, MRD MMDC ID AS Z AND VEF INFO ON ACCT, CALLED IN FOR SIF ADV NO SIF ON ACCT, IC 313-521-2531 WHICH ISNT A BAD NUMBER FOR Z."[81]  Plaintiff would consider a phone number associated with this entry a "wrong number" because it contains the text string "BAD NUMBER," but again the entry also contains the phrase "CONTACT MADE," and appears to be an inbound call from the debtor where the comment specifically states that the phone number "ISNT A BAD NUMBER."

73.  Because designated dispositions in the TSI data are contained in a free-form text field, in some cases more than one designated disposition appears in a call record.  Among the call records in the TSI data that contain one or more designated dispositions, the designated disposition "BAD NUMBER" is the one and only designated disposition in approximately 40 percent of the cases.  Yet there are many examples in which the call record that contains "BAD NUMBER" also contains the phrase "INVALID PHONE," which may indicate a disconnected number.  For example, the following entries appear in the "comment" field of the TSI data:

- "DIALER CALLED RESIDE/BAD NUMBER, 080709 1042 A1.BN 9782080373 LV INVALID PHONE;"[82]

- "IVR MESSAGE HOME/BAD NUMBER, 102609 1702 MO.BN 4086496999 LV INVALID PHONE;"[83] and

---

[80] DTV013919-013921.

[81] DTV013952–33830.  This call record is associated with the date June 20, 2011.

[82] DTV013952–33830.  This call record is associated with the date August 7, 2009.

[83] DTV013952–33830.  This call record is associated with the date October 26, 2009.

Exhibit 6
Page 28

CONFIDENTIAL

- "IVR CALLED/BAD NUMBER, 070109 1112 IH.BN 4095994537 LV INVALID PHONE."[84]

74. The examples above suggest that "BAD NUMBER" does not necessarily mean, or does not routinely mean, that the call was claimed by a called party to be a wrong number.

75. More generally, the above examples in which a phrase that refutes evidence of a wrong number call is contained in the same text entry as a phrase identified as a designated disposition by Plaintiff demonstrate the invalidity of Plaintiff's purported methodology for identifying wrong number calls by reference to a mechanical review of the call data. The examples demonstrate again the need for individual inquiry.

### E. Data Analysis Indicates That Many Calls Associated with Designated Dispositions Were Likely Made to the Intended Customer, Rendering Unreliable Any Methodology Relying on Dispositions to Identify Actual Wrong Numbers

76. As a more general matter, even if one were to presume to know that a particular disposition was recorded as a consequence of the called party reporting a wrong number, in any calling campaign it would not be surprising to learn that some called parties will, intentionally or unintentionally, untruthfully tell an agent or enter information into an IVR indicating that the agent has reached the wrong party as a way to end the call. The incentive to do so is likely heightened when the call pertains to debt collection.

77. As a further assessment of the reliability of Plaintiff's purported methodology for identifying wrong number calls via designated dispositions, I examined dispositions in the OCA data that suggest that the *correct* party was in fact reached on, or called in from, the alleged wrong phone number. I refer to a call associated with a disposition suggesting that the correct party was reached as a "successful call."

78. I focused on iQor. Of all the OCAs, iQor accounts for the largest number of unique phone numbers identified by Plaintiff's designated dispositions, with approximately 40 percent of those phone numbers appearing in the iQor data. The purpose of the analysis was to assess whether the designated dispositions are reliable indicators of actual wrong numbers

---

[84] DTV013952–33830.  This call record is associated with the date July 1, 2009.

26

Exhibit 6
Page 29

by examining whether there is other evidence in the data indicating that a successful call was associated with same number.  For example, if a call received a designated disposition, but on a later call to the same number the reached party agreed to pay the debt, I infer that the designated disposition is not a valid determinant of wrong numbers.

79.   In the iQor data there is a disposition "RIGHT PARTY."  For purposes of my analysis, I assumed that this disposition was used by iQor when the agent reached the intended party.

80.   Plaintiff designated one disposition in the iQor data—"WRONG NUMBER."  For each unique phone number associated with the disposition "WRONG NUMBER" in the iQor data, I examined whether the disposition "RIGHT PARTY" was associated with another call that was placed to the same phone number.

81.   For the approximately one million unique phone numbers associated with the disposition "WRONG NUMBER" in the iQor data, I found that approximately 22 percent of these numbers were also associated with at least one call with the disposition "RIGHT PARTY." (See Exhibit 6.)

82.   This analysis could not be performed on each of the other OCA's data sets individually.  For example, as I noted earlier, there were no dispositions in the Afni data that I could reasonably identify as a successful call disposition, so I do not know how Afni identified such calls.  In the TSI data, over 40 percent of all records do not show an identifiable phone number, and over 83 percent of the records with a successful call disposition do not have a phone number indicated.  Hence, calls with designated dispositions in the TSI data could not be tracked to determine whether the same number was associated with a successful call.[85]  Moreover, I understand that NCO did not produce all of its call records but instead produced only those "that include a disposition code of 'bad number.'"[86]  I therefore interpret that the NCO data were censored to exclude any successful calls.  I also understand from the Wilson Affidavit that while CMI provided call data to DIRECTV that

---

[85] In the TSI data, I classified the dispositions "AUTHORIZED CC," "AUTHORIZED CREDIT CD," "CONTACT MADE," "GOT MONEY," "GOOD NUMBER," and "PROMISE TO PAY" as indications that the right party had been reached.  Also note that the TSI data contained in DTVRMS Notes do not contain phone numbers, as noted in Exhibit 3.

[86] See, for example, *03/06/2020 Production Letter*.

27

Exhibit 6
Page 30

were produced in this litigation, the data do not "include all of the calls that CMI made for DIRECTV, just those files that CMI has retained."[87]   An analysis of successful calls associated with purported wrong numbers therefore could not be performed individually using CMI data because successful calls may have been recorded in files not retained by CMI.[88]

83.  To overcome these deficiencies and analyze all of the OCAs to the extent feasible, I analyzed all the data together.  That is, I considered all of the phone numbers in the combined data sets that had designated dispositions.  I examined whether those same phone numbers had successful call dispositions in *any* of the data sets.  For example, if a phone number received a designated disposition in the TSI data, I examined whether that same number received a successful call disposition from any of the OCAs in my data. The dispositions that I classified as indicative of successful calls in each data set are listed in Exhibit 7.

84.  Overall, approximately 13 percent of phone numbers associated with a designated disposition were also associated with at least one call with a successful call disposition in Exhibit 7 in at least one of the OCA data sets that I analyzed—suggesting that the phone number belonged to a DIRECTV customer and was not a wrong number, the designated disposition notwithstanding.[89]

85.  In addition, among the phone numbers associated with both a designated disposition and a successful call disposition, over two-thirds were associated with a successful call disposition sometime after or within 90 days before the designated disposition being recorded.

86.  In my opinion, these results constitute a severe indictment of the reliability of dispositions to identify any wrong numbers.  While many of the telephone numbers associated with a

---

[87] *02/09/2021 Wilson Affidavit* ¶¶ 50-51.

[88] In addition, CMI data contained in DTVRMS Notes do not contain phone numbers, as noted in Exhibit 3.

[89] This number—13 percent—certainly underestimates the percentage of calls with designated dispositions that in fact were also associated with successful calls.  This is because, as I explained, the number is derived from data sets that were partially censored to exclude successful calls and because there are many ambiguous dispositions in the data that I do not classify as indicative of the right party being reached.

Exhibit 6
Page 31

designated disposition were not associated with another successful call, the fact that many were associated with another successful call demonstrates the unreliability of treating dispositions in call data as dispositive of wrong numbers and the necessity of individual inquiry to determine which, if any, of the purported wrong number calls in fact reached wrong numbers.

87.    One cannot conclude that any telephone numbers that had a designated disposition but did not have a successful call disposition were properly identified as wrong numbers without further inquiry.  First, as I have discussed, the dispositions in these data sets are generally undefined.  There is insufficient information in the call records to know what the use was in practice at any of the OCAs for any of the designated dispositions, and they are necessarily ambiguous.  But even if the use of the dispositions at each OCA were known, and even if one were able to identify and refine the set of "designated dispositions" to those (if any) that uniquely were used by the OCAs to identify calls in which a recipient answered the phone and indicated that the call was a wrong number, the analysis I just reported demonstrates that it would not be possible from the data to determine which were truthful reports and which were not.  Called parties who intentionally or unintentionally misled the dialer or agent into coding the calls as "wrong number" calls would not necessarily choose to identify themselves on a later or earlier call to arrange payment or confirm the phone number.  The fact that some do demonstrates that the designated dispositions are not reliable indicators of wrong numbers on any call.

88.    Indeed, there is no definitive evidence in the data that there was even one true wrong number call.  As a general matter, customers receiving calls for debt collection may untruthfully or erroneously tell the agent that they called a wrong number, and I am unaware of any reliable method of distinguishing between the true wrong number calls and the false wrong number calls without individual inquiry.

## V.    MATCHING THIRD-PARTY DATA WITH DEFENDANT DATA CANNOT RELIABLY DISTINGUISH BETWEEN TRUE WRONG NUMBERS AND FALSE WRONG NUMBERS

89.    As noted earlier, the Court acknowledged that designated dispositions in call records may or may not identify a true wrong number, because a customer might falsely claim to the

29

Exhibit 6
Page 32

CONFIDENTIAL

OCA that they were not the intended called party.  The Court asserted, however, that "Defendant's databases" could be consulted to sift out the false wrong numbers in order to retain only the true wrong numbers.[90]

90.    Neither the Court nor Plaintiff has articulated how such an exercise could be conducted, given that there is no indication that Defendant's databases contain the names of individuals who happen to own phone numbers that appear in DIRECTV's customer databases but who are not and have not been, since October 1, 2004, DIRECTV customers. As an example, DIRECTV's databases would presumably not contain the name of Plaintiff, Ms. Brown, because, according to her Declaration, she was never a DIRECTV customer.[91]

91.    The fact that Defendant's data are not sufficient to determine the identities of individuals purportedly called on wrong numbers was recognized in the Notice Plan.[92]  In the Notice Plan, the parties agreed that to attempt to identify the owners of purported "wrong numbers," a notice administrator, Angeion, would use third-party data to perform a "reverse-lookup" of each of the cellular telephone numbers associated with an agreed-upon "wrong number" code that may have received at least one prerecorded DIRECTV telephone call.[93]

92.    A "reverse-lookup" database is a set of data that purports to provide names and other identifying information, such as addresses, of individuals associated with specific phone numbers.[94]  The purpose of the reverse-lookup performed by Angeion was to identify the individuals who may have owned the telephone numbers when the alleged violation calls were made to those numbers.[95]  According to the Declaration of Danielle Bracy, Project Manager at Angeion, Angeion also used a third-party reverse-lookup data provider to

---

[90] *03/29/2019 Order re Plaintiff's Motion for Class Cert,* pp. 3, 21.

[91] *05/25/2018 Brown Declaration*, ¶ 4.

[92] *06/19/2020 Notice Plan*.

[93] *06/19/2020 Notice Plan*, pp. 1, 4, 6.

[94] *06/19/2020 Notice Plan*, pp. 4, 6.

[95] *06/19/2020 Notice Plan*, p. 4.

Exhibit 6
Page 33

determine whether phone numbers were cellular numbers in addition to identifying the possible owners of the phone numbers.[96]

93.  The Bracy Declaration states, "DIRECTV then ran these phone numbers and names through its RMS database to determine whether the phone numbers belonged to current or former DIRECTV customers."[97]  This step to which the Bracy Declaration alludes entailed matching the reverse-lookup data relied upon by Angeion to DIRECTV's RMS database and was performed by my team under my supervision.  We compared the information for individuals identified in the reverse-lookup to DIRECTV's RMS database to determine if they had the same name (full, first, or last) and phone number (or another piece of corroborating information in addition to name) as a DIRECTV customer in DIRECTV's RMS database,[98] and individuals associated with such matches were subsequently removed from the notice pool.  Such a match indicates that the person called was not a wrong number and demonstrates that Plaintiff's list of designated dispositions identifies phone numbers that are not, in fact, wrong numbers.

94.  Beyond identifying "wrong numbers" via designated dispositions, Plaintiff has not offered any methodology for identifying members of the Class, so I do not know whether Plaintiff intends to apply the same methodology as was conducted for purposes of Class notice for (1) distinguishing between true wrong numbers and incorrect wrong numbers; and (2) determining the identities of the relevant Class members.

95.  To the extent that it is Plaintiff's intention to apply the same methodology for sifting the phone numbers identified by designated dispositions to eliminate those that are not true wrong numbers, and for identifying the names of the individuals called on true wrong numbers, the steps performed for Class notice cannot reliably achieve either objective in the absence of individual inquiry, as I explain in the following subsections.

---

[96] *04/14/2021 Bracy Declaration*, ¶¶ 1, 6.

[97] *04/14/2021 Bracy Declaration*, ¶ 7.

[98] I describe this procedure in more detail in Section V.C.

Exhibit 6
Page 34

CONFIDENTIAL

### A. Angeion Was Unable to Provide Any Identifying Information for the Majority of the Possible Class Member Phone Numbers, and the Information That Was Provided Generally Did Not Identify Unique Individuals

96. Angeion was not able to provide names nor addresses for the majority of purported potential Class members. Specifically, Angeion returned name and address information for fewer than 20 percent of the phone numbers that were provided to it. That is, Angeion was unable to provide *any* name or address for over 80 percent of the phone numbers identified as belonging to potential Class members.[99]

97. For the minority of phone numbers for which Angeion was able to provide name and address information, Angeion's findings did not restrict the name associated with an alleged wrong phone number to one individual. On the contrary, as Angeion itself pointed out in an email to Plaintiff's and Defendant's counsel, it found "up to 5 hits for each phone number and up to 3 addresses for each hit."[100]

98. I have received and reviewed the results of Angeion's reverse-lookup query. Of the approximately 2.5 million phone numbers associated with Plaintiff's designated dispositions, I found that fewer than 12 percent of those phone numbers were identified with only one name in the Angeion data.

99. As an example of the multiplicity of names and addresses associated with a single phone number, Table 1 shows the records associated with the phone number (201) 204-8787 in the data relied upon by Angeion. According to the OCA data, this phone number was dialed by iQor in 2012 and by DCI in 2013.

---

[99] My understanding is that there were approximately 2.5 million phone numbers associated with Plaintiff's designated dispositions. I also understand that Plaintiff sent these phone numbers to Angeion. Plaintiff produced data containing approximately 450,000 unique phone numbers that were classified as wireless numbers by Angeion. Angeion classified the vast majority of records returned from its reverse-lookup as associated with a wireless phone (see Email, Danielle Bracy, Project Manager, Angeion Group, to Daniel Hutchinson, re: Direct TV, September 25, 2020 (hereafter, *09/25/2020 Bracy Email*)).

[100] *09/25/2020 Bracy Email.*

Exhibit 6
Page 35

CONFIDENTIAL

## Table 1

## Results of Angeion's Reverse-Lookup of the Phone Number (201) 204-8787

| Phone_Number | Earliest | Latest | Full | First | Middle | Last | Address | City | State | Date1stSeen | DateLastSeen | RecordType |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2012048787** | **2012-03-24** | **2017-11-21** | **DRENA DOBRA** | **DRENA** | | **DOBRA** | **322 BROADWAY APT A** | **BAYONNE** | **NJ** | **01/09/2015** | **01/07/2020** | **Ownership** |
| 2012048787 | 2012-03-24 | 2017-11-21 | DRENA DOBRA | AKEEM | J | CROCKET | 341 N TENNESSEE AVE APT 312 | ATLANTIC CITY | NJ | | | Address |
| 2012048787 | 2012-03-24 | 2017-11-21 | DRENA DOBRA | ANGELA | | CROCKETT | 1012 N MICHIGAN AVE | ATLANTIC CITY | NJ | | | Address |
| 2012048787 | 2012-03-24 | 2017-11-21 | DRENA DOBRA | DRENA | | DOBRA | 322 BROADWAY APT 1 | BAYONNE | NJ | | | Address |
| **2012048787** | **2012-03-24** | **2017-11-21** | **AKEEM CROCKETT** | **AKEEM** | | **CROCKETT** | **31 MAUREEN CT** | **ERIAL** | **NJ** | **01/06/2014** | **01/06/2014** | **Ownership** |
| 2012048787 | 2012-03-24 | 2017-11-21 | AKEEM CROCKETT | AKEEM | J | CROCKETT | 386 AVENUE A | BAYONNE | NJ | | | Address |
| 2012048787 | 2012-03-24 | 2017-11-21 | AKEEM CROCKETT | DRENA | | WALSH | 47 COLUMBIA AVE 1 | JERSEY CITY | NJ | | | Address |
| 2012048787 | 2012-03-24 | 2017-11-21 | AKEEM CROCKETT | ANGELA | | CROCKETT | 341 N TENNESSEE AVE | ATLANTIC CITY | NJ | | | Address |
| **2012048787** | **2012-03-24** | **2017-11-21** | **ANGELA CROCKETT** | **ANGELA** | | **CROCKETT** | **322 BROADWAY APT A** | **BAYONNE** | **NJ** | **01/06/2014** | **01/06/2014** | **Ownership** |
| 2012048787 | 2012-03-24 | 2017-11-21 | ANGELA CROCKETT | ANGELA | A | MONTO | 47 COLUMBIA AVE APT 1 | JERSEY CITY | NJ | | | Address |
| 2012048787 | 2012-03-24 | 2017-11-21 | ANGELA CROCKETT | AKEEM | J | CROCKETT | 2825 ARCTIC AVE APT 2 | ATLANTIC CITY | NJ | | | Address |
| 2012048787 | 2012-03-24 | 2017-11-21 | ANGELA CROCKETT | DRENA | | DOBRA | 386 AVENUE A APT 2 | BAYONNE | NJ | | | Address |

Source:  Angeion data.

100. In Table 1, the second record (i.e., second row) indicates the "Full" name as DRENA DOBRA" whereas the "First" name is "AKEEM" and the "Last" name is "CROCKET."

101. Ignoring the "Middle" field, names in addition to "DRENA DOBRA" and "AKEEM CROCKET" that are associated with this one phone number in the "First" and "Last" fields include "ANGELA CROCKETT," "DRENA WALSH," "ANGELA MONTO," and "AKEEM CROCKETT" (spelled differently than "AKEEM CROCKET").   Hence, Angeion's reverse-lookup produced six names associated with this phone number.

102. In addition, Table 1 shows that at least three of the names associated with the phone number (201) 204-8787 are each associated with multiple addresses.

103. The relevant name for each phone number at issue in this case is the name of the person who used the phone at the time the relevant calls were made, not the person who uses the phone now.   Hence, to determine the relevant person associated with the phone number requires consideration of not only the phone number but also the dates of the calls.   The "date first seen" and "date last seen" fields shown in Table 1 imply that Angeion was unable to obtain any "ownership" information about this phone number before 1/06/2014.   But the calls at issue in this case that were made to this number in the OCA data sets were all made before 2014.   Hence, not only was Angeion unable to identify a unique individual, none of the ownership records provided purport to apply to the relevant time period.   For the same reason, the data also do not provide any information as to whether the person who received calls in 2012 was the same person who received calls in 2013.

33

Exhibit 6
Page 36

104. Angeion apparently was unable to refine the reverse-lookup data to determine which, if any, of the identified names was (or were) the individual(s) who actually received the purported "wrong number" calls from DIRECTV—i.e., is (or are) the potential Class member(s).  Instead, Angeion's "Class List"[101] that it created for its notice distribution includes 12 entries (name/address combinations) associated with this phone number.  Angeion apparently found three different email addresses associated with these 12 entries (one for Akeem Crockett and Akeem Crocket; one for Angela Crockett and Angela Monto; and one for Drena Dobra and Drena Walsh) and provided notice a total of 12 times to these 12 name/address combinations at the three email addresses.[102]

105. The "Class List" produced by Angeion contains 1,282,313 records.[103]  However, the example illustrates that the actual number of potential Class members in this list could be a fraction of the number of records.  This is because, out of the list of six names in the example, there may have been only one actual plaintiff; indeed, the individual (or individuals) who received the calls may not be on the list at all, as just discussed.

**B.      Third-Party Data Are Unreliable for Historical Reverse-Lookup of Recipients of Alleged Wrong Number Telephone Calls**

106. The third-party reverse-lookup database used by Angeion was supplied by LexisNexis.[104]  It was not supplied by Angeion itself, which "provides comprehensive settlement

---

[101] See DirecTV_Export_12-22.csv.

[102] Angeion did not disclose the source of the email address information, nor did Angeion reveal whether it made inferences that (for example) Angela Crockett and Angela Monto are the same person (despite having different addresses) and therefore have the same email address or whether, instead, Angeion's data source independently produced the same email address for the two names.

[103] See DirecTV_Export_12-22.csv.

[104] "Angeion performed data analysis with Lexis Nexis to determine whether the phone numbers were cellular telephones and the owner of each phone number and provided it to DIRECTV." (*04/14/2021 Bracy Declaration*, ¶ 6).

Exhibit 6
Page 37

management services for class actions," among other services.[105]  To my understanding, Angeion is not a data vendor.[106]

107.  As a general matter, sending telephone numbers to companies such as LexisNexis for reverse-lookup procedures, especially historical reverse-lookup information, is unreliable.

108.  LexisNexis does not disclose how it assembles its data.  On its website, LexisNexis states that it is not the source of the reverse-lookup data that it supplies and that the public records and commercially available data sources used in its reports may contain errors.[107]   In its Master Terms, LexisNexis also discloses that the source data may be inaccurate, that it does not provide a comprehensive compilation of the data, and that it does not warrant the correctness and completeness of its data.[108]

109.  The potential for reverse-lookup data to contain a material proportion of errors and omissions is validated by other evidence.  In one matter in which I testified, the plaintiff's expert witness testified that she believed the data from a particular third-party reverse-lookup data vendor, which she would rely upon for reverse-lookup services if she were class administrator, were 20 to 30 percent inaccurate.[109]

---

[105] See "Changing the Rules," Angeion Group, at https://www.angeiongroup.com/about.php.

[106] See *06/19/2020 Notice Plan*, pp. 1-2, which specifies the role of Angeion to be a notice provider–"Angeion is an experienced and capable notice provider who has the capability to administer email notice, and, if unsuccessful, postcard notice, as well as notice by internet publication."

[107] See "Phone Finder," LexisNexis Risk Solutions, at https://risk.lexisnexis.com/products/phone-finder. According to LexisNexis, its "Phone Finder" service "connects phones to identities" using a database of over 1,500 phone sources.  On the same page, it states, "Due to the nature and origin of public record information, the public records and commercially available data sources used in reports may contain errors."

[108] See "LexisNexis Master Terms & Conditions," LexisNexis, 2021, at https://risk.lexisnexis.com/masterterms. ¶12 of the Master Terms states that LexisNexis "DOES NOT MAKE AND HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE LN SERVICES. LN DOES NOT WARRANT THE CORRECTNESS, COMPLETENESS, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE LN SERVICES OR INFORMATION PROVIDED THEREIN." (Capitalization in the original.) Paragraph 12 then states "Due to the nature of public record information, the public records and commercially available data sources used in the LN Services may contain errors. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. The LN Services are not the source of data, nor are they a comprehensive compilation of the data. Before relying on any data, it should be independently verified."

[109] Hearing on Motions (Vol. 1), Proceedings before the Honorable Wiley Y. Daniel, Judge, United States District Court for the District of Colorado, *Seth Warnick, et al., v. DISH Network, L.L.C.*, In the United States District Court for the District of Colorado, Civil Action No. 12-cv-01952-WYD, March 19, 2014, pp. 125-126.

Exhibit 6
Page 38

CONFIDENTIAL

110. In the course of my work on TCPA matters in recent years I have researched and reviewed reverse-lookup data from several other data vendors in addition to LexisNexis.  I have not found a vendor that warrants the accuracy of its data, nor one that discloses its sources, nor one that documents the error rate or incompleteness rate of its data.  I have also not seen reverse-lookup data from any vendor that does not suffer the same types of deficiencies that I observed in the data relied upon by Angeion, as discussed in Section V.A above.  These deficiencies include, as illustrated there, a lack of any information on a substantial fraction of phone numbers, and multiple names associated with the remaining phone numbers.  I have also found that the reverse-lookup data sets from different vendors are not consistent with each other, by which I mean that for the same phone number, two different vendors will commonly have different sets of names.

111. Plaintiff also used LexisNexis to identify which telephone numbers were purportedly wireless at the time of the call for purposes of Class notice.[110]  There is no basis for concluding that LexisNexis's line type variable is accurate and, as just discussed, LexisNexis does not reveal how it derives its data, nor does it warrant its results.

### C.   Matching Third-Party Reverse-Lookup Data with Defendant Data Would Not Reliably Identify Actual Wrong Number Calls in the Absence of Individual Inquiry

112. If Plaintiff intends to use the data relied upon by Angeion, or other third-party reverse-lookup data, to distinguish between the phone numbers with designated dispositions which were true wrong numbers and those which were not, such an analysis would not be able to reliably make that distinction.

113. The Notice Plan called for Angeion to "perform a 'reverse-lookup' of each of the cellular telephone numbers associated with an agreed-upon 'wrong number code' that may have received at least one prerecorded DIRECTV telephone call."[111]  This would produce names and email addresses for "potential class members."[112]  Then the resulting data would be

---

[110] *04/14/2021 Bracy Declaration*, ¶ 6.

[111] *06/19/2020 Notice Plan*, p. 4.

[112] *06/19/2020 Notice Plan*, p. 4.

36

Exhibit 6
Page 39

CONFIDENTIAL

"compared to DIRECTV's customer database information to remove any persons who are/were DIRECTV customers."[113]  The Notice Plan then stated that Angeion would send an email to each individual in the remaining list.[114]  I refer to this as a "matching" methodology.  Under a matching methodology, every mismatch is identified as a Class member.

114. Even if the reverse-lookup data provided by third-party vendors were complete (which, as discussed above, is not true), and even if it reliably identified unique individuals for each phone number (which again, as discussed above, is not true), conducting a matching methodology necessarily involves ambiguity that, unless done with speculation, cannot be resolved without individual inquiry.  Consider the following scenarios, all of which are of types that I have seen in real data when attempting to match names across data sets:

- The customer account records identify an individual associated with a phone number as James Roberts, and the third-party data identify the individual as Jimmy Roberts.

- The customer account records identify an individual associated with a phone number as James J. Roberts, and the third-party data identify the individual as James Q. Roberts at a different address.

- The customer account records identify an individual associated with a phone number as James Roberts, and the third-party data identify the individual as James Robards.

- The customer account records identify an individual associated with a phone number as James Roberts, and the third-party data identify the individual as Robert James.

- The customer account records identify an individual associated with a phone number as James Roberts, and the third-party data identify the individual as Rhonda Roberts.

---

[113] *06/19/2020 Notice Plan*, p. 5.

[114] *06/19/2020 Notice Plan*, p. 5.

37

Exhibit 6
Page 40

CONFIDENTIAL

- The customer account records identify an individual associated with a phone number as James Roberts at 241 Spring Street, Springfield, Florida, and the third-party data identify the individual as James Roberts at 50 Main Street, Cleveland, Ohio.

- The customer account records identify an individual associated with a phone number as James Roberts, and the third-party data identify the individual as R. James.

- The customer account records identify an individual associated with a phone number as Rhonda Roberts at 241 Spring Street, Springfield, Florida, and the third-party data identify the individual as James & Rhonda Smith at 241 Spring Street, Springfield, Florida.

- The customer account records identify an individual associated with a phone number as Jane Roberts at 241 Spring Street, Springfield, Florida, and the third-party data identify the individual as Jane Smith at 241 Spring Street, Springfield, Florida.

- The customer account records identify an individual associated with a phone number as James Roberts, and the third-party data identify the individual as Jimmy Robertson.

- The customer account records identify an individual associated with a phone number as James Roberts, and the third-party data identify the individual as James Roberts.

115. The only one among these scenarios that appears unambiguously to be a match is the last one, and it would only be unambiguous if the addresses also match. For some of these cases, the differences appear to be misspellings, but these would be treated as differences (and therefore, as wrong number cases) under a matching methodology that required an exact match. For other cases, there is some ambiguity beyond apparent misspellings as to whether the information provided indicates that the person who holds the phone number called is the same as the person in DIRECTV's account records. In such cases, one can imagine reasonable scenarios in which the names refer to the same person or to people in

38

Exhibit 6
Page 41

CONFIDENTIAL

the same family; one can also imagine reasonable scenarios in which the names refer to different, unrelated people.  If the two people are different but in the same family, one can imagine reasonable scenarios in which the call was nevertheless to the right phone number (for example, the phone is part of a family plan or a DIRECTV customer was a family member of the person in whose name the DIRECTV account is held).

116. The propensity for these kinds of mismatches to occur is high.  As noted earlier, in the Notice effort conducted by Angeion, the step of matching the reverse-lookup data relied upon by Angeion to DIRECTV's RMS data was performed by my team under my supervision.  I observed numerous examples of ambiguities of the types I just listed, and more.

117. In undertaking the analysis, I took steps to address some of the ambiguities in the data while minimizing the use of judgement and interpretation. I excluded an Angeion record from the Class notice list only if it was matched to the DIRECTV data by name (full, first, or last) and at least one piece of corroborating information—phone number, address, and/or DIRECTV account number.

118. I performed minimal cleaning on names and addresses: for example, since middle initials are not consistently entered in both data sets, I removed middle initials from names; similarly, postal addresses are often, but not always, entered in abbreviated form, so I standardized addresses in both data sets to follow United States Postal Service abbreviations. I did use a "fuzzy matching" method to correct misspelled city names that had only one plausible match in the United States Geological Survey's Geographic Names Information System containing a list of populated places in the United States, and to match close spellings and misspellings of names within records that first matched on address, phone number, or DIRECTV account number, but I did not apply any other technologies to reconcile "near matches."   By adopting a strict matching protocol, I effectively minimized matches, thereby maximizing the inclusion of potential plaintiffs in the Class list.

119. For example, if the data relied upon by Angeion produced the name James Roberts for a given phone number, I preserved it on the list of potential Class members if the DIRECTV

39

Exhibit 6
Page 42

CONFIDENTIAL

data identified the name as Jimmy Robards, even if the phone number and address were the same in both sources.

120. If one were to adopt the same approach for determining who in fact is a member of the Class, the identified Class would be over-inclusive. There would be many purported Class members that were in fact DIRECTV customers. For example, consider the hypothetical case of James Roberts (in the reverse-lookup data) and Jimmy Robards (in the DIRECTV data). If one assumes that they are different people (as I did for purposes of the Class notice exercise), then James Roberts would be included in the Class. If they are in reality the same person (but one data set or the other misspelled the name), the Class would erroneously include a DIRECTV customer.

121. Alternatively, if one assumes that the two names are the same person, this assumption will exclude James Roberts from the Class. If they are, in fact, not the same person and James Roberts is not a DIRECTV customer, James Roberts would potentially be a legitimate Class member, and he would be erroneously excluded.

122. Hence, adopting a more nuanced matching definition will do a better job in reducing the incidence of non-Class members being erroneously included but risks excluding genuine Class members. I am not aware of any reliable method of determining whether James Roberts and Jimmy Robards are the same person without individual inquiry, and any formulaic method for guessing whether they are the same will result in either over-inclusion and/or under-inclusion in the Class.

123. When two names appear different but in reality are the same person, I refer to this as a "false mismatch." False mismatches incorrectly inflate the Class, as just described. One may attempt to avoid false mismatches by adopting more lenient rules regarding misspellings or other kinds of minor differences, but there is no definitive way to objectively determine the boundary between minor and significant differences in spellings.

124. One may also attempt to avoid false mismatches by adopting other nuanced matching rules, but these are also neither definitive nor universally applicable. For example, if one adopts a rule that two names constitute a match if the first names differ only by a nickname (such as Robert Caine and Bob Kain, Elizabeth Ingalls and Betsy Engels), there is not a programmatic means of identifying all nicknames. Even by eye, there is no apparent means

40

Exhibit 6
Page 43

CONFIDENTIAL

of identifying all nicknames, including those that are common in other cultures or in foreign names.  As another example, a false mismatch can occur because an individual commonly uses a middle name as a first name.  There is no programmatic method for identifying false mismatches associated with such individuals, noting that the "Middle" field in the Angeion data is often blank or populated by an initial.

125. The challenges just described relate to ambiguities in the data.  There are also challenges related to errors in the third-party data that make a matching methodology further unreliable.

126. For example, consider a scenario in which the DIRECTV customer account records identify an individual associated with a phone number as James Roberts, and the third-party data identify the individual as Sandra Silver.

127. It is possible that the telephone number is identified as being associated with Sandra Silver because, at the relevant time, the number did not belong to the customer James Roberts and did belong to Sandra Silver and was indeed a wrong number.  However, the following scenarios are also possible (among others):

- Sandra Silver is James Roberts's mother, wife, fiancée, or friend, and they have a family plan in her name, so she appears in the third-party data as being associated with the number.

- Sandra Silver is the true DIRECTV customer, but James Roberts is her husband, fiancé, or friend, and she (or he) opened the account in his name.

- The phone number belongs to James Roberts, but it used to belong to Sandra Silver, and the third-party data provider did not have accurate information that the phone number had been reassigned to James during the relevant time period.

- The phone number belongs to James Roberts, but the third-party data provider simply made an error when identifying Sandra Silver as being associated with the number.

128. These are cases in which the matching analysis would result in an incorrect inference that the mismatch indicates a wrong number, and information in the data would not necessarily trigger the analyst to suspect a possible match or conduct further inquiry.

41

Exhibit 6
Page 44

CONFIDENTIAL

129. It is not possible to know the error rate in any particular third-party reverse-lookup data set.  As I have described, third-party data vendors do not report accuracy statistics or warrant the accuracy of their data, and there is no gold-standard data set against which to test such data.  In my experience, however, most match attempts across data sets from different sources result in some form of ambiguity or mismatch.  Some may be "correct" mismatches—i.e., the individuals are truly different people; and some are an artifact of the variations and errors in the data.

130. Even a small error rate in the third-party data can lead to very high error rates in the purported Class list if the purported Class list is determined by attempting to match the names reported by third-party data providers against customer account records and treating material mismatches as Class members.[115]  This is because even if there were a small number of material errors in the third-party data, every one of them would be assigned to the purported Class list, and the purported Class list could therefore be very numerous (as numerous as the number of errors in the third-party data) even if there were no genuine wrong numbers at all.

131. To see this by way of example, suppose there are 10,000 phone numbers identified via dispositions as purported wrong numbers.  Such a list would contain all phone numbers associated with either (a) non-account holders (as intended), or (b) DIRECTV's account holders for which the calls were incorrectly reported or recorded as wrong number calls.  Suppose one queried information for these numbers from reverse-lookup services and compared the names of the returned data to the names held in DIRECTV's accounts in order to execute a matching methodology to weed out the type (b) numbers.

132. Let the "Mismatch List" denote the set of mismatches between the reverse-lookup data and the account data.  That is, an individual would be on the Mismatch List if his or her name was (1) associated with a phone number in one of the proposed classes according to reverse-lookup data and (2) was distinct from the name of the individual associated with that phone number in DIRECTV's account data.  Suppose for the sake of illustration that

---

[115] If one assumed *any* mismatches were class members (including, for example, apparent misspellings or nicknames), and not just material mismatches, the error rate in the class list would be even higher.

42

Exhibit 6
Page 45

CONFIDENTIAL

of the 10,000 telephone numbers associated with the proposed Class because of a designated disposition, 20 percent are in fact those of non-account holders. Hence, there would be, under that assumption, 2,000 recipients of wrong number calls (i.e., 2,000 legitimate Class members). Suppose, also, (consistent with the testimony I referred to earlier in Section V.B) that reverse-lookup databases are 25 percent inaccurate,[116] meaning that 25 percent of the time the name provided in the reverse-lookup data is materially different from the name of the true holder of the phone number. The inaccuracies would not necessarily lead to false mismatches among the actual non-account holders, because whether the database accurately or inaccurately identified the name associated with the telephone number of a non-account holder, it would presumably not coincidentally match the name of the DIRECTV account holder. Hence, regardless of the inaccuracies in the reverse-lookup database, we would expect to find 2,000 correct mismatches (actual wrong numbers).

133. However, there would also be an expected addition of 0.25 x 0.80 x 10,000 = 2,000 false mismatches, because 80 percent of the 10,000 telephone numbers belong to the actual account holders, but in 25 percent of those cases, the reverse-lookup database will be materially incorrect, and the names will not match. Hence, in this example, there would be 2,000 + 2,000 = 4,000 individuals on the Mismatch List, 2,000, or 50 percent, of which are included because of false mismatches. That is, in this example, if the Mismatch List were used as the basis of culling the purported wrong number list and defining the group that received actual wrong number calls, a 25 percent error rate in the third-party database would translate into a 50 percent over-inclusion rate in the Class list because 50 percent of the individuals that would be identified as receiving "wrong number" calls would not have actually received wrong number calls.

134. My example assumed specific values for the percentage of telephone numbers that received actual wrong number calls for the purposes of illustration. It is unknown what percentage of telephone numbers associated with Plaintiff's designated dispositions received actual

---

[116] In fact, reverse-lookup databases are not only inaccurate with regard to the information they contain but also incomplete in that they lack data on many active numbers. I am ignoring the incompleteness of these databases for simplicity in this illustration.

Exhibit 6
Page 46

wrong number calls, and it is unknown precisely what the error rate of the reverse-lookup database that would be used is.  The error rate in an actual purported wrong number Class list arising from a matching methodology would vary depending on the error rates in the data and the actual percentage of wrong number calls, which cannot be determined without individual inquiry.[117]  My point is not to imply a specific error rate but rather to explain that the error rate that can arise from attempting to match names across databases can inflate the error rate from the data into a significantly higher error rate in the purported wrong number Class list.

## VI. DATA FROM TELECOMMUNICATIONS CARRIERS — EVEN IF PROVIDED — ARE UNLIKELY TO RELIABLY IDENTIFY WRONG NUMBER CALLS WITHOUT INDIVIDUALIZED INQUIRY

135.  I understand that Plaintiff has issued subpoenas to wireless carriers, asking the carriers to produce documents sufficient to identify all available contact information (name, address, email) of the subscribers/users according to a list of date and phone number combinations supplied by Plaintiff, and to supply the dates of service for the phone number associated with such person(s) and the type of service (i.e., mobile, landline, etc.).[118]

136.  Plaintiff has not articulated the purpose of the subpoenas or how the data, if produced,[119] will be used.  Like the data from third-party reverse-lookup data vendors, data from

---

[117] Suppose the number of individuals that have a designated disposition is $Z$, the percentage of individuals with the designated dispositions that are not customers is $x$, and the error rate in the reverse-lookup database is $y$.  Then the number of false mismatches will be $Z \times y \times (1 - x)$.  The total number of mismatches (the total number of individuals that will make it onto the Mismatch List) would be $(Z \times x) + [Z \times y \times (1 - x)]$.  The ratio of the false mismatches to total mismatches would therefore be $[y(1 - x)]/[x + y(1 - x)]$.  This is the false inclusion rate in the resulting Mismatch List.  Notice that the percentage of errors in the resulting Mismatch List is independent of the size of $Z$.

[118] Subpoena to Testify at a Deposition in a Civil Action, *Jenny Brown, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, October 12, 2020.  The date/phone number combinations were supplied by Plaintiff in a file referred to as "Schedule A."  I understand that the subpoenas sent to T-Mobile, Verizon, and AT&T were identical.

[119] While the Court recently issued an order regarding the production of data from one of these carriers, I am not aware that the data have been produced. (Stipulated Order to Compel Verizon to Produce Documents, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case No. 2:13-CV-01170-DMG-Ex, May 10, 2021, p. 4).  If the data are produced, I may supplement my analysis.

Exhibit 6
Page 47

wireless carriers would also not provide a reliable means of distinguishing between true wrong numbers and false wrong numbers, however, if that is Plaintiff's intended use.

137.    The name associated with a wireless account according to the wireless carriers will not necessarily match the name on a DIRECTV account, even if it is the same person, for many of the same reasons that a name provided in third-party reverse-lookup data will not necessarily match the name on a DIRECTV account.  There are a number of possible reasons that this may occur.

138.    First, family and other group plans for wireless telephone service are often (if not always) held in the name of one subscriber (the party to whom the bill is addressed).  While carriers generally have names associated with the subscribers on all postpaid accounts, they do not necessarily have names for the users of the lines within multi-line postpaid accounts.  For example, the subscriber on a family plan consisting of five people may be the mother, and the carrier would therefore have the mother's name as the subscriber on the account, but the carrier may not have a record of names associated with the other four lines in the account.  In such a case, a query of the carrier's customer database for each line in the account will return the name of the mother, not the name of the user of each individual line.

139.    If, for example, the DIRECTV account is held in the name of James Roberts, but James Roberts's cell phone is in a family plan that is in the name of his wife, Rhonda Smith, the names will not match, and one will reach an incorrect mismatch (since the cell phone carrier returns Rhonda Smith as the name associated with James Roberts's cell phone).  One would conclude that Rhonda Smith was a non-customer who received a wrong number call.

140.    An additional example that illustrates why matching names in data from wireless carriers to names in DIRECTV's customer account database would not reliably identify wrong numbers is that the DIRECTV customer's phone number may be part of a family plan held in the name of a parent with a different last name.  Neither the first name nor the last name on the cell phone account with the carrier would necessarily match the first and last name on the DIRECTV account in such a case.  The DIRECTV customer may also have a different address if the phone number listed in the parent's name were associated with the parent's address, but the adult child received DIRECTV service at a different address.

45

Exhibit 6
Page 48

CONFIDENTIAL

141. Family and other group plans are and were very common during the Class period. In 2012, analysts estimated that 58 to 75 percent of wireless telephone subscribers were on multiple line family plans.[120] In 2016, a Cowen and Company survey found that 65.5 percent of wireless telephone subscribers were on multiple line family plans.[121]

142. The major wireless carriers have stated publicly that they do not routinely hold and/or verify name information on the users of phones in multi-line plans. For example, in Morgan v. Orlando Health et al., a declaration was filed by Neil Schmidt, a consultant at Verizon Corporate Resources Group LLC ("Schmidt Declaration").[122] According to the Schmidt Declaration, a portion of Verizon postpaid numbers are assigned to group plans, and there were an average of 2.98 telephone numbers per retail postpaid Verizon account in 2015.[123] While subscribers may add a label to a number on a group plan, Verizon Wireless has no way to determine the meaning of such a label, the person associated with such a label, or whether any person whose name matches the label is actually using the cellular phone number.[124] This was particularly true between 2013 and 2017.[125]

143. Moreover, according to a declaration filed in Morgan v. Orlando Health et al. by Lisa Likely, an employee of AT&T Mobility LLC ("Likely Declaration"),[126] a portion of AT&T postpaid numbers are also assigned to group plans such as family and business plans.[127] AT&T does not require from subscribers and typically does not possess personal

---

[120] Andy Vuong, "Wireless subscribers are finding breaking up is hard to do," *Denver Post*, September 16, 2012; "Real time: The growing demand for data: 2012 North American wireless industry survey," PwC, April 2013, p. 55.

[121] Colby Synesael, *et al.,* "Wireless Survey – 4Q16 + CowenVision Video," Cowen and Company Equity Research, January 18, 2017, p. 11.

[122] Declaration of Neil Schmidt, *Angela Morgan v. Orlando Health, Inc., et al.,* In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 24, 2019 (hereafter, *05/24/2019 Schmidt Declaration*).

[123] *05/24/2019 Schmidt Declaration,* ¶ 5.

[124] *05/24/2019 Schmidt Declaration,* ¶ 6.

[125] *05/24/2019 Schmidt Declaration,* ¶ 6.

[126] Declaration of Lisa Likely, *Angela Morgan v. Orlando Health, Inc., et al.,* In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 23, 2019 (hereafter, *05/23/2019 Likely Declaration*).

[127] *05/23/2019 Likely Declaration,* ¶ 7.

46

Exhibit 6
Page 49

CONFIDENTIAL

information regarding other persons who may use the subscriber's cellular phone numbers and will only maintain such information if it is voluntarily provided by the subscriber.[128] In addition, AT&T is not able to verify with certainty the identity of the user of a particular number on a particular date or time.[129]  AT&T reiterated similar points in this case in Non-Party AT&T Inc's Objections to Plaintiff's Rule 45 Subpoena, dated October 27, 2020.[130]

144.   In Keim v. ADF Midatlantic et al., a declaration was filed by Patricia Cauldwell, an employee of T-Mobile US, Inc. ("Cauldwell Declaration"),[131] which stated that T-Mobile is unable to identify a specific telephone number as the phone number of the subscriber or account holder when there are multiple telephone numbers on an account.[132]  T-Mobile does not require, and thus typically does not possess, personal information regarding other persons who may also use the subscriber's cellular phone number.[133]  Even where such information is provided, it is not determinative as to the identity of the actual user(s) of the number.[134]  T-Mobile reiterated those limitations in its objections to Plaintiff's subpoena in this case.[135]

145.   Similarly, according to an affidavit filed in Morgan v. Orlando Health et al. by Calli Keep, an employee of Sprint Corporation (which is now part of T-Mobile) ("Keep Affidavit"),[136]

---

[128] *05/23/2019 Likely Declaration,* ¶¶ 5-6.

[129] *05/23/2019 Likely Declaration,* ¶ 12.

[130] Non-Party AT&T Inc's Objections to Plaintiff's Rule 45 Subpoena, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Case 2:13-cv-01170-DMG-E, October 27, 2020 (hereafter, *10/27/2020 AT&T Objections to Plaintiff's Subpoena*), ¶ 4.

[131] Declaration of Patricia Cauldwell, *Brian Keim v. ADF Midatlantic LLC, et al.,* In the United States District Court for the Southern District of Florida, Civil Action No. 9:12-cv-80577-KAM, May 17, 2019 (hereafter, *05/17/2019 Cauldwell Declaration*).

[132] *05/17/2019 Cauldwell Declaration,* ¶ 8.

[133] *05/17/2019 Cauldwell Declaration,* ¶ 4.

[134] *05/17/2019 Cauldwell Declaration,* ¶ 4.

[135] Letter, Kelsey L. Kingsbery to Alexander H. Burke, [Re: Brown v. DirecTV, LLC, Case No: 2:13-cv-01170 Subpoena to Testify at Deposition], November 4, 2020 (hereafter, *11/04/2020 T-Mobile Objection to Subpoena*), p. 2.

[136] Affidavit of Calli Keep, *Angela Morgan v. Orlando Health, Inc., et al.,* In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 3, 2019 (hereafter, *05/03/2019 Keep Affidavit*).

Exhibit 6
Page 50

subscribers are not required to provide documentation regarding the "user" of a phone.[137] According to a declaration filed in Morgan v. Orlando Health et al. by George Kamba, an employee of U.S. Cellular Corp. ("Kamba Declaration"),[138] while U.S. Cellular collects personal information such as subscriber name and address as of the date of account activation in connection with its postpaid service, it does not require and typically does not possess personal information regarding other persons who may also use the subscriber's cellular phone number(s).[139] Thus, U.S. Cellular is unable to verify with certainty the identity of the user of a subscriber's cellular phone number.[140] In addition, a portion of U.S. Cellular's postpaid numbers are assigned to group plans such as family and business plans, and even where U.S. Cellular does have information of users other than the subscriber, this information is not determinative as to the identity of these users.[141]

146. Another impediment relating to cell phone carrier data is that carriers do not necessarily have names associated with prepaid accounts—indeed, one of the attractions of prepaid accounts for some customers is that they can be obtained anonymously or under false names, because carriers need not perform a credit check or other checks on accounts that are prepaid. For example, Verizon does not require personal information to open or use a prepaid account, and even when personal information exists for such accounts, the accuracy of such information cannot be verified.[142] Similarly, AT&T does not require prepaid customers to provide personal information upon account activation, and no steps would be taken to verify the completeness or accuracy of such information if it is provided.[143] Likewise, upon account activation, U.S. Cellular does not require prepaid customers to provide personal information and no steps are taken to verify the

---

[137] *05/03/2019 Keep Affidavit,* ¶ 8.

[138] Declaration of George Kamba, *Angela Morgan v. Orlando Health, Inc., et al.,* In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 29, 2019 (hereafter, *05/29/2019 Kamba Declaration*).

[139] *05/29/2019 Kamba Declaration,* ¶¶ 5-6.

[140] *05/29/2019 Kamba Declaration,* ¶ 5.

[141] *05/29/2019 Kamba Declaration,* ¶¶ 7-8.

[142] *05/24/2019 Schmidt Declaration,* ¶ 2.

[143] *05/23/2019 Likely Declaration,* ¶ 3.

Exhibit 6
Page 51

CONFIDENTIAL

completeness or accuracy of such information.[144]  No identification is required by Boost Mobile, Sprint's prepaid service, to open an account.[145]  In this case, T-Mobile also stated that it does not require subscribers of prepaid accounts to provide personal identifying information upon account activation because T-Mobile does not send bills to these customers.[146]

147. Prepaid accounts were a very significant part of the wireless marketplace during the Class period.  The FCC found that as of the fourth quarter of 2016, prepaid connections accounted for about 23 percent of all retail mobile wireless connections.[147]

148. Prepaid subscribers are also more likely than postpaid subscribers to be in lower income brackets. [148]  Because the calls at issue in this case relate to debt collections, a disproportionate number of the intended call recipients may be more likely (from a

---

[144] *05/29/2019 Kamba Declaration,* ¶ 3.

[145] *05/03/2019 Keep Affidavit,* ¶ 9.

[146] *11/04/2020 T-Mobile Objection to Subpoena, p. 2.*

[147] Twentieth Report, *In the Matter of Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services,* Before the Federal Communications Commission, WT Docket No. 17-69, FCC 17-126 (Released: September 27, 2017) (hereafter, *2017 FCC 20th CMRS Report*), Appendix II: Table II.B.ii, p. 73 and Chart II.B.2 at p. 12.  Table II.B.ii shows quarterly total mobile wireless connections by service segment: it reports 257,158,000 postpaid (retail) connections and 77,216,000 prepaid (retail) connections, for a total of 334,374,000 retail connections in the fourth quarter of 2016.  Postpaid connections then have a share of 257,158,000 /334,374,000 = 77 percent of retail connections and prepaid connections have a share of 77,216,000 /334,374,000 = 23 percent.  The non-retail connections comprise wholesale connections (25,031,000 connections, or 6 percent of the total 416,684,000 wireless connections in the fourth quarter of 2016) and "connected devices" such as data sticks and WiFi hot-spots (57,279,000 connections, or 14 percent of wireless connections in the fourth quarter of 2016).  Wireless connections are not exactly equal to subscribers, as a subscriber might have more than one wireless connection associated with an account.  See *2017 FCC 20th CMRS Report,* ¶ 19 and footnote 64.

[148] As of May 2016, 26.8 percent of prepaid subscribers in the U.S. had an annual income below $25,000, compared to 11.7 percent of postpaid subscribers, and over 50 percent had an annual income below $50,000, compared to just over 30 percent for postpaid subscribers.  Nineteenth Report, *In the Matter of Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services,* Before the Federal Communications Commission, WT Docket No. 16-137, DA 16-1061 (Released: September 23, 2016) (hereafter, *2016 FCC 19th CMRS Report*), ¶ 46 and Chart III.B.1 at p. 38.

49

Exhibit 6
Page 52

CONFIDENTIAL

statistical, demographic standpoint) to have prepaid, rather than postpaid, wireless accounts.


Debra J. Aron, Ph.D.

May 21, 2021

50

Exhibit 6
Page 53

CRA | Charles River Associates

**Exhibit 1**

## Debra J. Aron
Vice President

PhD, Economics
University of Chicago

BA, Economics
University of California at Los
Angeles

Dr. Debra J. Aron is a Vice President in the Competition Practice. Debra applies her expertise in economic and policy matters, including competition and antitrust analysis, intellectual property, class certification, and damages analysis, in both regulatory and litigation disputes. She has provided expert testimony for over 20 years in a variety of high-stakes federal, state, regulatory, and arbitration cases relating to competition and antitrust including market definition, conduct cases, and price fixing damages, intellectual property damages including patents and trade secrets; class actions and class certification including consumer fraud matters and TCPA; pricing; unjust enrichment; and economic cost analyses. She also has conducted competition analyses in several high-profile mergers and macroeconomic analyses of pricing and investment changes.  Dr. Aron's practice spans many industries, and she has a specific expertise in telecommunications and technology, including wireless services, wireline services, backbone, RAN, and customer premises equipment, satellite communications, and computer technology.

## Publications

"The Economics of 5G Deployment in the "Race" to 5G: The Economic Effects of Adopting New Technology," with Olga Ukhaneva and Chloe Sun, *CRA Insights: The Economics of 5G* (March 2021).

"The Economics of 5G Deployment in the "Race" to 5G: The State of 5G in the US, South Korea, and Other Countries," with Andy Baziliauskas, Olga Ukhaneva, and Chloe Sun, *CRA Insights: The Economics of 5G* (December 2020).

"The Economics of 5G Deployment in the "Race" to 5G: The Role of Open RAN," with Olga Ukhaneva and Chloe Sun, *CRA Insights: The Economics of 5G* (October 2020).

"The Damaging Effects of Large Postal Service Price Increases on Online Retailers, Consumers, and the U.S. Postal Service," with Justin Lenzo, Ph.D., Charles River Associates Whitepaper, September 28, 2020.

"The Economics of 5G Deployment in the 'Race' to 5G: The Role of Massive MIMO," with Olga Ukhaneva and Chloe Sun, *CRA Insights: The Economics of 5G* (August 2020).

"The Economics of 5G Deployment in the 'Race' to 5G: The Role of Mid-Band Spectrum," with Olga Ukhaneva and Chloe Sun, *CRA Insights: The Economics of 5G* (July 2020).

"An Economic Perspective on Balancing Unquantified Harms and Benefits Under the Consumer Welfare Standard," with Steven Tenn, 2019 COLUM. BUS. L. REV. (2019).

Exhibit 6
Page 54

Charles River Associates

"Lessons from the Economic Deregulation of the Airline and Telecommunications Industries," *Infrastructure* 58, no. 2 (Winter 2019).

"An Empirical Analysis of Regulator Mandates on the Pass Through of Switched Access Fees for In-State Long-Distance Telecommunications in the U.S.," with David E. Burnstein, Ana Danies, and Gerry Keith, June 19, 2013. Available at SSRN: http://ssrn.com/abstract=1674082.

Contributing author, ABA SECTION OF ANTITRUST LAW, TELECOM ANTITRUST HANDBOOK, Second Edition, (Chicago: American Bar Association), March 2013.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," with Allan T. Ingraham, *Review of Network Economics* 11, issue 4, 2012.

"Social Welfare Implications of Liability Rules in Major Environmental Damages Cases," with Francis X. Pampush, Environmental Litigation Committee Newsletter, Fall 2011.

"Regulatory Policy and the Reverse Cellophane Fallacy," with David E. Burnstein, *Journal of Competition Law and Economics* 2010; doi: 10.1093/joclec/nhp033.

"Investment in Next Generation Networks and Wholesale Telecommunications Regulation," with Robert W. Crandall, November 3, 2008. Available at SSRN: http://ssrn.com/abstract=1294910.

"Pricing Principles and Pricing Methodologies for Essential Facilities," May 2008.

Contributing author, ABA SECTION OF ANTITRUST LAW, TELECOM ANTITRUST HANDBOOK, (2005), (Chicago: American Bar Association), 2005.

"The Proper Treatment of Spare Network Capacity in Regulatory Cost Models," with Ana Danies, May 2005. Available at SSRN http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133365.

"State Commissions Systematically Have Set UNE Prices Below Their Actual Costs," with Frank Pampush and E. Gerry Keith, November 2003. Available at SSRN http://ssrn.com/abstract=3327613.

"Broadband Adoption in the United States: An Empirical Analysis," with David E. Burnstein, in DOWN TO THE WIRE: STUDIES IN THE DIFFUSION AND REGULATION OF TELECOMMUNICATIONS TECHNOLOGIES, Allan Shampine, ed., (Nova Science Publishers, Hauppauge, NY, 2003).

"Developments in the Theory of Vertical Foreclosure as Applied to Regulated Telecommunications Markets" (March 2002), Prepared for Presentation at The American Bar Association Section of Antitrust Law, 50th Annual Spring Meeting.

"Modifications at HHIs for Vertical Supply Relationships" with Wenqing Li and James Langenfeld, White Paper submitted to European Commission, February 2000.

"Economic Theories of Tying and Foreclosure Applied—And Not Applied—in Microsoft," with Steven S. Wildman, *Antitrust* 14, no. 1, 1999, pp.48-52.

Exhibit 6
Page 55

"Effecting a Price Squeeze Through Bundled Pricing," with Steven S. Wildman, in COMPETITION, REGULATION, AND CONVERGENCE: CURRENT TRENDS IN TELECOMMUNICATIONS POLICY RESEARCH, Gillett and Vogelsang, eds. (New Jersey: Lawrence Erlbaum Associates, Inc.) 1999, pp. 1-17.

"Worldwide Wait?  How the Telecom Act's Unbundling Requirements Slow the Development of the Network Infrastructure," with Ken Dunmore and Frank Pampush, *Industrial and Corporate Change* 7, no. 4, 1998, pp. 615-621.

"The Pricing of Customer Access in Telecommunications," with Steven S. Wildman, *Industrial and Corporate Change* 5, no. 4, 1996, pp. 1029-1047.

"Bonus and Penalty Schemes as Equilibrium Incentive Devices, With Application to Manufacturing Systems," with Pau Olivella, *Journal of Law, Economics, and Organization* 10, Spring 1994, pp. 1-34.

"Diversification as a Strategic Preemptive Weapon," *Journal of Economics and Management Strategy* 2, Spring 1993, pp. 41-70.

"Using the Capital Market as a Monitor:  Corporate Spin-offs in an Agency Framework," *RAND Journal of Economics* 22, Winter 1991, pp. 505-518.

"Firm Organization and the Economic Approach to Personnel Management, *American Economic Review* 80, no. 2, May 1990, pp. 23-27.

"The Introduction of New Products," with Edward P. Lazear, *American Economic Review* 80, no. 2, May 1990, pp. 421-426.

"Ability, Moral Hazard, Firm Size, and Diversification," *RAND Journal of Economics* 19, Spring 1988, pp. 72-87.

"Worker Reputation and Productivity Incentives," *Journal of Labor Economics* 5, no. 4, October 1987, part 2, pp. S87-S106.

"The Role of Managerial Ability and Moral Hazard in the Determination of Firm Size, Growth and Diversification," Ph.D. Dissertation, University of Chicago, August 1985.

## Presentations

Panelist, Platform Antitrust, "On the Intersection Between Antitrust Enforcement and Other Regulatory Spheres as it Relates to Digital Platforms," Global Competition Review Live 9th Annual Antitrust Law Leaders Forum, Miami Beach, Florida, February 2020.

"Balancing Unquantified Benefits and Harms Under the Consumer Welfare Standard," The New York State Bar Association Antitrust Law Section, 2019 William Howard Taft Lecture, Commenter to the remarks of The Honorable Douglas H. Ginsburg, New York, New York, September 2019.

Exhibit 6
Page 56

"The Impact on the U.S. Economy of Excluding Huawei from Participation in the U.S. Market for Wireless Network Equipment," Presentation at the Fiscal Year 2019 National Defense Authorization Act, Section 889, Public Meeting of Department of Defense, General Services Administration, and NASA, Washington, D.C., July 19, 2019.

Moderator, "Your Expert Is Your Friend: How to Effectively Deliver Expert Testimony," ABA: The Woman Advocate Committee Regional CLE Program: Raising the Bar, Chicago, Illinois, October 2018.

"Lessons from the Deregulation of the Airline and Telecommunications Industries," ABA Infrastructure and Regulated Industries Section, Dallas, Texas, August 2018.

"Economic Fundamentals: Vertical and Coordinated Effects in Mergers," ABA Section of Antitrust Law, Fundamentals of Antitrust Economics Series, Chicago, Illinois, July 2018.

Panelist, "Considerations for the Economists' Analysis in Opt-Out Relative to Class Action Litigation," ABA 5th Annual Western Regional CLE Program on Class Actions and Mass Torts, San Francisco, California, June 2018.

"Lessons from the Deregulation of the Airline and Telecommunications Industries," ABA Infrastructure and Regulated Industries Section, Fall Council Meeting, Palm Beach, Florida, October 2017.

"Economic Fundamentals: Vertical and Coordinated Effects in Mergers," ABA Section of Antitrust Law, Fundamentals of Antitrust Economics Series, Washington, D.C., May 2016.

Panelist, "Economic Fundamentals: Market Power," ABA Spring Meeting, Washington, D.C., April 2016.

"The Economic Impact of Electricity Price Increases in Puerto Rico," ABA Section of Public Utility, Communications and Transportation Law, Spring Council Meeting, Naples, Florida, March 2016.

Moderator, "Effective Cross-Examination of the Expert Witness: Practical Tips and Video Clips," ABA Annual Meeting, Chicago, Illinois, July 2015.

Moderator, "The Science of Persuasion: Practical Insights from Research on Expert Witness Effectiveness and Jury Decision-Making," ABA Section of Litigation Annual Conference, New Orleans, Louisiana, April 2015.

Panelist, "How to Manage Conversations with Expert Witnesses," ABA Section of Litigation, Environmental, Mass Torts, & Products Liability Litigation Committees' Joint CLE Seminar, Avon, Colorado, January 30, 2014.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," Federal Communications Commission, Washington, D.C., June 11, 2013.

Exhibit 6
Page 57

Charles River Associates

Panelist, "A Primer: Getting the Most Out of Your Experts — Do's and Don'ts in the Use of Expert Witnesses: Learning from the Experts," ABA Section of Litigation Annual Conference, Chicago, Illinois, April 26, 2013.

"An Empirical Analysis of Regulator Mandates on the Pass Through of Switched Access Fees for In-State Long-Distance Telecommunications in the U.S.," with David E. Burnstein, Ana Danies, and Gerry Keith, Wesleyan University, Middletown, Connecticut, March 27, 2013.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," with Allan Ingraham, The 40th Research Conference on Communication, Information and Internet Policy (TPRC), September 22, 2012.

Panelist, "Two Decades of Daubert: Junk Science Replaced by Junk Rulings?" ABA Section of Litigation Annual Conference, Washington, DC, April 20, 2012.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," with Allan Ingraham, New America Foundation, workshop on Defining and Measuring Meaningful Broadband Adoption, April 11, 2012, Washington, DC.

"Social Welfare Implications of Liability Rules in Major Environmental Damages Cases," with Francis X. Pampush, American Bar Association Sections of Litigation and Criminal Justice Joint Annual Conference, April 15, 2011, Miami, Florida.

"Consumer Benefits of Intrastate Access Rate Reform in Minnesota," Center for Science, Technology and Public Policy, Humphrey School of Public Affairs, University of Minnesota, January 26, 2011.

"An Empirical Analysis of Regulator Mandates on the Pass Through of Switched Access Fees for In-State Long-Distance Telecommunications in the U.S.," with David E. Burnstein, Ana Danies, and Gerry Keith, The 38th Research Conference on Communication, Information and Internet Policy (Telecommunications Policy Research Conference), October 3, 2010, George Mason University Law School, Arlington, Virginia.

"Pricing Principles and Pricing Methodologies for Essential Facilities," The 36th Research Conference on Communication, Information and Internet Policy (TPRC), September 27, 2008.

"Regulatory Policy and the Reverse Cellophane Fallacy," with David E. Burnstein, 17th Biennial International Telecommunications Society Conference, Montréal, Québec, Canada, June 24-27, 2008.

"The Use of Economic Analysis in 'Industry Expert' Testimony," CLE course, XPRT Forum, March 7, 2008.

Exhibit 6
Page 58

Presentations to the New Jersey Board of Public Utilities and to the New Jersey Legislature's Telecommunications Utilities Committee regarding the economic principles for a forward-looking regulatory agenda in light of the facts of competition nationwide and in New Jersey, and the costs of regulation, October – November 2006.

"The Interaction of Regulation with Economics and Financial Analysis in Litigation, Policy, and Strategy Consulting," CLE course, XPRT Forum, October 7, 2006.

"Comments on 'Economic Analysis in FCC Merger Proceedings,'" Conference on Economic Analysis and FCC Decisionmaking, presented by the Federal Communications Bar Association (FCBA) and Stanford Institute for Economic Policy Research (SIEPR), Washington, D.C., March 15, 2006.

"Economic Principles for Consumer Protection Rules," Pri Telecom / Tech Briefing, Santa Clara, California, October 11, 2005.

"The Proper Treatment of Spare Network Capacity in Regulatory Cost Models," Presentation at the Advanced Workshop in Regulation and Competition, Center for Research in Regulated Industries, Skytop, Pennsylvania, May 2005.

"Telecommunications Regulation: What's Obsolete? What Will Become Obsolete?" Presentation at the State and City Telecom Reform Conference, Heartland Institute, Chicago, Illinois, December 2004.

"Trends in Telecommunications Demand & Supply," Presentation at the 46th Annual NARUC Regulatory Studies Program, Michigan State University, August 2004.

"The Economic Costs of Proposed Wireless Regulations in California," Presentation to Commissioners Brown and Kennedy, California Public Utilities Commission, San Francisco, California, April 2004.

"The Economics of UNE Pricing: Presentation to Staff," Ex parte presentation to the staff of the FCC, in FCC WC Docket No. 03-173: Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers, March 2004.Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers, March 2004.

"The High Cost of Proposed New Wireless Regulations," Presentation to the Pacific Research Institute conference "Regulating Wireless in California: Bill of Rights... or Wrongs?," San Francisco, California, April 2003.

"The TELRIC Showdown," Panelist, NARUC Staff Subcommittee on Telecommunications, 2002 Annual Convention, Chicago, Illinois, November 2002.

Exhibit 6
Page 59

"Economic Principles for Efficient Pricing of Municipal Rights-of-Way," National Association of Telecommunications Officers and Advisors (NATOA), Chicago, Illinois, September 2002.

"Trends in Voice and Broadband Competition in Telecommunications Markets: Markets, Strategies, and Regulation," 82nd Annual Convention of the Indiana Telecommunications Association, Lexington, Kentucky, June 2002.

"Broadband Deployment in the United States," Emerging Opportunities in Broadband Symposium, Northwestern University, Evanston, Illinois, December 2001.

"Local Competition in Illinois," Illinois Telecommunications Symposium, Northwestern University, Evanston, Illinois, December 2000.

"Licensing and Access to Innovations in Telecommunications and Information Services," Telecommunications Policy Research Conference, Alexandria, Virginia, September 2000.

"Effecting a Price Squeeze Through Bundled Pricing," Federal Communications Commission, Washington, D.C., May 1999.

"Competitive and Strategic Use of Optional Calling Plans and Volume Pricing Plans," The Institute for International Research Conference for Competitive Pricing of Telecommunications Services, Chicago, Illinois, July 1998.

"Effecting a Price Squeeze Through Bundled Pricing," Consortium for Research in Telecommunications Policy Conference, University of Michigan, Ann Arbor, Michigan, June 1998.

"The Pricing of Customer Access in Telecommunications," Conference on Public Policy and Corporate Strategy for the Information Economy, Evanston, Illinois, May 1996.

"Diversification as a Strategic Preemptive Weapon," University of Iowa, Iowa City, Iowa, February 1994.

"Diversification as a Strategic Preemptive Weapon, "University of Buffalo, Buffalo, New York, February 1994.

"Diversification as a Strategic Preemptive Weapon," University of Southern California, Los Angeles, California, December 1993.

"Strategic Pricing," Winter Meetings of the Econometric Society, Discussant, Anaheim, California, December 1993.

Exhibit 6
Page 60

Charles River Associates

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets,"
Michigan State University, Lansing, Michigan, November 1993.

"Diversification as a Strategic Preemptive Weapon," Rutgers University, New Brunswick, New
Jersey, November 1993.

"Diversification as a Strategic Preemptive Weapon," University of California at Santa Cruz, Santa
Cruz, California, November 1993.

"Diversification as a Strategic Preemptive Weapon," Graduate School of Business, Stanford
University, Stanford, California, November 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets,"
Purdue University, West Lafayette, Indiana, September 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets,"
Summer Meetings of the Econometric Society, Boston University, Boston, Massachusetts, June
1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets,"
University of California, Department of Economics, Berkeley, California, May 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets,"
Stanford University, Graduate School of Business, Stanford, California, May 1993.

"Diversification as a Strategic Preemptive Weapon," Stanford University, Graduate School of
Business, Stanford, California, April 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets,"
Hoover Institution, Stanford, California, April 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets,"
University of California, Graduate School of Business, Berkeley, California, February 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets,"
Stanford University, Department of Economics, Stanford, California, February 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets,"
Hoover Institution, Stanford, California, January 1993.

Exhibit 6
Page 61

Debra J. Aron

Charles River Associates
Page 9

"Pricing Strategies," Session Discussant, 1992 North American Winter Meeting of The Econometric Society, Anaheim, California, January 1992.

"Diversification as a Strategic Preemptive Weapon," University of Toronto, Toronto, Canada, November 1991.

"Diversification as a Strategic Preemptive Weapon," Queen's University, Kingston, Ontario, Canada, November 1991.

"Bonuses and Penalties as Equilibrium Incentive Devices, with Application to Manufacturing Systems," University of Chicago, Chicago, Illinois, June 1991.

"The Timing of Entry into New Markets," Summer Meetings of the Econometric Society, University of Pennsylvania, Philadelphia, Pennsylvania, June 1991.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," University of Chicago, Chicago, Illinois, April 1991.

"Bonuses and Penalties as Equilibrium Incentive Devices, with Application to Manufacturing Systems," Winter Meetings of the Econometric Society, Washington, D.C., December 1990.

"Corporate Spin-offs in an Agency Framework," University of Washington, Seattle, Washington, October 1990.

"The Timing of Entry Into New Markets," University of British Columbia, Vancouver, British Columbia, October 1990.

"Corporate Spin-offs in an Agency Framework," Texas A&M University, College Station, Texas, April 1990.

"Firm Organization and the Economic Approach to Personnel Management," Winter Meetings of the American Economic Association, New York, New York, December 1989.

"Corporate Spin-offs in an Agency Framework," Western Finance Association Meetings, Seattle, Washington, June 1989.

"Corporate Spin-offs in an Agency Framework," University of Rochester, Rochester, New York, May 1989.

"Corporate Spin-offs in an Agency Framework," North American Summer Meetings of the Econometric Society, Minneapolis, Minnesota, June 1988.

Exhibit 6
Page 62

Charles River Associates

"Competition, Relativism, and Market Choice," North American Summer Meetings of the Econometric Society, Berkeley, California, June 1987.

"Competition, Relativism, and Market Choice," University of Chicago, Chicago, Illinois, April 1987.

"Rate Reform and Competition in Electric Power," Discussant, Conference on Competitive Issues in Electric Power, Northwestern University, Evanston, Illinois, March 1987.

"Worker Reputation and Productivity Incentives," New Economics of Personnel Conference, Arizona State University, Tempe, Arizona, April 1986.

"Ability, Moral Hazard, and Firm Diversification," Various Universities, 1985, 1994, including Yale University, University of Rochester, Stanford University, University of Minnesota, California Institute of Technology, Duke University, Northwestern University, Brown University, Harvard University, University of California - Los Angeles, University of Pennsylvania.

## Academic Journal Refereeing

Dr. Aron has served as a referee for The Rand Journal of Economics, the Journal of Political Economy, the Journal of Finance, the American Economic Review, the Quarterly Journal of Economics, the Journal of Industrial Economics, the Journal of Economics and Business, the Journal of Economic Theory, the Journal of Labor Economics, the Review of Industrial Organization, the European Economic Review, the Journal of Economics and Management Strategy, the International Review of Economics and Business, the Quarterly Review of Economics and Business, Management Science, the Journal of Public Economics, the Journal of Institutional and Theoretical Economics, and the National Science Foundation.

## Testimony (2011-2020)

Deposition of Debra J. Aron in Naomi Gonzales v. Agway Energy Services, LLC, United States District Court for the Northern District of New York, Case No. 5:18-CV-235 (MAD/ATB), October 22, 2020.

Trial Testimony of Debra J. Aron in Sumotext Corp. v. Zoove, Inc. et al., United States District Court, Northern District of California, San Jose Division, Case No. 5:16-cv-01370-BLF-NMCx, March 3, 2020.

Trial Testimony of Debra J. Aron in Motorola Solutions, Inc. et al. v. Hytera Communications Corporation Ltd. et al., United States District Court for the Northern District of Illinois, Eastern Division, Case No. 1:17-cv-01973, February 3-4, 2020.

Exhibit 6
Page 63

Hearing Testimony of Debra J. Aron in Order Instituting Rulemaking into the Review of California High Cost Fund-A Program, Before the Public Utilities Commission of the State of California, Rulemaking 11-11-007, January 29-30, 2020.

Prefiled Written Testimony of Debra J. Aron in Order Instituting Rulemaking into the Review of California High Cost Fund-A Program, Before the Public Utilities Commission of the State of California, Rulemaking 11-11-007, November 15, 2019.

Trial Testimony of Debra J. Aron in Hewlett-Packard Co. v. Quanta Storage Inc. et al., United States District Court for the Southern District of Texas, Houston Division, Case No. 4:18-cv-00762, October 21, 2019.

Deposition of Debra J. Aron in Motorola Solutions, Inc. et al. v. Hytera Communications Corporation Ltd. et al., United States District Court for the Northern District of Illinois, Eastern Division, Case No. 1:17-cv-01973, September 20, 2019.

Deposition of Debra J. Aron in Jonathan Coffey et al. v. WCW & Air, Inc. et al., United States District Court, for the Northern District of Florida, Pensacola Division, Case No. 3:17-cv-90-TKW-HTC, September 13, 2019.

Deposition of Debra J. Aron in Sumotext Corp. v. Zoove, Inc. et al., United States District Court, Northern District of California, San Jose Division, Case No. 5:16-cv-01370-BLF-NMCx, August 1, 2019.

Deposition of Debra J. Aron in Waddell Williams, et al. v. Bluestem Brands, Inc., United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-CV-1971-T-27AAS, September 21, 2018.

Deposition of Debra J. Aron in Robert Hossfeld, et al. v. Compass Bank, N.A., et al., United States District Court, Northern District of Alabama, Southern Division, Case No. 2:16-CV-2017-ACA, September 7, 2018.

Deposition of Debra J. Aron in Ventures Edge legal, PLLC, et al. v. GoDaddy.com, LLC, et al., United States District Court, District of Arizona, Case No. 2:15-cv-02291-GMS, January 30, 2018.

Deposition of Debra J. Aron in Rajesh Verma, et al. v. Memorial Healthcare Group Inc., et al., United States District Court, Middle District of Florida, Jacksonville Division, Case No. 3:16-CV-00427-HLA-JRK, June 27, 2017.

Trial Testimony of Debra J. Aron in T-Mobile USA, Inc. v. Huawei Device, USA, Inc., et al., In the United States District Court for the Western District of Washington at Seattle, Case No. C14-1351-RAJ, May 12, 2017.

Deposition of Debra J. Aron in Re Optical Disk Drive Antitrust Litigation, Hewlett-Packard Company v. Toshiba Corp., et al., United States District Court, Northern District of California, MDL Docket No. 3:10-MD-02143-RS, Case No. 3:13-cv-05370-RS, March 23, 2017.

Exhibit 6
Page 64

Charles River Associates

Deposition of Debra J. Aron in <u>Peerless Network, Inc., et al. v. AT&T Corp.</u>, In the United States District Court for the Southern District of New York, Case No. 15 CV 870, February 17, 2017.

Trial Testimony of Debra J. Aron in <u>Thomas H. Krakauer, et al. v. Dish Network, L.L.C.</u>, In the United States District Court for the Middle District of North Carolina, Durham Division, Case No. 1:14-CV-333, January 17, 2017.

Deposition of Debra J. Aron in <u>T-Mobile USA, Inc. v. Huawei Device, USA, Inc., et al.</u>, In the United States District Court for the Western District of Washington at Seattle, Case No. C14-1351-RAJ, September 29, 2016.

Deposition of Debra J. Aron in <u>Southwestern Bell Telephone Co., et al. v. V247 Telecom, LLC, et al.</u>, In the United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:14-CV-01409-M, August 31, 2016.

Hearing Testimony of Dr. Debra J. Aron in <u>Order Instituting Investigation into the State of Competition Among Telecommunications Providers in California, and to Consider and Resolve Questions raised in the Limited Rehearing of Decision 08-09-042</u>, Before the Public Utilities Commission of the State of California, Investigation 15-11-007, July 20, 2016.

Prefiled Written Rebuttal Testimony of Dr. Debra J. Aron in <u>Order Instituting Investigation into the State of Competition Among Telecommunications Providers in California, and to Consider and Resolve Questions raised in the Limited Rehearing of Decision 08-09-042</u>, Before the Public Utilities Commission of the State of California, Investigation 15-11-007, July 15, 2016.

Prefiled Written Testimony of Dr. Debra J. Aron in <u>Order Instituting Investigation into the State of Competition Among Telecommunications Providers in California, and to Consider and Resolve Questions raised in the Limited Rehearing of Decision 08-09-042</u>, Before the Public Utilities Commission of the State of California, Investigation 15-11-007, June 1, 2016 and March 5, 2016.

Deposition of Debra J. Aron in <u>Ramzy Ayyad, et al. v. Sprint Spectrum, L.P.</u>, In the Superior Court of the State of California for the County of Alameda, Case No.: RG03-121510, March 29, 2016.

Deposition of Debra J. Aron in <u>Avnet, Inc. and BSP Software, LLC v. Motio, Inc.</u>, In the United States District Court for the Northern District of Illinois, Eastern Division, Case No.: 1:12-cv-2100, March 9, 2016.

Deposition of Debra J. Aron in <u>Lena K. Thodos and David Miller, et al. v. Nicor, Inc., et al.</u>, In the Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No.: 1:12-cv-2100, February 22, 2016.

Deposition of Debra J. Aron in <u>Henry Espejo v. Santander Consumer USA, Inc.</u>, In the United States District Court for the Northern District of Illinois, Eastern Division, Case No.: 1:11-cv-08987, January 12, 2016.

Exhibit 6
Page 65

Deposition of Debra J. Aron in Rachel Johnson, et al., v. Yahoo!, Inc. and Zenaida Calderin, et al. v. Yahoo!, Inc., in the United States District Court for the Northern District of Illinois, Eastern Division, Case Nos.: 14-cv-2028 and 14-cv-2753 and Rafael David Sherman, et al., v. Yahoo!, Inc., In the United States District Court for the Southern District of California, Case No.: 13-CV-00041-GPC-WVG (Combined), June 23, 2015.

Trial Testimony of Debra J. Aron in Salsgiver Communications, Inc., et al., v. Consolidated Communications Holdings, Inc., et al., In the Court of Common Pleas, Allegheny County, Pennsylvania, Case No. No. GD 08-7616, May 2015.

Trial Testimony of Debra J. Aron in Sprint Communications Company L.P. v. Comcast Cable Communications, LLC, et al., In the United States District Court for the District of Delaware, Case No. 1:12-cv-01013-RGA, February 3-4, 2015.

Deposition of Debra J. Aron in Herbert Chen et al. v. Robert Howard-Anderson et al., In the Court of Chancery of the State of Delaware, Case No. C.A. 5878-VCL, December 16, 2014.

Deposition of Debra J. Aron in Sprint Communications Company L.P. v. Comcast Cable Communications, LLC, et al., In the United States District Court for the District of Delaware, Case No. 1:12-cv-01013-RGA, November 20, 2014.

Testimony of Debra J. Aron in Bayer CropScience LP v. Albaugh, Inc., et al., Before the American Arbitration Association, Case No. 16-171-Y-00511-12, October 20-21, 2014.

Trial Testimony of Debra J. Aron in Comcast IP Holdings I, LLC v. Sprint Communications Company L.P., et al., In the United States District Court for the District of Delaware, Case No. 12-205-RGA (CJB), October 9, 2014.

Prefiled Written Reply Testimony of Debra J. Aron in The Utility Reform Network v. Pacific Bell Telephone Company, Before the Public Utilities Commission of the State of California, Case No. 13-12-005, October 3, 2014.

Deposition of Debra J. Aron in Amanda Balschmiter, et al., v. TD Auto Finance, LLC, In the United States District Court, Northern District of Illinois, Eastern Division, Case No. 13cv1186, September 10, 2014.

Prefiled Written Testimony of Debra J. Aron in The Utility Reform Network v. Pacific Bell Telephone Company, Before the Public Utilities Commission of the State of California, Case No. 13-12-005, August 22, 2014.

Deposition of Debra J. Aron in Grant Birchmeier, et al., v. Caribbean Cruise Line, Inc., et al., In the United States District Court, Northern District of Illinois, Eastern Division, Case No. 12 CV 4069, July 19, 2014.

Exhibit 6
Page 66

Charles River Associates

Deposition of Debra J. Aron in Comcast IP Holdings I, LLC v. Sprint Communications Company L.P., et al., United States District Court for the District of Delaware, Case No. 12-205-RGA(CJB), July 11, 2014.

Deposition of Debra J. Aron in In re: Methyl Tertiary Butyl Ether Products Liability Litigation, Commonwealth of Puerto Rico, et al., v. Shell Oil Co., et al., In the United States District Court, Southern District of New York, Case No. 07 Civ. 10470, May 27, 2014.

Depositions of Debra J. Aron in In re: Polyurethane Foam Antitrust Litigation, General Motors, L.L.C. v. Carpenter Co., et al., In the United States District Court for the Northern District of Ohio, Western Division, Case No. 3:12-pf-10027-JZ, April 30, 2014 and September 8, 2014.

Trial Testimony of Debra J. Aron in Seth Warnick, et al., v. Dish Network, L.L.C., In the United States District Court, District of Colorado, Civil Action No. 12-cv-01952-WYD, March 20, 2014.

Deposition of Debra J. Aron in Seth Warnick, et al., v. Dish Network, L.L.C., In the United States District Court, District of Colorado, Civil Action No. 12-cv-01952-WYD, September 25, 2013.

Deposition of Debra J. Aron in In re: Methyl Tertiary Butyl Ether ("MTBE") Product Liability Litigation, New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al., In the United States District Court, Southern District of New York, No. 08 Civ. 312, May 29, 2013.

Prefiled Written Testimony and Reply Testimony of Debra J. Aron in In the Matter of the Petition Filed by ALASCOM, INC. d/b/a AT&T ALASKA to be Relieved of its Carrier of Last Resort Responsibilities in Certain Locations in Southwest Alaska, Before the Regulatory Commission of Alaska, Docket No. U-12-127, April 1, 2013 and January 17, 2013.

Deposition of Debra J. Aron in William Douglas Fulghum, et al., v. Embarq Corporation, et al., In the United States District Court for the District of Kansas, Civil Action No.: 07-CV-2602 (EFM/JPO), November 29, 2011.

Deposition of Debra J. Aron in Southwestern Bell Telephone Company, et al., v. IDT Telecom, Inc., et al., In the United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3-09-CV-1268-P, November 10, 2011.

Direct and Rebuttal Testimony of Debra J. Aron in the Matter of Petition of Sprint to Reduce Intrastate Switched Access Rates of Incumbent Local Exchange Carriers in North Carolina, Before the North Carolina Utilities Commission, Docket No. P-100, Sub 167, August 18, 2011 and September 27, 2011.

Prefiled Written Testimony and Rebuttal Testimony of Debra J. Aron in the Matter of: An Investigation Into the Intrastate Switched Access Rates of All Kentucky Incumbent and Competitive Local Exchange Carriers, Commonwealth of Kentucky, Before the Public Service Commission, Docket No. 2010-00398, September 30, 2011, and July 8, 2011.

Exhibit 6
Page 67

Charles River Associates

Testimony of Debra J. Aron before the Utilities Committee of the Kansas Legislature regarding the status of competition in telecommunications markets in Kansas, February 2011.

Testimony of Debra J. Aron before the Telecommunications Committee of the Legislature of the state of Washington regarding the consumer benefits and competitive effects of switched access reform, February 2011.

## Professional organizations

Member, American Economic Association

Member, Econometric Society

Associate Member, American Bar Association

Past Member, Telecommunications Policy Research Conference Program Committee

## Honors and awards

Guthman Research Chair, Kellogg Graduate School of Management, Northwestern University, Summer 1994.

Hoover National Fellowship, Hoover Institution, 1992-1993.

Faculty Research Fellow, National Bureau of Economic Research, 1987-1990.

PepsiCo Research Chair, Northwestern University, 1990.

Kellogg Research Professorship, Northwestern University, 1989.

National Science Foundation Research Grant, 1987-1988.

Buchanan Chair, Kellogg Graduate School of Management, Northwestern University, 1987-1988.

IBM Chair, Kellogg Graduate School of Management, Northwestern University, 1986-1987.

## Teaching

Courses taught: Pricing Strategy; Information, Communication, and Competition (economics of strategy and competition); Intermediate Microeconomic Theory; Managerial Economics (microeconomic theory as applied to business strategy and decision making) at the M.B.A. level, The Economics of Information at the Ph.D. level.

Also qualified to teach: graduate Microeconomic Theory; Industrial Organization and Labor Economics; the Economics of Personnel; Public Finance; Project Evaluation; Applied Game Theory.

## Professional history

Exhibit 6
Page 68

Debra J. Aron

| | |
|---|---|
| 2019–Present | *Vice President*, Charles River Associates, Chicago, IL |
| 2018–2019 | *Principal and Senior Managing Director*, Ankura Consulting Group, Chicago, IL |
| 2010-2018 | *Principal and Managing Director*, Navigant Economics, Chicago, IL |
| 2000-2016 | *Adjunct Associate Professor*, Northwestern University, Evanston, IL |
| 1995-2010 | *Managing Director*, LECG, LLC, Evanston, IL |
| 1993-1995 | *Visiting Assistant Professor of Managerial Economics*, Northwestern University, Evanston, IL |
| 1985-1992 | *Assistant Professor of Managerial Economics*, Northwestern University, Evanston, IL |
| 1992-1993 | *National Fellow*, Hoover Institution at Stanford University, Stanford, CA |
| 1983-1984 | *Instructor*, University of Chicago Department of Economics, Chicago, IL |
| 1979-1980 | *Staff Economist*, Civil Aeronautics Board, Office of Economic Analysis, Washington, D.C. |

May 2021

Exhibit 6
Page 69

## List of Documents Considered

**Procedural Documents and Exhibits Therein, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E**

Fourth Amended Complaint for Damages and Injunctive Relief Pursuant to 47 U.S.C. § 227, Et Seq. (Telephone Consumer Protection Act), September 30, 2013.

Stipulated Protective Order, July 9, 2014.

Declaration of Gail Husman in Support of DIRECTV, LLC's Statement for Joint Stipulation on Plaintiff's Motion to Compel, November 3, 2014.

Declaration of Matthew R. Wilson in Support of Plaintiff's Motion for Class Certification, May 23, 2018.

Declaration of Alexander H. Burke in Support of Plaintiff's Motion for Class Certification, May 24, 2018.

Declaration of Daniel M. Hutchinson in Support of Plaintiff's Motion for Class Certification, May 24, 2018.

Declaration of Jenny Brown, May 25, 2018.

Memorandum of Points and Authorities in Support of Plaintiff's Motion for Class Certification, May 25, 2018.

Plaintiff's Notice of Motion and Motion for Class Certification and to Overrule Order Denying Motion to Compel, May 25, 2018.

Declaration of Nicole Martin in Support of DIRECTV's Opposition to Plaintiff's Motion for Class Certification, June 21, 2018.

Defendant DIRECTV, LLC's Opposition to Plaintiff's Motion for Class Certification, June 22, 2018.

Declaration of Gail Husman in Support of DIRECTV's Opposition to Plaintiff's Motion for Class Certification, June 22, 2018.

Plaintiff's Reply in Support of Class Certification, July 6, 2018.

Order Re Plaintiff's Motion for Class Certification [222], March 29, 2019.

In Chambers - Order Re Defendant's Motion to Compel Arbitration [276], August 5, 2019.

In Chambers - Order Re Joint Status Report [292], December 2, 2019.

Joint Statement Regarding the Class Definition and Class Notice, December 16, 2019.

Order Extending Time to Prepare Joint Class Notice Plan [299], December 18, 2019.

Order Re Joint Statement Regarding Class Notice [301], January 10, 2020.

Exhibit 6
Page 70                                        Page 1

Declaration of Jason Davis, April 30, 2020.

Joint Notice of Motion and Motion to Approve Class Notice, June 19, 2020.

Subpoena to Testify at a Deposition in a Civil Action, October 12, 2020.

Non-Party AT&T Inc.'s Objections to Plaintiff's Rule 45 Subpoena, October 27, 2020.

Affidavit of Nelson Wilson, February 9, 2021.

Declaration of Andy Balthaser in Response to Subpoena, March 8, 2021.

Plaintiff's Unopposed Notice of Motion and Motion to Amend Class Notice, April 14, 2021.

Declaration of Danielle Bracy of Angeion Group LLC, April 14, 2021.

Plaintiff's Notice of Motion and Unopposed Motion for Entry of Agreed Production Order, May 10, 2021.

Stipulated Order to Compel Verizon to Produce Documents, May 10, 2021.

## Other Legal Documents

Hearing on Motions (Vol. 1), Proceedings before the Honorable Wiley Y. Daniel, Judge, United States District Court for the District of Colorado, *Seth Warnick, et al., v. DISH Network, L.L.C.,*  In the United States District Court for the District of Colorado, Civil Action No. 12-cv-01952-WYD, March 19, 2014.

Affidavit of Calli Keep, *Angela Morgan v. Orlando Health, Inc., et al.,*  In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 3, 2019.

Declaration of Patricia Cauldwell, *Brian Keim v. ADF Midatlantic LLC, et al.,*  In the United States District Court for the Southern District of Florida, Civil Action No. 9:12-cv-80577-KAM, May 17, 2019.

Declaration of Lisa Likely, *Angela Morgan v. Orlando Health, Inc., et al.,*  In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 23, 2019.

Declaration of Neil Schmidt, *Angela Morgan v. Orlando Health et al.,*  In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 24, 2019.

Declaration of George Kamba, *Angela Morgan v. Orlando Health, Inc., et al.,*  In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 29, 2019.

Declaration of Stephen A. Watkins, *Angela Morgan v. Orlando Health et al.,*  In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, June 7, 2019

Exhibit 6
Page 71
Page 2

## Production Letters

Letter, Hans J. Germann to Daniel Hutchinson, [re: DIRECTV Production DTV-013859 - DTV-013948], March 6, 2020.

Letter, Hans J. Germann to Daniel Hutchinson, [re: data DIRECTV has produced and the data it still intends to produce], April 3, 2020.

Letter, Hans J. Germann to Daniel Hutchinson, [re: supplemental production, Bates numbered DTVV0035705-08], July 14, 2020.

Letter (via Fax), Verizon Subpoena Compliance to Burke Law Offices LLC, re: Verizon Case #: 20253070, Docket/File #: 2:13-cv-01170, October 20, 2020.

Letter, Hans J. Germann to Daniel Hutchinson, [re: Results of the "matching" analysis performed on the Angeion data], November 2, 2020.

Letter, Kelsey L. Kingsbery to Alexander H. Burke, re: Brown v. DirectTV, LLC, Case No.: 2:13-cv-01170; Subpoena to Testify at Deposition, November 4, 2020.

## Third Party Documents

"DIRECTV Official Site," DIRECTV, http://www.directv.com.

"Number of DIRECTV video subscribers in the United States from 1st quarter 2014 to 4th quarter 2020(in millions)," Statista, at https://www.statista.com/statistics/497288/DIRECTV-number-video-subscribers-usa/.

"AT&T Completes Acquisition of DIRECTV," AT&T Press Release, July 24, 2015, at https://about.att.com/story/att_completes_acquisition_of_DIRECTV.html.

"The CMI Group acquires The Affiliated Group," The CMI Group Press Release, April 29, 2015, at https://www.thecmigroup.com/news/the-cmi-group-acquires-the-affiliated-group.

"About The CMI Group," The CMI Group, at https://www.thecmigroup.com/about-us.

The CMI Group, at https://www.thecmigroup.com/.

"Accounts Receivable Management, The CMI Group, at https://www.thecmigroup.com/solutions/accounts-receivable-management.

National Consumer Law Center (NCLC) Digital Library, § 1.3.5.1, at https://library.nclc.org/fdc/01030501-0.

National Consumer Law Center (NCLC) Digital Library, § 1.3.5.2.1, at https://library.nclc.org/fdc/0103050201-0.

"Changing the Rules," Angeion Group, at https://www.angeiongroup.com/about.php.

"Phone Finder," LexisNexis Risk Solutions, at https://risk.lexisnexis.com/products/phone-finder.

Exhibit 6
Page 72                                    Page 3

"LexisNexis Master Terms & Conditions," LexisNexis, 2021, at
https://risk.lexisnexis.com/masterterms.

Andy Vuong, "Wireless subscribers are finding breaking up is hard to do," *Denver Post,* September
16, 2012.

Real time: The growing demand for data: 2012 North American wireless industry survey," PwC,
April 2013.

Colby Synesael, *et al.,* "Wireless Survey – 4Q16 + CowenVision Video," Cowen and Company
Equity Research, January 18, 2017.

Twentieth Report, *In the Matter of Implementation of Section 6002(b) of the Omnibus Budget
Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With
Respect to Mobile Wireless, Including Commercial Mobile Services,* Before the Federal
Communications Commission, WT Docket No. 17-69, FCC 17-126 (Released: September 27,
2017).

Nineteenth Report, *In the Matter of Implementation of Section 6002(b) of the Omnibus Budget
Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With
Respect to Mobile Wireless, Including Commercial Mobile Services,* Before the Federal
Communications Commission, WT Docket No. 16-137, DA 16-1061 (Released: September 23,
2016).

NPA Database, North American Numbering Plan Administrator, March 30, 2021, at
https://nationalnanpa.com/reports/reports_npa.html.

## Correspondence

Email, Kyle Steinmetz to Olga Ukhaneva and Debra Aron, re: FW: CONFIDENTIAL
COMMUNICATION and PRODUCTION BY THE CMI GROUP, INC. - Jenny Brown v DirecTV -
Information Produced by third-party debt collector - The CMI Group, Inc., June 1, 2020.

Email, Danielle Bracy, Project Manager, Angeion Group to Daniel Hutchinson, re: Direct TV,
September 25, 2020.

Email, Kyle Steinmetz to Joshua Sherman and Hans Germann, re: Preliminary results and data
questions, May 7, 2021.

## Interviews

Interview with Leslie Belloso and Lino Jameal, AT&T Credit and Collections, April 28, 2020.

Interview with Emily Westridge Black, Haynes Boone, May 18, 2021.

Interview with Sergey Kolosovskiy and Brendan Lee, iQor, May 14, 2021.

## Data

Brown Data Sample (5.6.21) 4811-8801-5080 v.1.xlsb
DirecTV_Export_12-22.csv

Exhibit 6
Page 73
Page 4

Schedule A.csv
L_v2_deduped BD.xlsx
U_v2_deduped BD.xlsx
V_v2_deduped BD.xlsx
W_v2_deduped BD.xlsx
Debtor_Data C4_20200615.mdb
Debtor_Data_20191115_0852.mdb
Debtor_Data_20191206_0538.mdb
Debtor_Data_20200110_0144.mdb
Debtor_Data_20200207_0444.mdb
Debtor_Data_20200221_0356.mdb
Debtor_Data_20200306_0444.mdb
Debtor_Data_20200320_0329.mdb
Debtor_Data_20200403_0351.mdb
Debtor_Data_20200417_0343.mdb
Debtor_Data_20200501_0204.mdb
Debtor_Data_20200515_0130.mdb
Debtor_Data_20200529_0130.mdb
debtor_data_20200605_0130.mdb
Debtor_Data_20200611_0130.mdb
debtor_data_20200612_0130.mdb
debtor_data_20200621_0130.mdb
Debtor_Data_20200626_0130.mdb
debtor_data_20200723_0130.mdb
Service_Demographics_20191115_0852.mdb
Service_Demographics_20191206_0538.mdb
Service_Demographics_20200110_0144.mdb
Service_Demographics_20200207_0444.mdb
Service_Demographics_20200221_0356.mdb
Service_Demographics_20200306_0444.mdb
Service_Demographics_20200320_0329.mdb
Service_Demographics_20200403_0351.mdb
Service_Demographics_20200417_0343.mdb
Service_Demographics_20200501_0204.mdb
Service_Demographics_20200515_0130.mdb
Service_Demographics_20200529_0130.mdb
service_demographics_20200605_0130.mdb
Service_Demographics_20200611_0130.mdb
service_demographics_20200612_0130.mdb
Service_Demographics_20200615.mdb
service_demographics_20200621_0130.mdb
Service_Demographics_20200626_0130.mdb
service_demographics_20200723_0130.mdb
User_Defined_20200306_0444.mdb

Exhibit 6
Page 74

Page 5

User_Defined_Data_20191115_0852.mdb
User_Defined_Data_20191206_0538.mdb
User_Defined_Data_20200110_0144.mdb
User_Defined_Data_20200207_0444.mdb
User_Defined_Data_20200221_0356.mdb
User_Defined_Data_20200403_0351.mdb
User_Defined_Data_20200417_0343.mdb
User_Defined_Data_20200501_0204.mdb
User_Defined_Data_20200515_0130.mdb
User_Defined_Data_20200529_0130.mdb
user_defined_data_20200605_0130.mdb
User_Defined_Data_20200611_0130.mdb
user_defined_data_20200612_0130.mdb
User_Defined_Data_20200615.mdb
user_defined_data_20200621_0130.mdb
User_Defined_Data_20200626_0130.mdb
user_defined_data_20200723_0130.mdb
User_Defined_Data_20203020_0329.mdb

## Other

2020.06.24 Direct Notice – Final Disposition Codes (737476185_1.xlsx)
RMS FICO Agency Codes 2020 05 14 (737151361_1).xlsx

## Bates Numbered Documents

| Bates Alpha | Beginning Bates | Ending Bates |
|---|---|---|
| Convergent | 0000001 | 0000012 |
| DTV- | 001753 | 001772 |
| DTV- | 007468 | 007471 |
| DTV- | 013859 | 013860 |
| DTV- | 013919 | 013948 |
| DTV | 013949 | 033870 |
| DTV | 035705 | 035708 |
| DTV | 035718 | 035719 |

Exhibit 6
Page 75
Page 6

# Exhibit 3

## Summary of Collection Agency Data Received

| Collection Agency[1] | Analyzed? | Contained in DTVRMS Notes? | Analyzed in DTVRMS Notes? | Other comments on DTVRMS Notes | Received separately from DTVRMS Notes? | Analyzed separately from DTVRMS Notes? | Other comments on data received separately from DTVRMS Notes |
|---|---|---|---|---|---|---|---|
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] |
| Diversified Consultants, Inc. (DCI) | Yes | Yes | Yes | *N/A* | Yes | Yes | *N/A* |
| Nationwide Credit, Inc. (NCI) | Yes | Yes | No | No phone numbers | Yes | Yes | *N/A* |
| Transworld Systems, Inc. (TSI) | Yes | Yes | No | No phone numbers | Yes | Yes | *N/A* |
| NCO Group, Inc. (NCO) | Yes | No | *N/A* | *N/A* | Yes | Yes | *N/A* |
| iQor US, Inc. | Yes | No | *N/A* | *N/A* | Yes | Yes | *N/A* |
| CMI Group, LLC | Yes | Yes | No | No phone numbers | Yes | Yes | *N/A* |
| Afni, Inc. | Yes | Yes | No | No phone numbers | Yes | Yes | *N/A* |
| Receivables Management Services, LLC | Yes | Yes | Yes | *N/A* | No | *N/A* | *N/A* |
| First National Collection Bureau, Inc. | No | Yes | No | No phone numbers | Yes | No | Data do not contain dispositions |
| Convergent Outsourcing, Inc. | No | Yes | No | No phone numbers | Yes | No | Plaintiff did not provide designated dispositions |
| CBE Group, Inc. | No | Yes | No | No phone numbers | Yes | No | Plaintiff did not provide designated dispositions |
| Allied Insterstate, Inc. | No | Yes | No | No phone numbers | No | *N/A* | *N/A* |
| AmSher | No | Yes | No | Did not make prerecorded calls[2] | No | *N/A* | *N/A* |
| Constar Financial Services, LLC | No | Yes | No | No phone numbers / Did not make prerecorded calls[3] | No | *N/A* | *N/A* |
| Credence Resource Management | No | Yes | No | No phone numbers / Did not make prerecorded calls[4] | No | *N/A* | *N/A* |
| Credit Control Services | No | Yes | No | No phone numbers / Did not make prerecorded calls[5] | No | *N/A* | *N/A* |
| Enhanced Recovery Company, LLC | No | Yes | No | Most records have no phone number; records that do have phone numbers are from a time period when ERC did not make prerecorded calls[6] | No | *N/A* | *N/A* |
| Focus Receivables Management (now Sequium) | No | Yes | No | No phone numbers | No | *N/A* | *N/A* |
| IC System, Inc. | No | Yes | No | No phone numbers / Did not make prerecorded calls[7] | No | *N/A* | *N/A* |

Exhibit 6
Page 76

# Exhibit 3, Continued

## Summary of Collection Agency Data Received

| Collection Agency[1] | Analyzed? | Contained in DTVRMS Notes? | Analyzed in DTVRMS Notes? | Other comments on DTVRMS Notes | Received separately from DTVRMS Notes? | Analyzed separately from DTVRMS Notes? | Other comments on data received separately from DTVRMS Notes |
|---|---|---|---|---|---|---|---|
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] |
| Plaza Associates | No | Yes | No | No phone numbers | No | N/A | N/A |
| Prince Parker and Associates | No | Yes | No | Did not make prerecorded calls[8] | No | N/A | N/A |
| Receivables Performance Management | No | Yes | No | No phone numbers | No | N/A | N/A |
| Riddle and Associates | No | Yes | No | No phone numbers | No | N/A | N/A |
| Sunrise | No | Yes | No | No phone numbers | No | N/A | N/A |
| Virtuoso Sourcing Group | No | Yes | No | No phone numbers / Did not make prerecorded calls[9] | No | N/A | N/A |
| West Interactive | No | Yes | No | No phone numbers | No | N/A | N/A |

Notes:

[1] Agency names in the DTVRMS Notes data are inferred from codes in the "RMSUSERID" field using "RMS FICO Agency Codes 2020 05 14 (737151361_1).xlsx" provided to me by counsel.

[2] AmSher provided a declaration (DTV-001756–8) stating that it did not use prerecorded messages to make collection calls to delinquent DIRECTV accounts.

[3] Constar Financial Services, LLC provided a declaration (DTV-001759–61) stating that it did not use prerecorded messages to make collection calls to delinquent DIRECTV accounts.

[4] Credence Resource Management provided a declaration (DTV-007470–1) stating that it did not use prerecorded messages to make collection calls to delinquent DIRECTV accounts.

[5] Credit Control Services provided a declaration (DTV-001762–3) stating that it did not use prerecorded messages to make collection calls to delinquent DIRECTV accounts.

[6] Enhanced Recovery Company, LLC, did not make prerecorded calls after January 19, 2016, according to Declaration of Jason Davis, April 30, 2020 (SGR/21805188.1).

[7] IC Systems, Inc. provided a declaration (DTV-001766–8) stating that it did not use prerecorded messages to make collection calls to delinquent DIRECTV accounts.

[8] Prince Parker and Associates provided a declaration (DTV-001769–70) stating that it did not use prerecorded messages to make collection calls to delinquent DIRECTV accounts.

[9] Virtuoso Sourcing Group provided a declaration (DTV-001771–2) stating that it did not use prerecorded messages to make collection calls to delinquent DIRECTV accounts.

Exhibit 6
Page 77

# Exhibit 4

## Summary of Collection Agency Data Analyzed

| Data Provider | Date Range | Contains an Indicator of Prerecorded Calls? | Contains an Indicator that Dialed Number Is a Cellphone Number? | Contains a Dialed Phone Number? | Contains an Indicator of Inbound/Outbound Call? | Contains First and Last Name? |
|---|---|---|---|---|---|---|
| [A] | [B] | [C] | [D] | [E] | [F] | [G] |
| DCI | 04/12/2012 – 04/24/2014 [1] | No. DCI did not leave prerecorded messages, but calls between Apr. 2012 and Apr. 2014 may have involved an IVR.[2] | No | Yes | No | Yes |
| NCI | 06/06/2014 – 12/31/2014 | No | No. Cell numbers were not dialed between June 2014 and Dec 2014.[3] | Yes | Yes | Yes |
| TSI | 01/02/2009 – 09/18/2014 | No | No | Subset of records contain a phone number in the text field "comment" | Subset of records contain the word "inbound" in the text field "comment" | No |
| NCO | 05/09/2008 – 02/10/2020[4] | No | No | Each record contains 1 to 3 phone numbers; the data do not indicate which phone number was actually dialed | No | Yes |
| iQor | 05/09/2008 – 02/25/2020[5] | No | Yes | Yes | No | No |
| CMI | 12/12/2009 – 07/15/2014 | No | No | Yes | Known for a subset of records for which we know the meaning of the call disposition | No |
| Afni | 12/17/2009 – 12/31/2015 | No | No | Yes | Records have a variable "inboundoutboundflag" that always has the value "O" | No |
| DTVRMS Notes | 10/09/2012 – 04/30/2014 (DCI)[1][6] 10/17/2013 – 03/31/2017 (RMS, LLC) | No | No | Subset of OCAs have phone numbers for some or all of their records in the text field "RMSTRXNOTE" | Some records contain codes in two-letter field "RMSTRANCDE" that RMS Vendor Guide indicates mean inbound or outbound call | No |

Notes:
[1] I received DCI call records both from the DCI production and the DTVRMS Notes production. The time periods covered by these two source overlap, and it appears that records for some, but not all, calls in the overlapping period appear in both sources.
[2] Based on *03/06/2020 Production Letter*.
[3] Based on *03/06/2020 Production Letter*.
[4] The NCO data include additional call records that took place prior to the beginning of the class period on 05/09/2008; I exclude these calls from my analysis.
[5] The iQor data include additional call records that took place prior to the beginning of the class period on 05/09/2008; I exclude these calls from my analysis.
[6] The RMS Notes data include additional DCI call records that took place after 04/30/2014, but according to *03/06/2020 Production Letter* DCI did not make automated calls after this date, so I exclude these calls from my analysis.
Sources:
DTV013919–21 (DCI), DTV013949 (NCI), DTV013952–33830 (TSI), DTV013924–6 (NCO), DTV033836 (iQor), DTV033854 (CMI), DTV033848–51 (Afni), DTV033860–9 (DTVRMS Notes).

Exhibit 6
Page 78

# Exhibit 5
# 2020.06.24 Direct Notice--Final Disposition Codes (737476185_1).XLSX

| Vendor | TSI | DIRECTV RMS System | AFNI | iQor | DCI | NCI | NCO | CMI |
|---|---|---|---|---|---|---|---|---|
| Field | Disposition | Disposition | Disposition | Disposition | Disposition | Disposition | Disposition | Disposition |
| | BAD NUMBER | Wrong number | DELIVEREDPERSON HP (WRONG NUMBER) | WRONG NUMBER | Wrong number | AGENT - Deceased | BP where State Code starts with N or O | 241 |
| | CALL F SCREEN/DOES NOT KNOW DEBTOR | Bad Phone Number | DELIVEREDPERSON WP (WRONG NUMBER) | | | AGENT - Wrong Number | | OIWN |
| | CALL OTHER/BAD NUMBER | REMOVING OLD# | TRANSFER AGENT DO NOT CALL - NOT CONSUMER - PHONE1 | | | | | |
| | CALL OTHER/DOES NOT KNOW DEBTOR | RMVNG OLD # | TRANSFER AGENT WRONG NUMBER PHONE 1 | | | | | |
| | CALL WORK/DEBTOR EXPIRED DIED | uif sd wrg# | TRANSFER AGENT DO NOT CALL - NOT CONSUMER - PHONE2 | | | | | |
| | CALL WORK/DOES NOT KNOW DEBTOR | uim sd wrg# | WRONG NUMBER - PHONE 2 | | | | | |
| | CALL/BAD NUMBER | REMOVING OLD # | | | | | | |
| | CALL/DEBTOR EXPIRED DIED | ##:TW:TW:Talked with 3rd party | | | | | | |
| | CALL/DOES NOT KNOW DEBTOR | TR MM WRONG NUMBER | | | | | | |
| | CALLED RESIDE/DEBTOR EXPIRED DIED | Talked with 3rd Party UIF | | | | | | |
| | CALLED RESIDE/DOES NOT KNOW DEBTOR | Wrong#   MS | | | | | | |
| | CALLED/DEBTOR EXPIRED DIED | RD, WRONG # ...SDC | | | | | | |
| | CALLED/DOES NOT KNOW DEBTOR | ##  WND : Wrong Number Discon | | | | | | |
| | CEASEDESISTPER COMMENT  PLEASE STOP ALL CALLS TO 503 266 1951 AND 503266 1928 I DO NOT HAVE ANY BUSINESS WITH YOU. THANKS THESEARE NEW NUMBERS FOR US. RQSTD STOP CLL ON THE SHREPOINT DLTED THE PHNE NMBR | WRONG#....................... | | | | | | |
| | CLL SAME NAM/BAD NUMBER | RD WRONG# | | | | | | |
| | | JG | | | | | | |
| | DIED/BAD NUMBER | OB  WRNG # GDW | | | | | | |
| | DIED/CLERICAL FUNCTION | RMV # WRONG#...AO | | | | | | |
| | DIED/CONTACT MADE | female sd wrng nmbr @ | | | | | | |
| | DIED/DEBTOR EXPIRED DIED | WRONG# | | | | | | |
| | | REMOVED.CLG | | | | | | |
| | DIED/GOOD NUMBER | [0-9][0-9][0-9] both wr | | | | | | |
| | DIED/PROMISE TO PAY | WRONG[0-9][0-9][0-9] | | | | | | |
| | DIED/SEE COMMENTS | [0-9][0-9] IS A WRO | | | | | | |
| | HOME/BAD NUMBER | [0-9][0-9] IS A WRN | | | | | | |
| | HOME/DOES NOT KNOW DEBTOR | [0-9][0-9] IS A WN | | | | | | |
| | HOME/NEARBY DSNT KNOW DTR | [0-9][0-9] IS A WRG | | | | | | |
| | INBOUND CALL/BAD NUMBER | .WRNG | | | | | | |
| | INBOUND CALL/DOES NOT KNOW DEBTOR | WRMG%# | | | | | | |
| | MESSAGE HOME/BAD NUMBER | wrmg nmbr | | | | | | |
| | NEIGHBOR/DOES NOT KNOW DEBTOR | .WR | | | | | | |
| | OTHER/BAD NUMBER | STATING WR | | | | | | |
| | OTHER/DEBTOR EXPIRED DIED | [0-9][0-9] WRO | | | | | | |
| | OTHER/DOES NOT KNOW DEBTOR | [0-9][0-9] WRN | | | | | | |
| | RESIDENCE/BAD NUMBER | [0-9][0-9] WRG | | | | | | |
| | RESIDENCE/DEBTOR EXPIRED DIED | WRONG [0-9][0-9][0-9] | | | | | | |
| | RESIDENCE/DOES NOT KNOW DEBTOR | WRONG PERSON | | | | | | |
| | RESIDENCE/NEARBY DSNT KNOW DTR | remove%wro | | | | | | |

Exhibit 6
Page 79

# Exhibit 5, Continued
# 2020.06.24 Direct Notice--Final Disposition Codes (737476185_1).XLSX

| Vendor | TSI | DIRECTV RMS System | AFNI | iQor | DCI | NCI | NCO | CMI |
|--------|-----|--------------------|------|------|-----|-----|-----|-----|
| Field | Disposition | Disposition | Disposition | Disposition | Disposition | Disposition | Disposition | Disposition |
| TRADE/BAD NUMBER | | wron%remove | | | | | | |
| TRANSFER/BAD NUMBER | | number%remove | | | | | | |
| WORK/BAD NUMBER | | remove%wrn | | | | | | |
| WORK/DEBTOR EXPIRED DIED | | remove%wrg | | | | | | |
| WORK/DOES NOT KNOW DEBTOR | | THIS # %wro | | | | | | |
| WORK/NEARBY DSNT KNOW DTR | | THIS # %wrn | | | | | | |
| WRONG PARTY ABOUT TO END CALL TP ANSWER MRD SAID | | THIS # %wrg | | | | | | |
| WRONG NO. GIVE ALT NO. FOR THE CM | | | | | | | | |
| WRONG PARTY COMP ADV NCO SD THIS IS NOT CX NUM GVE CX NUM | | [0-9][0-9] is wr | | | | | | |
| WRONG PARTY SD CX GOT A NEW NUM | | is wro | | | | | | |
| WRONG PARTY SD JST CB AT HIS NUM | | is wrn | | | | | | |
| WRONG PARTY THS NUM | | is wrg | | | | | | |
| WRONG PARTY-HUSB MRD CALL CONS GVE NUM | | is the wro | | | | | | |
| WRONG PARTY-NEW TO 1- NO ANSWERTEL OTHER/BUSY SIGNAL | | is the wrn | | | | | | |
| WRONG PARTY-NEW TO 1- NO ANSWERTEL OTHER/NO ANSWER | | is the wrg | | | | | | |
| WRONG PARTYDIALER CALL F SCREEN/BAD NUMBER | | wro%n | | | | | | |
| WRONG PARTYDIALER CALL F SCREEN/CONTACT MADE | | wro%# | | | | | | |
| WRONG PARTYDIALER CALL F SCREEN/GOT INFORMATION | | SD %WRO | | | | | | |
| WRONG PARTYDIALER CALL F SCREEN/LEFT NUMBER | | SD %WRG | | | | | | |
| WRONG PARTYDIALER CALL OTHER/BAD NUMBER | | SD %WRN | | | | | | |
| WRONG PARTYDIALER CALLED RESIDE/BAD NUMBER | | SD %WR%# | | | | | | |
| WRONG PARTYINCOMING CALL/BAD NUMBER | | S AID %WRO | | | | | | |
| WRONG PARTYR DLD | | SAID %WRO | | | | | | |
| WRONG PARTYSLF MRD NT GD NMBRGV ALT NMBR | | SAID %WRG | | | | | | |
| WRONG PARTYTEL OTHER/BAD NUMBER | | SAID %WRN | | | | | | |
| WRONG PARTYTEL OTHER/BUSY SIGNAL | | SAID %WR%# | | | | | | |
| WRONG PARTYTEL OTHER/DOES NOT KNOW DEBTOR | | wr# | | | | | | |
| WRONG PARTYTEL OTHER/GOT INFORMATION | | wrg%n | | | | | | |
| WRONG PARTYTEL OTHER/INFO OBTAINED | | wrg%# | | | | | | |
| WRONG PARTYTEL OTHER/NO ANSWER | | wrn%n | | | | | | |
| WRONG PARTYTEL OTHER/NO MESSAGE LEFT | | wrn%# | | | | | | |
| WRONG PARTYTELEPHONE RESIDENCE/LEFT MESSAGE | | wrn%party | | | | | | |
| WRONG PARTYUNKNOWN TO MANUAL DIALED | | wrg%party | | | | | | |
| WRONG PARTYUNKNOWN TO MANUAL RMVD | | wrg pa | | | | | | |
| WRONG PARTYUNKNOWN TO MANUAL STTD WHEN ON ANOTHER ACCT THT PARTY AT | | wro%party | | | | | | |
| WRONG PARTYUNKNOWN TO MANUAL TP GAVE ALT NUMB | | Bad N | | | | | | |
| WRONG PARTYUNKNOWN TO MANUAL-NEW TO 1- NO ANSWERTEL OTHER/NO MESSAGE LEFT | | Bad # | | | | | | |
| WRONG PARTYUNKNOWN TO MANUAL-NEW TO 8- BAD NUMBERTEL OTHER/BAD NUMBER | | REMOVIGN OLD | | | | | | |
| WRONG PARTYUNKNOWN TO MANUALD CX DNT LIVE HERE GVE CX NUM | | rmv [0-9][0-9] | | | | | | |
| WRONG PARTYUNKNOWN TO MANUALDIALER CALL F SCREEN/BAD NUMBER | | rmvd [0-9][0-9][0-9] | | | | | | |
| WRONG PARTYUNKNOWN TO MANUALDIALER CALL F SCREEN/GOT INFORMATION | | remove [0-9][0-9][0-9] | | | | | | |

Exhibit 6
Page 80

# Exhibit 5, Continued
# 2020.06.24 Direct Notice--Final Disposition Codes (737476185_1).XLSX

| Vendor | TSI | DIRECTV RMS System | AFNI | iQor | DCI | NCI | NCO | CMI |
|--------|-----|--------------------|------|------|-----|-----|-----|-----|
| Field | Disposition | Disposition | Disposition | Disposition | Disposition | Disposition | Disposition | Disposition |
| | WRONG PARTYUNKNOWN TO MANUALINCOMING CALL/BAD NUMBER | removed [0-9][0-9][0-9] | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALINCOMING CALL/DOES NOT KNOW DEBTOR | remove PH | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALINCOMING CALL/GOT INFORMATION | bad# | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALINCOMING CALL/NO LONGER EMPLOYED | rmvd # | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALINCOMING CALL/SEE COMMENTS | rmvd# | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALNE TO ANTHR TP MRD SD CX DNT LIVGE HRE GAVE CX NUM | rmv # | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALNG NUM FOR CX GOT ALT NUM ITS | rmv# | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALNT LIVE THR GAVE CX NUM | REMOVED # | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALO CH MRD ASK PERM T XFER  REF NT ALLOWEN TO CALL ON HER WPGAVE ALT NUMB | removin% old# | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALSD SHE DSNT LIVE HERE ANYMORE GVE CX NUM | | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALT FRST SD CX IS DECEASED | | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALT HE KNW CX GAVE CX NUM | | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALT LIVE THR MRD GAVE CX NUM | | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALTEL OTHER/BAD NUMBER | | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALTEL OTHER/BUSY SIGNAL | | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALTEL OTHER/DEAD LINE | | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALTEL OTHER/DOES NOT KNOW DEBTOR | | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALTEL OTHER/HUNG UP | | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALTEL OTHER/NO MESSAGE LEFT | | | | | | | |
| | WRONG PARTYUNKNOWN TO MANUALVE HERE MRD ASKD FOR CX NUM SD HOLD ON ILL ASK CX SISTER GAVE CX NUM) | | | | | | | |

Exhibit 6
Page 81

CONFIDENTIAL

## Exhibit 6

## Many Alleged Wrong Phone Numbers
## Were Also Associated with Successful Calls (iQor Data)

| | | |
|---|---|---:|
| [A] | Unique Phone Numbers Associated with the Disposition "WRONG NUMBER" in the iQor Data | 1,040,264 |
| [B] | Alleged Wrong Phone Numbers Also Associated with the Disposition "RIGHT PARTY" in the iQor Data | 231,119 |
| **[C] = [B]/[A]** | **Share of Alleged Wrong Phone Numbers Also Associated with Successful Calls** | **22%** |

Notes:

[1] The count of "unique phone numbers" includes only phone numbers that have an area code that is assigned and in service in the United States, and that had at least one alleged wrong number call that took place on or after May 9, 2008.

[2] Calls with the disposition "RIGHT PARTY" are considered to be successful calls. "WRONG NUMBER" is the wrong-number disposition identified by Plaintiff for the iQor data. For a list of successful dispositions across all OCA datasets, see Exhibit 7.

Exhibit 6
Page 82

# Exhibit 7
# Call Dispositions in the OCA Call Record Data

| RMS Notes | | |
|---|---|---|
| **Successful Call Dispositions*** | | |
| Good Phone | | |
| Right Party Contact | | |

| **Other Call Dispositions** | | |
|---|---|---|
| Bad Address | Email Opt-Out | Outbound Call |
| Bad Email | Good Address | Skip Tracing |
| Bad Phone | Good Email | Text Opt-Out |
| CBR Date Removed | Inbound Call | Text Sent |
| CBR Date Reported | Mail Returned | Trigger |
| CBR Date Updated | Mail Sent | Update Address |

Note: RMS Notes dispositions reflect page 28 of the RMS Vendor Guide and do not reflect the usage of all OCAs uploading call records to RMS Notes.

| TSI | | |
|---|---|---|
| **Successful Call Dispositions*** | | |
| AUTHORIZED CC | GOT MONEY | |
| AUTHORIZED CREDIT CD | GOOD NUMBER | |
| CONTACT MADE | PROMISE TO PAY | |

Note: TSI calls are not considered a success if the call record indicates that the debtor has died.

| **Other Call Dispositions** | | |
|---|---|---|
| ANSWERING MACHINE | GOT INFORMATION | NO PHONE |
| ATTORNEY HANDLING | HOLD ACCOUNT | NO WRITTN COMMUNICAT |
| BAD NUMBER | HUNG UP | NUMBER DISCONNECTED |
| BANKRUPTCY | INFO OBTAINED | PAYMENT SCHEDULE |
| BUSY SIGNAL | INSURANCE DENIED | REBILL INSURANCE |
| CALL BACK | LEFT MESSAGE | RECEIVED POST DATES |
| CALL TERMINATED | LEFT NUMBER | REFUSED TO PAY |
| CAN BE REACHED NUMBR | NEARBY DSNT KNOW DTR | SEE COMMENTS |
| CLERICAL FUNCTION | NEARBY INFO | STALL |
| COMMENTS | NEARBY SD NO CALLS | SUPPORT WORK |
| COMPLIANCE COMPLAINT | NEW TELEPHONE NUMBER | TELCO |
| DEAD LINE | NO ANSWER | TP |
| DEBTOR EXPIRED DIED | NO ENGLISH | TRIGGER RECEIVED |
| DECLINED RTND CC | NO INFORMATION | TRIGGER REMOVE EVENT |
| DOES NOT KNOW DEBTOR | NO LISTING | UNCOLLECTABLE |
| DTR REFUSED SECOND X | NO LONGER EMPLOYED | UNCOOPERATIVE |
| FAILED CONTACT | NO MESSAGE LEFT | UNRECOGNIZED LINE |
| FRAUD IDENTITY | NO PHN COMMUNICATION | |

Note: TSI call records have an inconsistent structure; dispositions listed here are text that appear to be call dispositions.

Exhibit 6
Page 83

# Exhibit 7, Continued
# Call Dispositions in the OCA Call Record Data

| Afni | | |
|---|---|---|
| **Successful Call Dispositions\*** | | |
| *None Identified* | | |

| **Other Call Dispositions** | | |
|---|---|---|
| 101 BUSY | 165 DELIVEREDPERSON WP (WRONG NUMBER) | 501 TRANSFER AGENT BUSY |
| 102 CALL_BAD_NUMBER | 174 BADNUMBERUNASSIGNED HP | 502 TRANSFER AGENT DISCONNECTED/ BAD NUMBER - PHONE 1 |
| 103 CALL_BAD_NUMBER (WORK) | 175 BADNUMBERUNASSIGNED WP | 503 TRANSFER AGENT DISCONNECTED/ BAD NUMBER - PHONE 2 |
| 105 DELIVEREDMACHINE | 176 UNDELIVEREDMACHINE | 505 TRANSFER AGENT LEFT VOICEMAIL |
| 108 MACHINE_HANGUP | 179 NOT_SUPPORTED HP | 510 TRANSFER AGENT NO ANSWER |
| 110 NOANSWER | 180 INVALID PHONE NUMBER HP | 511 NOT CONNECTED |
| 111 NOTCONNECTED | 184 NOT_SUPPORTED WP | 514 TRANSFER AGENT FAX PHONE 1 |
| 114 BADNUMBERFAX | 185 INVALID PHONE NUMBER WP | 515 TRANSFER AGENT FAX PHONE 2 |
| 115 BADNUMBERFAX (WORK PHONE) | 201 BUSY | 519 TRANSFER AGENT DO NOT CALL - NOT CONSUMER - PHONE1 |
| 116 DELIVEREDPERSON (HP) | 205 DELIVEREDMACHINE | 526 TRANSFER AGENT - SUCCESSFUL TRANSFER TO MLK |
| 117 BLOCKED (HP) | 208 MACHINE_HANGUP | 530 VERIFIED - CUST HUNG UP |
| 125 DELIVEREDPERSON HP (HOLDFORRIGHTPARTY) | 209 NEVER_TRIED | 533 TRANSFER AGENT - UNSUCCESSFUL TRANSFER TO MLK |
| 134 DELIVEREDPERSON HP (INBUOUND) | 210 NOANSWER | 535 TRANSFER AGENT LM W/ 3RD PARTY |
| 129 DELIVEREDPERSON HP (DC_CALL_CENTER_NO_ANSWER) | 211 NOTCONNECTED | 536 TRANSFER AGENT WRONG NUMBER - PHONE 1 |
| 130 DELIVEREDPERSON HP (DC CLIENT H/U DURING TRANSFER) | 213 WIRELESS | 548 TRANSFER AGENT DO NOT CALL - NOT CONSUMER - PHONE2 |
| 131 DELIVEREDPERSON HP (DC-CLIENT H/U ON HOLD) | 214 BADNUMBERFAX HP | 565 WRONG NUMBER - PHONE 2 |
| 132 DELIVEREDPERSON HP (DC FAILED) | 215 BADNUMBERFAX WP | 588 VERIFIED - CUST REQUESTED REMOVED |
| 136 DELIVEREDPERSON HP (WRONG NUMBER) | 219 DNC HP | 590 HANG UP |
| 146 BLOCKED (WP) | 229 DELIVEREDPERSON HP (DC_CALL_CENTER_NO_ANSWER) | 591 VERIFIED - CEASE COMMUNICATIONS |
| 154 DELIVEREDPERSON WP (HOLDFORRIGHTPARTY) | 230 DELIVEREDPERSON HP (DC_CLIENT_H/U_DURING_TRANSFER) | 592 VERIFIED - DISPUTED AND TRANSFERRED |
| 145 DELIVEREDPERSON WP (INBOUND) | 231 DELIVEREDPERSON HP (DC_CLIENT_H/U_ON_HOLD) | 593 VERIFIED ? LIVE LMTC |
| 158 DELIVEREDPERSON WP (DC_CALL_CENTER_NO_ANSWER) | 258 DELIVEREDPERSON WP (DC_CALL_CENTER_NO_ANSWER) | 594 VERIFIED - ATTORNEY REPRESENTATION |
| 159 DELIVEREDPERSON WP (DC_CLIENT_H/U_DURING_TRANSFER) | 259 DELIVEREDPERSON WP (DC_CLIENT_H/U_DURING_TRANSFER) | 595 VERIFIED - BANKRUPTCY |
| 160 DELIVEREDPERSON WP (DC_CLIENT_HANGUP_ON_HOLD) | 260 DELIVEREDPERSON WP (DC_CLIENT_H/U ON HOLD) | 596 VERIFIED- DISPUTED AND HUNG UP |
| 161 DELIVEREDPERSON WP (DC_FAILED) | 280 INVALID PHONE NUMBER HP | |
| 163 DELIVEREDPERSON WP (DC_SUCCESS) | 285 INVALID PHONE NUMBER WP | |

| iQor | | |
|---|---|---|
| **Successful Call Dispositions\*** | | |
| RIGHT PARTY | | |

| **Other Call Dispositions** | | |
|---|---|---|
| NO ANSWER | FAX | CPDROP |
| CPMACHINE | NVFAX | OTHER PARTY |
| FAILED | ABANDON | WRONG NUMBER |
| UNREACHABLE | CPMESSAGE | NULL |
| BUSY | NVMACHINE | |

Exhibit 6
Page 84

# Exhibit 7, Continued
# Call Dispositions in the OCA Call Record Data

| DCI | | |
|---|---|---|
| **Successful Call Dispositions*** | | |
| Promise to Pay | | |
| Refusal to Pay | | |
| Talked to debtor | | |

| **Other Call Dispositions** | | |
|---|---|---|
| Answering Machine No Message Left | Invalid Phone Number | Talked with |
| Answering machine detected | Line busy | Transferred call |
| Call dropped | No Answer | Unknown Result Code |
| Debtor hung up | No answer | Wrong number |
| Debtor not in | Operator intercept | |
| Fax machine detected | Talked to Consumer | |

| CMI | | | | | | |
|---|---|---|---|---|---|---|
| **Successful Call Dispositions*** | | | | | | |
| 135 | PROMISE TO PAY | | 235 | Promise to Pay | OIXP | OB IVR Transferred to Payment IVR |
| 136 | CREDIT CARD PAYMENT | | 236 | Credit card by phone | | |
| 137 | DIRECT CHECK PAYMENT | | 237 | Check by phone | | |

| **Other Call Dispositions** | | | | | | |
|---|---|---|---|---|---|---|
| 134 | NO COMMITMENT | | 292 | Dispute DIRECTV | OIHU | OB IVR Other Party Hung Up |
| 139 | LEFT MSG-PERSON | | 297 | CAN NOT PAY | OILM | OB IVR Left Message with Unconfirmed Par |
| 140 | HUNG UP ON AGENT | | 890 | VERBAL NO CALL RECEIVED | OINR | OB IVR No Response |
| 141 | INCOMING NOTIFICATION OF WRONG NUMBER | | 891 | PERMANENT DO NOT CALL | OIWN | OB IVR Wrong Number |
| 150 | INBOUND/SPANISH SPEAKER | | CLT | Call Back Later Today | OIXF | OB IVR Transferred to Agent |
| 189 | AGENT AWAITING DOCUMENTATION | | CNP | CAN NOT PAY | TFC | TRANSFERRED CALL TO CLIENT |
| 232 | FOLLOW UP SCHEDULED | | DAC | PARTY HUNG UP ON HOLD (ABORT) | TFE | TRANSFERRED CALL TO ESC AGT |
| 234 | No commitment | | DAM | *Missing* | TFR | RPC TRANSFER |
| 238 | LEFT MSG-ANS MACHINE | | DND | *Missing* | TSQ | TRANSFERRED TO SPANSIH QUEUE |
| 239 | Other party | | DPV | *Missing* | VMM | *Missing* |
| 240 | Party hung up | | DRO | *Missing* | VMMAM | ID VAL/MM BLASTER TO MACHINE |
| 241 | OUTGOING NOTIFICATION OF WRONG NUMBER | | DZS | ANSWERING MACHINE - LEFT MESSAGE | VMMP | ID VAL/MM BLASTER TO PERSON |
| 243 | Busy | | FUS | FOLLOW UP SCHEDULED | answer | Global Connect Answered Live Person |
| 244 | No Answer | | MCON | MANUAL DIAL CONNECTED | | |
| 250 | Transferred to Spanish queue | | MDIS | MANUAL DIAL DISCONNECT | | |
| 271 | Do not contact customer again | | OIFO | OB IVR Left Message | | |

Note: Dispositions labeled "Missing" were not present in the produced documentation.

Exhibit 6
Page 85

# Exhibit 7, Continued
# Call Dispositions in the OCA Call Record Data

| NCI | | |
|---|---|---|
| **Successful Call Dispositions*** | | |
| AGENT - PTP Arranged | AGENT - CUST RPC 4 | AGENT - CUST RPC PTP 2 |
| AGENT - PTP Payment in Full | AGENT - CUST RPC 5 | AGENT - CUST RPC PTP 3 |
| AGENT - CUST RPC 10 | AGENT - CUST RPC 7 | AGENT - CUST RPC PTP 4 |
| AGENT - CUST RPC 12 | AGENT - CUST RPC 8 | AGENT - CUST RPC PTP 5 |
| AGENT - CUST RPC 2 | AGENT - CUST RPC 9 | AGENT - CUST RPC PTP 6 |
| AGENT - CUST RPC 3 | AGENT - CUST RPC PTP 1 | |
| | | |
| **Other Call Dispositions** | | |
| AGENT - Bankrupt | AGENT - Refused to Pay | Maximum Account Attempts Reached (Not Ma |
| AGENT - Busy | AGENT - Third Party | No Answer |
| AGENT - CUST 10 | AGENT - Wrong Number | Not Attempted (Not Made) |
| AGENT - CUST 11 | Account or Phone in Other File (Not Made | Operator Transfer |
| AGENT - CUST WPC 1 | Answering Machine (Hung Up) | Operator Transfer (Abandoned Max Hold Ti |
| AGENT - Customer Hung Up | Busy | Operator Transfer (Agent Abandoned) |
| AGENT - Dead Air | Disconnected Before Validation (Immediat | Operator Transfer (Agent Terminated Call |
| AGENT - Debtor Dispute | Duplicate Call (Not Made) | Operator Transfer (Caller Abandoned Befo |
| AGENT - Deceased | Excluded via Dialing Sequence (Not Made) | Operator Transfer (Caller Abandoned) |
| AGENT - Does Not Speak English | Fax | Operator Transfer Failed (No Answer) |
| AGENT - Fax | Hung Up in Opening | Operator Transfer Failed (Other) |
| AGENT - Left Message Machine | Invalid Phone Number | Specified Do Not Call (Not Made) |
| AGENT - Left Message Person | Invalid Phone Number (Not Made) | Wireless Call Suppressed (Not Made) |
| AGENT - No Message Left | Listened | |

Note: I refer to a call associated with a disposition suggesting that the correct party was reached as a "successful call."

Exhibit 6
Page 86