# EXHIBIT 7

Exhibit 7
Page 1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

JENNY BROWN and CARMEN MONTIJO,

                 Plaintiffs,

     v.

DIRECTV, LLC,

                Defendant.

Case No. 2:13-cv-01170-DMG-E

# SUPPLEMENTARY EXPERT REPORT OF DR. DEBRA J. ARON

August 27, 2021

Exhibit 7
Page 2

## Contents

I.    QUALIFICATIONS AND ASSIGNMENT ................................................................. 1

II.   SUMMARY OF OPINIONS ............................................................................... 3

III.  DATA PROVIDED BY VERIZON AND AT&T ACCOUNT FOR A RELATIVELY SMALL
      FRACTION OF THE TELEPHONE NUMBERS IDENTIFIED BY PLAINTIFFS, ARE NOT
      ALWAYS NAMES OF PERSONS, AND DO NOT NECESSARILY COVER THE DATES OF ALL
      OF THE CALLS TO THOSE NUMBERS ................................................................ 4
      A.  Background ........................................................................................ 4
      B.  The Majority of the Peters-Stasiewicz Wireless Numbers Do Not Appear in the
          Wireless Data Supplied by AT&T and Verizon ..................................... 5
      C.  Many of the Peters-Stasiewicz Wireless Numbers that Appear in the AT&T Wireless
          Data Do Not Contain Carrier-Verified Name Information of an Individual ............... 8
      D.  Many of the Peters-Stasiewicz Wireless Numbers that Appear in the Verizon
          Wireless Data Do Not Provide Carrier-Verified Name Information of an Individual 11

IV.   THE AT&T AND VERIZON DATA ILLUSTRATE THE INADEQUACY OF CARRIER DATA
      FOR IDENTIFYING USERS OF LINES ON MULTI-LINE PLANS ............................ 14

Exhibit 7
Page 3

CONFIDENTIAL

## I.  QUALIFICATIONS AND ASSIGNMENT

1.  My name is Debra J. Aron.  I am a Vice President at Charles River Associates ("CRA").  CRA is an international consulting and expert services firm that provides, among other services, economic expertise for litigation, regulatory proceedings, policy debates, and business strategies.

2.  I am the same Debra J. Aron who submitted an expert report in this matter on May 21, 2021 and gave deposition testimony on June 18, 2021.  In my May 2021 report, I analyzed whether it is possible using the methodologies proposed by Plaintiffs and the Court to identify alleged wrong number wireless telephone calls made to individuals in the certified Class reliably without individual inquiry.  I also analyzed whether it is possible, given telephone numbers and the date(s) of the call(s) at issue in this case, to identify the names of the Class members accurately and reliably, without individual inquiry.

3.  In October 2020, Plaintiffs issued a subpoena for customer-specific data to AT&T, Verizon, and T-Mobile.[1]  Since filing my May 2021 report, AT&T and Verizon have produced data in response to Plaintiffs' subpoena.  Data from T-Mobile were sent by Plaintiffs to DIRECTV on August 24, 2021[2] and therefore I have not had sufficient time to analyze the T-Mobile data prior to filing this report.  If permitted, I will supplement this report to reflect my analysis of the T-Mobile data.

4.  I was asked by counsel for Defendant DIRECTV, LLC ("DIRECTV") to quantify the degree to which the data produced by the wireless carriers in response to Plaintiffs' subpoenas provide information about the telephone numbers listed by Christina Peters-

---

[1]  Subpoena to Testify at a Deposition in a Civil Action, *Jenny Brown, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, October 12, 2020.  The subpoenas sent to AT&T, T-Mobile, and Verizon in October 2020 were identical.  I also understand that Plaintiffs sent an additional subpoena to AT&T in March 2021 (Subpoena to Testify at a Deposition in a Civil Action to AT&T Inc., *Jenny Brown, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, March 17, 2021).

[2] Email, Sean Petterson to Hans Germann and Kyle Steinmetz, re: Jenny Brown v. DIRECTV, LLC, August 24, 2021 (hereafter, *08/24/2021 Petterson email*).

Exhibit 7
Page 4

CONFIDENTIAL

Stasiewicz in Exhibit G of her Expert Report of May 21, 2021[3] and the extent to which the information provided includes a carrier-verified name of an individual person.  I was also asked to assess whether the data produced presents the challenges that I discussed in my May 2021 Expert Report in which I explained the deficiencies of wireless carrier data for identifying the actual users of a wireless telephone number at the time of a purportedly "wrong number" call that was placed to collect a debt to DIRECTV.

5.    My curriculum vitae is attached as Exhibit 1 to this report and a list of the documents that I considered in my analysis is contained in Exhibit 2.

6.    In what follows, Section II summarizes my findings in this report.  Section III quantifies the percentage of telephone numbers in Ms. Peters-Stasiewicz's list that are accounted for in any way by the data produced by AT&T and Verizon; the extent to which the information produced for the identified phone numbers includes what appears to be an individual person's carrier-verified name; and explains that further analysis would be necessary to quantify the fraction of the phone numbers for which identifying information was supplied that is relevant to the dates of "designated disposition" calls (that is, calls on which key words, phrases, or codes that Plaintiffs purport to identify as indicating a "wrong number" were applied by the outside collection agency).

7.    Section IV demonstrates that the data produced present the patterns and deficiencies that I discussed in my May 2021 Expert Report that prevent relying on such data to reliably identify wrong number calls and the recipients of such calls without individualized inquiry.

8.    If new data and facts become available to me that alter my conclusions I will augment or modify my report accordingly.

---

[3] Expert Report of Christina Peters-Stasiewicz, *Jenny Brown and Carmen Montijo, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Case 13-cv-01170-DMG, May 21, 2021 (hereafter, *05/21/21 Peters-Stasiewicz Report*), ¶ 45.

2

Exhibit 7
Page 5

CONFIDENTIAL

## II.   SUMMARY OF OPINIONS

9.  I have found that 37 percent of the 537,108 "Qualified Wireless Numbers"[4] (hereafter, "Peters-Stasiewicz Wireless Numbers") identified by Christina Peters-Stasiewicz appear for some date(s) in the wireless data supplied by AT&T and Verizon.

10.  The applicable date of the account information provided for each telephone number that appears in the carrier data may or may not correspond to the date on which an alleged designated disposition call was made to that telephone number, or the date of any particular alleged "wrong number" call, determination of which would require analysis of the data that is beyond the scope of this report.

11.  In many instances, the name of the account holder produced by the carrier was that of a business or reseller rather than the name of any individual.  In addition, in many instances the line was reported to be prepaid, with no individual's name.  Further, a name, if any, provided on a prepaid line is not verified by the carrier.  In some cases, the "names" are not names at all but are labels such as "MOM" or "IPAD."

12.  In the AT&T data, nine percent of the telephone numbers for which account data were produced have no carrier-verified name of an individual reported for any date or time period, and approximately 50 percent of the telephone numbers have no carrier-verified name of an individual reported for at least some of the dates provided in the data.

13.  In the Verizon data, 15 percent of the telephone numbers for which account data were produced have no carrier-verified name of an individual reported for any date or time period, and 16 percent of the telephone numbers have no carrier-verified name of an individual reported for at least some of the dates provided in the data.

14.  My analysis of the wireless data produced by AT&T and Verizon, particularly with respect to the distinction between subscribers and users and with respect to the ambiguities created by multi-line plans, confirms the issues that I raised in my May 2021 Expert Report

---

[4] *05/21/21 Peters-Stasiewicz Report*, ¶ 45.

Exhibit 7
Page 6

CONFIDENTIAL

regarding deficiencies in wireless carrier data for determining whether a telephone call was
to a wrong number and for determining who received the purported wrong number call.

15.   Summary statistics describing the data produced by AT&T and Verizon are contained in
the following table:

**Table 1**
**Carrier Subpoena Response Data Summary**

|  | Found in... | | | |
|---|---|---|---|---|
|  | AT&T Only | Verizon Only | Both AT&T and Verizon | Neither AT&T nor Verizon |
| Peters-Stasiewicz Wireless Numbers | 136,796 | 57,924 | 4,438 | 337,950 |
| Percent of All Peters-Stasiewicz Wireless Numbers | 25% | 11% | 1% | 63% |
| *Of Peters-Stasiewicz Wireless Numbers Found in the Carrier Data:* | | | | |
| Non-Identifiable Name for Every Account Provided for the Number | 9% | 15% | 4% | |
| Non-Identifiable Name for at Least One Account Provided for the Number | 50% | 16% | 37% | |
| Peters-Stasiewicz Wireless Numbers Associated with Multiple Distinct Accounts in the Data | 68% | 4% | *n/a* | |

Notes: Multiple accounts are provided for some numbers. Non-identifiable names include prepaid accounts and business names, and, for AT&T, the resellers and other non-individual names listed in Exhibit 3.

Sources: Expert Report of Christina Peters-Stasiewicz, at Exhibit G; AT&T Subpoena Response Data; Verizon Subpoena Response Data.

## III.   DATA PROVIDED BY VERIZON AND AT&T ACCOUNT FOR A RELATIVELY SMALL FRACTION OF THE TELEPHONE NUMBERS IDENTIFIED BY PLAINTIFFS, ARE NOT ALWAYS NAMES OF PERSONS, AND DO NOT NECESSARILY COVER THE DATES OF ALL OF THE CALLS TO THOSE NUMBERS

### A.   Background

16.   In May 2021, Christina Peters-Stasiewicz submitted a report on behalf of Plaintiffs in
which she identified 537,108 telephone numbers that purport to meet certain criteria related
to what Plaintiffs have identified as "wrong number" disposition codes, among other
criteria, and that she claims she also identified as wireless telephone numbers.[5]   I
understand that Plaintiffs issued subpoenas to AT&T, T-Mobile, and Verizon, asking the

---

[5] *05/21/21 Peters-Stasiewicz Report,* ¶¶ 8, 31, 33, 45.

4

Exhibit 7
Page 7

CONFIDENTIAL

carriers to produce documents sufficient to identify all available contact information (name, address, email) of their "subscribers/users" according to a list of date and phone number combinations supplied by Plaintiffs, and to supply the dates of service for the phone number associated with such person(s) and the type of service (i.e., mobile, landline, etc.).[6]  The date/phone number combinations were supplied by Plaintiffs to each carrier in a file referred to as "Schedule A."

17.   In response to Plaintiffs' subpoenas, AT&T produced data that were sent by Plaintiffs to DIRECTV on July 14, 2021[7] and Verizon produced data that were sent by Plaintiffs to DIRECTV on June 2, 2021[8] and July 9, 2021.[9]

### B.   The Majority of the Peters-Stasiewicz Wireless Numbers Do Not Appear in the Wireless Data Supplied by AT&T and Verizon

18.   To determine whether the data produced by the wireless carriers subpoenaed by Plaintiffs contain information regarding the Peters-Stasiewicz Wireless Numbers, I searched for those phone numbers in the data provided by AT&T and Verizon.  I found that 37 percent of the Peters-Stasiewicz Wireless Numbers appear for at least some point in time in the

---

[6] Subpoena to Testify at a Deposition in a Civil Action, *Jenny Brown, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, October 12, 2020.  The subpoenas sent to AT&T, T-Mobile, and Verizon were identical.  I understand that all phone numbers identified by AT&T were assigned to a cellular telephone service through AT&T or Cricket Wireless on the associated dates in the data (Declaration of Lisa Likely, *Jenny Brown and Carmen Montijo, et al v. DIRECTV, LLC*, In the United States District Court for the Central District of California, Western Division, Case No. 2:13-cv-01170-DMG-E, August 9, 2021 (hereafter, *08/09/21 Likely Declaration*), ¶ 4.  I also understand that Verizon Wireless produced data in response to Plaintiffs' subpoena and therefore infer that the phone numbers identified by Verizon Wireless were wireless on the associated dates in the data. (Declaration of Tami Ware, *Jenny Brown and Carmen Montijo, et al v. DIRECTV, LLC*, In the United States District Court for the Central District of California, Western Division, Case No. 2:13-cv-01170-DMG-E, August 12, 2021 (hereafter, *08/12/21 Ware Declaration*), ¶ 3.

[7] Email, Dan Marovitch to Hans Germann and Kyle Steinmetz, re: Brown v. DIRECTV, LLC, No. 2:13-cv-01170 (C.D. Cal.), July 14, 2021.

[8] Email, Dan Marovitch to Hans Germann and Kyle Steinmetz, re: Brown v. DIRECTV, LLC, No. 2:13-cv-01170 (C.D. Cal.), June 2, 2021.

[9] Email, Dan Marovitch to Susan Dziekan, Hans Germann, Kyle Steinmetz, and Rowena Cabitac, re: Re: Subpoenas/Notice of Depositions - Brown v. DIRECTV, LLC, No. 2:13-cv-01170 (C.D. Cal.), July 9, 2021.

Exhibit 7
Page 8

CONFIDENTIAL

data provided by AT&T and Verizon.[10]  The remaining 63 percent of the Peters-Stasiewicz Wireless Numbers appear nowhere in the AT&T and Verizon data.

19.   As noted, the Schedule A that Plaintiffs sent to each carrier provided one or more dates for each listed telephone number.  Examination of Schedule A indicates that many of the telephone number/date combinations do not represent a date on which a call with a designated disposition was made to that number.

20.   It appears from the data that if a telephone number was reassigned by the carrier from one owner to a different owner between one call-date and another call-date, the carrier supplied account information associated with both (or more) accounts.  In the data, some telephone numbers are associated with three or more accounts.  Additionally, I find that for some phone numbers, information was returned for some but not all the dates in Schedule A.

21.   Hence, the fact that a telephone number appears in the data of a carrier does not necessarily imply that there exists information pertaining to the owner of the account at the time of a purported designated disposition call.  For example, if the carrier-supplied information was for an account that terminated on July 1, 2014 but a designated disposition call to that number occurred after that date, the information supplied would not necessarily be that of the person (if any)[11] who received that designated disposition call.  The same limitation applies to any particular alleged "wrong number" call—the existence of a telephone number in the data produced does not necessarily imply that there exists information pertaining to the owner of the account at the time of any particular wrong number call.

22.   Performing the analysis necessary to determine the percent of the Peters-Stasiewicz Wireless Numbers that appear in the AT&T data or the Verizon data *on the date of each alleged wrong number call(s), and/or on the date of the alleged designated disposition call(s),* would be a substantially more resource-intensive effort and is outside the scope of

---

[10] I find that 25 percent of the Peters-Stasiewicz Wireless Numbers appear only in the data supplied by AT&T, 11 percent of the Peters-Stasiewicz Wireless Numbers appear only in the data supplied by Verizon, and one percent of the Peters-Stasiewicz Wireless Numbers appear in both the AT&T and Verizon data.

[11] For example, the call could have gone to no one if the phone number was no longer assigned to any customer.  As another possibility, if the person to whom the number was assigned at the time of the purported wrong number call later relinquished the number, it may have been returned to its originally assigned wireless or wireline carrier and reassigned to another customer by that carrier.

6

Exhibit 7
Page 9

CONFIDENTIAL

this report.  My examination of the carrier data shows that even for phone numbers for which information is provided, information is not provided for each date included in Schedule A.  I note only that my finding that 37 percent of the Peters-Stasiewicz Wireless Numbers appear in the produced data is an overestimate of the percent of numbers for which any information was provided relevant to the date of each alleged wrong number call.[12]  In addition, my analysis is not determinative of the percent of the Peters-Stasiewicz Wireless Numbers that appear in the produced data on the date of the calls with a designated disposition (a call that purportedly identified that the number was a "wrong number").

23.    I have not had sufficient time to analyze the data provided by T-Mobile, which DIRECTV received from Plaintiffs on August 24, 2021, only three days before the submission of this report.[13]  Given that I found 37 percent of the 537,108 Peters-Stasiewicz Wireless Numbers in the data provided by AT&T and Verizon, in order for the data from the three subpoenaed wireless carriers to account for all (or nearly all) of the Peters-Stasiewicz Wireless Numbers (regardless of date), the T-Mobile data would need to contain over 60 percent of the Peters-Stasiewicz Wireless Numbers.  However, Verizon Wireless and AT&T Mobility jointly accounted for approximately 68 percent of the wireless connections in the United States during the class period (which I understand to be May 9, 2008 to the present).[14]

---

[12] Assuming, for purposes of this statement, that the dates in Schedule A are the dates of calls that Plaintiffs allege to be wrong number calls.

[13] *08/24/2021 Petterson email.*

[14] Specifically, the Federal Communications Commission (FCC) estimates Verizon and AT&T represented 35 and 33 percent of U.S. wireless connections, respectively, among the top four national providers (Verizon Wireless, AT&T, T-Mobile, and Sprint) plus certain regional publicly traded, facilities-based wireless service providers, on average from 2011 to 2019.  During this same period, T-Mobile and Sprint—which has since merged with T-Mobile—represented 15 and 14 percent, respectively. *In the Matter of Implementation of Section 401 of the Repack Airwaves Yielding Better Access for Users of Modern Services Act of 2018: 2020 Communications Marketplace Report*, Before the Federal Communications Commission, GN Docket No. 20-60, FCC 20-188 (Released: December 31, 2020), Figure II.A.3, p. 14. See also Nineteenth Report, *In the Matter of Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services,* Before the Federal Communications Commission, WT Docket No. 16-137, DA 16-1061 (Released: September 23, 2016), Table II.B.1, p. 11; and Seventeenth Report, *In the Matter of Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services,* Before the Federal Communications Commission, WT Docket No. 13-135, DA 14-1862 (Released: December 18, 2014), Table II.B.1, p. 11.

Exhibit 7
Page 10

CONFIDENTIAL

### C. Many of the Peters-Stasiewicz Wireless Numbers that Appear in the AT&T Wireless Data Do Not Contain Carrier-Verified Name Information of an Individual

24.  I find that 25 percent of the 537,108 Peters-Stasiewicz Wireless Numbers appear in the data supplied by AT&T (and do not appear in the Verizon data).[15]

25.  I further examined this subset of the Peters-Stasiewicz Wireless Numbers that appear (only) in the data supplied by AT&T to determine the extent to which the AT&T data provide carrier-verified name information of individuals.  I will refer to the 25 percent of the 537,108 Peters-Stasiewicz Wireless Numbers that appear in the data supplied by AT&T (and that do not appear in the Verizon data) as the "Matched Peters-Stasiewicz AT&T Wireless Numbers."

26.  There are four fields in the AT&T data that contain potential name information: "BAN First Name," "BAN Last Name," "CTN First Name," and "CTN Last Name."

27.  According to the Declaration of Lisa Likely ("Likely Declaration"), Director of the Global Legal Demand Center for AT&T Inc. and its affiliates,[16] the "BAN First Name" and the "BAN Last Name" are the first and last names of the account owner for the phone number during the identified time period.[17]  In addition, according to Ms. Likely, the "CTN First Name" and "CTN Last Name" are the first and last names of the phone number's user during the identified time period.[18]  However, I also understand that the "CTN First Name," and "CTN Last Name" fields cannot be relied upon to provide the correct identity of a user because 1) AT&T takes no steps to verify user information, 2) AT&T does not require the account holder to provide user information and 3) there is no requirement to update user information. [19]  Also, according to the Likely Declaration, "AT&T does not require subscribers of its brands to provide personal information regarding persons who may use a

---

[15] Later in this report I will discuss the Peters-Stasiewicz Wireless Numbers that appear in both the AT&T and Verizon data.

[16] *08/09/21 Likely Declaration*, ¶ 1.

[17] *08/09/21 Likely Declaration,* ¶ 4.

[18] *08/09/21 Likely Declaration,* ¶ 4.

[19] Interview with Emily Westridge Black, Haynes Boone, May 18, 2021.

8

Exhibit 7
Page 11

CONFIDENTIAL

phone number ('users').  AT&T only has user information if it is voluntarily provided by the subscriber."[20]  Hence, the name, if any, in the "CTN First Name" and "CTN Last Name" fields are not carrier-verified names of the user of the telephone number.

28.   In addition, the BAN First Name and BAN Last Name fields do not purport to be the names of user of the telephone number but rather purport to be the names of the account owner. For any given telephone number, the account owner may not be the user of the telephone number.

29.   Further, in some instances, the "BAN" name fields are populated but the contents of the fields do not appear to be the names of individuals.  In Exhibit 3, I provide a list of entries found in either the "BAN First Name" field, the "BAN Last Name" field, or across both fields that I conclude from inspection are not the names of individuals.

30.   My investigation of the data did not constitute an exhaustive manual search of each record to attempt to identify all entries that are not names of individuals, a task that would be impractical given the size of the data and futile given that it is not possible to know from inspection and without individual inquiry whether some entries are or are not the name of an individual (for example, "John Doe" and "Benjamin Moore" appear as account owners in the data and I assumed for purposes of my analysis that these are names of individual account owners).  Instead, I programmatically identified all cases in the data in which a given text string in the combined account name fields were the same on 20 or more records, on the theory that business names with multiple lines and reseller names may appear repeatedly.  I then further investigated those account name entries against FCC reseller information to identify resellers and I reviewed the entries manually to recognize common business names.[21]  This process is conservative as it undoubtedly misses some names that are resellers or businesses because they each appear fewer than 20 times or are ambiguous.

---

[20] *08/09/21 Likely Declaration,* ¶ 3, fn. 1.

[21] Specifically, for purposes of constructing Exhibit 3, I examined the AT&T data for entries in the combined "BAN First Name" and "BAN Last Name" fields that occur in at least 20 rows.  To identify resellers, I compared the names that arose from this method to the list of resellers in the FCC Form 499 data. "FCC Form 499 Filer Database," Federal Communications Commission, https://apps.fcc.gov/cgb/form499/499a.cfm (accessed August 16, 2021).  FCC Form 499 is required to be filed annually by telecommunication providers, including resellers, for purposes of determining regulatory fees. "2021 Telecommunications Reporting Worksheet

9

Exhibit 7
Page 12

CONFIDENTIAL

31. Exhibit 3 includes names of resellers that submitted Form 499 to the FCC, (examples include "Tracfone Wireless" and "Locus Communications" in the "BAN Last Name" field); names that appear to be business names (examples include "Home Depot" and "Deloitte and Touche LLP" in the "BAN Last Name" field); and additional entries in the account owner name fields that I presume are not the names of individuals (examples include "ATT User" and "Fleet Driver").

32. In addition, I presume that all entries in the "BAN First Name" field, the "BAN Last Name" field, or across both fields containing the words or phrases "PREPAID," "PREPAY," "PRE PAID," or "PRE PAY" are not names of individuals, and instead indicate prepaid lines.[22]

33. While in some cases these records of prepaid accounts are populated with (apparently) individuals' names in the "CTN First Name" and "CTN Last Name" fields, AT&T does not verify the information in these fields, as discussed above.  In addition, AT&T has indicated that it does not verify the names of prepaid customers, as I noted in my May 2021 Expert Report.[23]

34. After accounting for entries that are clearly not the names of individuals using the methodology just described, I find that nine percent of the Matched Peters-Stasiewicz AT&T Wireless Numbers are not associated with the name of an individual in the "BAN First Name" and "BAN Last Name" fields in any of the accounts associated with that number in the data supplied.  That is, nine percent of the Matched Peters-Stasiewicz AT&T Wireless Numbers are either prepaid lines, are associated with business names, are

---

Instructions," Federal Communications Commission, November 2020.  The FCC Form 499 Filer Database identifies the names of telecommunications providers that file Form 499.

[22] The data also contain apparent misspellings of these words, such as "PERPAID" and "PREPIAD," in the "BAN First Name" and "BAN Last Name" fields.  To be conservative, I did not count those as prepaid lines but instead included them as "individuals."

[23] According to a declaration filed in Morgan v. Orlando Health et al. by Lisa Likely, AT&T does not require prepaid customers to provide personal information upon account activation, and no steps would be taken to verify the completeness or accuracy of such information if it is provided. (Declaration of Lisa Likely, *Angela Morgan v. Orlando Health, Inc., et al.,* In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 23, 2019, ¶ 3).  See also Expert Report of Dr. Debra J. Aron, *Jenny Brown v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case CV 13-01170-DMG (Ex), May 21, 2021 (hereafter, *05/21/2021 Aron Report*), ¶ 146.

Exhibit 7
Page 13

CONFIDENTIAL

associated with the name of a reseller company, or are otherwise presumed to not be the name of individual (e.g., "ATT User").

35. I also find that in 50 percent of the Matched Peters-Stasiewicz AT&T Wireless Numbers there is at least one instance (that is, for at least one of the distinct accounts associated with that number in the data supplied) for which the number is not associated with a name of an individual in the "BAN First Name" and "BAN Last Name" fields.

36. I assumed for purposes of counting the number of Matched Peters-Stasiewicz AT&T Wireless Numbers that are not associated with the name of an individual in the "BAN First Name" and "BAN Last Name" fields that all first and last name combinations in the "BAN First Name" and "BAN Last Name" fields that are not in Exhibit 3 or identified as prepaid represent the names of individuals.  As noted above, the process I used was conservative (i.e., undercounts the number of phone numbers with account owner names that are not the name of an individual person) because it undoubtedly missed some names that are resellers, businesses, or other non-specific names rather than individuals.

37. In all cases (for 100 percent of the records supplied by AT&T), determining whether the data supply the name of an individual on the date of the call(s) with designated dispositions, and/or on the date of any other particular purported wrong number call, would require further inquiry into the data to match the date of the call with the effective dates of each identified account associated with that number.

### D.   Many of the Peters-Stasiewicz Wireless Numbers that Appear in the Verizon Wireless Data Do Not Provide Carrier-Verified Name Information of an Individual

38. I find that 11 percent of the 537,108 Peters-Stasiewicz Wireless Numbers appear in the data supplied by Verizon (and do not appear in the AT&T data).

39. I further examined this subset of the Peters-Stasiewicz Wireless Numbers that appear in the data supplied by Verizon to determine the extent to which the Verizon data provide carrier-verified name information of individuals.  I will refer to the 11 percent of the 537,108 Peters-Stasiewicz Wireless Numbers that appear in the data supplied by Verizon (and that do not appear in the AT&T data) as the "Matched Peters-Stasiewicz Verizon Wireless Numbers."

Exhibit 7
Page 14

CONFIDENTIAL

40.  There are six fields in the Verizon data that potentially contain name information: "Acct Owner First Name," "Acct Owner Last Name," "Acct Owner Middle Name," "User First Name," "User Last Name," and "User Middle Name." The Verizon data also contain a "Acct Owner Business Name" field that appears to contain business names.  In addition, the Verizon data contain a field (labeled "Type") that indicates whether an account is prepaid or postpaid.

41.  There is no indication in the Verizon data of telephone numbers that Verizon supplies to resellers.[24]

42.  I find that 5 percent of the Matched Peters-Stasiewicz Verizon Wireless Numbers are identified as prepaid numbers in every account in which they appear.

43.  In my May 2021 Expert Report I noted that in Morgan v. Orlando Health et al., a declaration was filed by Neil Schmidt, a consultant at Verizon Corporate Resources Group LLC ("Schmidt Declaration").[25]  According to the Schmidt Declaration, Verizon does not require personal information to open or use a prepaid account, and even when personal information exists for such accounts, the accuracy of such information cannot be verified.[26]

44.  In addition, setting aside the fact that name information associated with prepaid accounts is not verified, in some cases it is clear that the account owner name fields associated with prepaid phone numbers are populated with information that does not represent a name.  Specific examples of such cases are shown in Exhibit 4 and include "names" such as "Update Info," "DECLINED DECLINED," and "OAS PHONEINTHEBOX."

45.  Of the postpaid Matched Peters-Stasiewicz Verizon Wireless Numbers, approximately 11 percent contain an entry in the "Acct Owner Business Name" field but contain no

---

[24] Other than a small number of idiosyncratic exceptions in which the name of a reseller appears in the "Acct Owner Business Name" field, it appears from the data that Verizon did not include in its production information on phone numbers that it supplies to resellers (if any).

[25] Declaration of Neil Schmidt, *Angela Morgan v. Orlando Health, Inc., et al.,* In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 24, 2019 (hereafter, *05/24/2019 Schmidt Declaration*).  See also *05/21/2021 Aron Report,* ¶ 142.

[26] *05/24/2019 Schmidt Declaration,* ¶ 2.  See also *Aron Report,* ¶ 146.

Exhibit 7
Page 15

CONFIDENTIAL

information in any of the three account owner name fields in every account associated with those phone numbers.

46.     Overall, 15 percent of the Matched Peters-Stasiewicz Verizon Wireless Numbers either 1) are postpaid numbers and contain an entry in the "Acct Owner Business Name" field but do not contain individual identifying information in any of the three account owner name fields or 2) are identified only as prepaid numbers, in any of the accounts associated with that number in the data supplied.[27]

47.     I find that 16 percent of the Matched Peters-Stasiewicz Verizon Wireless Numbers either 1) are identified with a prepaid account in at least one instance or 2) are associated with at least one postpaid account for which information is contained in the "Acct Owner Business Name" field but not in any of the three account owner name fields.

48.     As with the AT&T data, in the Verizon data the account owner name fields do not purport to be, and may not be, the name of the user of the telephone.[28]

49.     In addition, as with the AT&T data, in all cases (for 100 percent of the records supplied by Verizon), determining whether the data supply the name of an individual on the date of the call(s) with designated dispositions, and/or on the date of any other particular purported wrong number call, would require further inquiry into the data to match the date of the call with the effective dates of each identified account associated with that number.

---

[27] I find that one percent of the 537,108 Peters-Stasiewicz Wireless Numbers appear in both the Verizon data and the AT&T data. I refer to the one percent of the 537,108 Peters-Stasiewicz Wireless Numbers that appear in the Verizon data and in the AT&T data as the "Matched Peters-Stasiewicz AT&T and Verizon Overlap Wireless Numbers." Overall, 4 percent of the Matched Peters-Stasiewicz AT&T and Verizon Overlap Wireless Numbers meet the following criteria: 1) they are not associated with the name of an individual in the "BAN First Name" and "BAN Last Name" fields in any account associated with that number in the AT&T data; *and either* 2a) they contain an entry in the "Acct Owner Business Name" field but never contain individual identifying information in any of the three account owner name fields in the Verizon data, *or* 2b) they are identified as prepaid numbers in the Verizon data in every account associated with that number in the Verizon data. That is to say, 4 percent of the Matched Peters-Stasiewicz AT&T and Verizon Overlap Wireless Numbers do not have a carrier-verified name of an individual associated with it in either the AT&T or the Verizon data for any time period or date.

[28] *08/12/21 Ware Declaration,* ¶ 5.

13

Exhibit 7
Page 16

CONFIDENTIAL

## IV.   THE AT&T AND VERIZON DATA ILLUSTRATE THE INADEQUACY OF CARRIER DATA FOR IDENTIFYING USERS OF LINES ON MULTI-LINE PLANS

50.   As noted above, the subscriber to a line is not necessarily the user of that line.  While the user of a line may not be the subscriber on any type of account, the distinction between the user and subscriber can be readily understood in the context of multi-line accounts.  In a family plan multi-line account, for example, the subscriber (generally, the person to whom the bill is sent) is the same for all lines, while the lines may be used by the subscriber's family, friends, household employees, or others.  In my May 2021 Expert Report, I noted that while carriers generally have names associated with the subscribers on all postpaid accounts, they do not necessarily have names for the actual users of the lines within multi-line postpaid accounts.[29]  This observation is confirmed by investigation of the data produced by AT&T and Verizon.

51.   In Exhibit 5, I provide examples from the AT&T and Verizon data in which an account is associated with multiple phone numbers during an overlapping time period (indicating that it is a multi-line plan), but shows the same name for all phone numbers in the account in both the account holder fields and the customer name fields.  In multi-line plans it is likely that at least some of the lines are used by individuals other than the subscriber.  Hence, the name in the customer name fields likely does not, in many cases, identify the users of the lines in these accounts.

52.   According to the Schmidt Declaration, while subscribers may add a label to a number on a group plan (which may be populated into the user name field), Verizon Wireless has no way to determine the meaning of such a label, the person associated with such a label, or whether any person whose name matches the label is actually using the cellular phone number.[30]  Similarly, AT&T stated in this case that it does not verify any information subscribers choose to submit regarding "users" and does not use such information for any business purpose.[31]

---

[29] *05/21/2021 Aron Report,* ¶ 138.

[30] *05/24/2019 Schmidt Declaration*, ¶ 6.  See also *05/21/21 Aron Report*, ¶ 142.

[31] Non-Party AT&T Inc.'s Objections to Plaintiff's Rule 45 Subpoena, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Case 2:13-cv-01170-DMG-E, October 27, 2020, ¶ 4.

Exhibit 7
Page 17

CONFIDENTIAL

53.   In the carrier-produced data, there is no indicator that identifies which phone numbers are part of multi-line plans.  In addition, the data do not necessarily show all lines in a given account; they show only the phone numbers that were on Schedule A [32] because, presumably, they were called by an outside collection agency (OCA) in this case.  The examples shown in Exhibit 5, in which there are multiple phone numbers per account, appear in the data because, apparently, an OCA called more than one phone number in the same account.  For all other phone numbers in the data, there is no way to know from the data whether the phone number is part of a multi-line account nor whether, if it is, it is a primary or secondary line on the account nor who the user of the line is.  Hence, it is possible that many of the Peters-Stasiewicz Wireless Numbers that have the same account name and user name in the AT&T and Verizon data are lines in multi-line plans in which the user is distinct from the account owner.  The true fraction is unknown and, regardless of the fraction, the specific phone numbers that are part of multi-line plans and for which the user is distinct from the account owner is not knowable from the data.

54.   In some instances, phone numbers that are presumably in multi-line plans, but for which there are no other phone numbers in the data associated with the same account, are populated with "user" names that are clearly nicknames or other shorthand identifiers of possible "users" of the line.  Examples in the name field of the AT&T and Verizon data are shown in Exhibit 6.


Debra J. Aron, Ph.D.

August 27, 2021

---

[32] Interview with Emily Westridge Black, Haynes Boone, May 18, 2021.

Exhibit 7
Page 18

**CRA** Charles River Associates                                    **Exhibit 1**

## Debra J. Aron
Vice President

PhD, Economics
University of Chicago

BA, Economics
University of California at Los
Angeles

Dr. Debra J. Aron is a Vice President in the Competition Practice. Debra applies her expertise in economic and policy matters, including competition and antitrust analysis, intellectual property, class certification, and damages analysis, in both regulatory and litigation disputes. She has provided expert testimony for over 20 years in a variety of high-stakes federal, state, regulatory, and arbitration cases relating to competition and antitrust including market definition, conduct cases, and price fixing damages, intellectual property damages including patents and trade secrets; class actions and class certification including consumer fraud matters and TCPA; pricing; unjust enrichment; and economic cost analyses. She also has conducted competition analyses in several high-profile mergers and macroeconomic analyses of pricing and investment changes.  Dr. Aron's practice spans many industries, and she has a specific expertise in telecommunications and technology, including wireless services, wireline services, backbone, RAN, and customer premises equipment, satellite communications, and computer technology.

## Publications

"The Economics of 5G Deployment in the "Race" to 5G: The Economic Effects of Adopting New Technology," with Olga Ukhaneva and Chloe Sun, *CRA Insights: The Economics of 5G* (March 2021).

"The Economics of 5G Deployment in the "Race" to 5G: The State of 5G in the US, South Korea, and Other Countries," with Andy Baziliauskas, Olga Ukhaneva, and Chloe Sun, *CRA Insights: The Economics of 5G* (December 2020).

"The Economics of 5G Deployment in the "Race" to 5G: The Role of Open RAN," with Olga Ukhaneva and Chloe Sun, *CRA Insights: The Economics of 5G* (October 2020).

"The Damaging Effects of Large Postal Service Price Increases on Online Retailers, Consumers, and the U.S. Postal Service," with Justin Lenzo, Ph.D., Charles River Associates Whitepaper, September 28, 2020.

"The Economics of 5G Deployment in the 'Race' to 5G: The Role of Massive MIMO," with Olga Ukhaneva and Chloe Sun, *CRA Insights: The Economics of 5G* (August 2020).

"The Economics of 5G Deployment in the 'Race' to 5G: The Role of Mid-Band Spectrum," with Olga Ukhaneva and Chloe Sun, *CRA Insights: The Economics of 5G* (July 2020).

"An Economic Perspective on Balancing Unquantified Harms and Benefits Under the Consumer Welfare Standard," with Steven Tenn, 2019 COLUM. BUS. L. REV. (2019).

Exhibit 7
Page 19

"Lessons from the Economic Deregulation of the Airline and Telecommunications Industries,"
*Infrastructure* 58, no. 2 (Winter 2019).

"An Empirical Analysis of Regulator Mandates on the Pass Through of Switched Access Fees for
In-State Long-Distance Telecommunications in the U.S.," with David E. Burnstein, Ana Danies, and
Gerry Keith, June 19, 2013. Available at SSRN: http://ssrn.com/abstract=1674082.

Contributing author, ABA SECTION OF ANTITRUST LAW, TELECOM ANTITRUST HANDBOOK, Second
Edition, (Chicago: American Bar Association), March 2013.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States,"
with Allan T. Ingraham, *Review of Network Economics* 11, issue 4, 2012.

"Social Welfare Implications of Liability Rules in Major Environmental Damages Cases," with
Francis X. Pampush, Environmental Litigation Committee Newsletter, Fall 2011.

"Regulatory Policy and the Reverse Cellophane Fallacy," with David E. Burnstein, *Journal of
Competition Law and Economics* 2010; doi: 10.1093/joclec/nhp033.

"Investment in Next Generation Networks and Wholesale Telecommunications Regulation," with
Robert W. Crandall, November 3, 2008. Available at SSRN: http://ssrn.com/abstract=1294910.

"Pricing Principles and Pricing Methodologies for Essential Facilities," May 2008.

Contributing author, ABA SECTION OF ANTITRUST LAW, TELECOM ANTITRUST HANDBOOK, (2005),
(Chicago: American Bar Association), 2005.

"The Proper Treatment of Spare Network Capacity in Regulatory Cost Models," with Ana Danies,
May 2005. Available at SSRN http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133365.

"State Commissions Systematically Have Set UNE Prices Below Their Actual Costs," with Frank
Pampush and E. Gerry Keith, November 2003. Available at SSRN
http://ssrn.com/abstract=3327613.

"Broadband Adoption in the United States: An Empirical Analysis," with David E. Burnstein, in DOWN
TO THE WIRE: STUDIES IN THE DIFFUSION AND REGULATION OF TELECOMMUNICATIONS TECHNOLOGIES,
Allan Shampine, ed., (Nova Science Publishers, Hauppauge, NY, 2003).

"Developments in the Theory of Vertical Foreclosure as Applied to Regulated Telecommunications
Markets" (March 2002), Prepared for Presentation at The American Bar Association Section of
Antitrust Law, 50th Annual Spring Meeting.

"Modifications at HHIs for Vertical Supply Relationships" with Wenqing Li and James Langenfeld,
White Paper submitted to European Commission, February 2000.

"Economic Theories of Tying and Foreclosure Applied—And Not Applied—in Microsoft," with
Steven S. Wildman, *Antitrust* 14, no. 1, 1999, pp.48-52.

Exhibit 7
Page 20

Charles River Associates

"Effecting a Price Squeeze Through Bundled Pricing," with Steven S. Wildman, in COMPETITION, REGULATION, AND CONVERGENCE: CURRENT TRENDS IN TELECOMMUNICATIONS POLICY RESEARCH, Gillett and Vogelsang, eds. (New Jersey: Lawrence Erlbaum Associates, Inc.) 1999, pp. 1-17.

"Worldwide Wait?  How the Telecom Act's Unbundling Requirements Slow the Development of the Network Infrastructure," with Ken Dunmore and Frank Pampush, *Industrial and Corporate Change* 7, no. 4, 1998, pp. 615-621.

"The Pricing of Customer Access in Telecommunications," with Steven S. Wildman, *Industrial and Corporate Change* 5, no. 4, 1996, pp. 1029-1047.

"Bonus and Penalty Schemes as Equilibrium Incentive Devices, With Application to Manufacturing Systems," with Pau Olivella, *Journal of Law, Economics, and Organization* 10, Spring 1994, pp. 1-34.

"Diversification as a Strategic Preemptive Weapon," *Journal of Economics and Management Strategy* 2, Spring 1993, pp. 41-70.

"Using the Capital Market as a Monitor:  Corporate Spin-offs in an Agency Framework," *RAND Journal of Economics* 22, Winter 1991, pp. 505-518.

"Firm Organization and the Economic Approach to Personnel Management, *American Economic Review* 80, no. 2, May 1990, pp. 23-27.

"The Introduction of New Products," with Edward P. Lazear, *American Economic Review* 80, no. 2, May 1990, pp. 421-426.

"Ability, Moral Hazard, Firm Size, and Diversification," *RAND Journal of Economics* 19, Spring 1988, pp. 72-87.

"Worker Reputation and Productivity Incentives," *Journal of Labor Economics* 5, no. 4, October 1987, part 2, pp. S87-S106.

"The Role of Managerial Ability and Moral Hazard in the Determination of Firm Size, Growth and Diversification," Ph.D. Dissertation, University of Chicago, August 1985.

## Presentations

Panelist, Platform Antitrust, "On the Intersection Between Antitrust Enforcement and Other Regulatory Spheres as it Relates to Digital Platforms," Global Competition Review Live 9th Annual Antitrust Law Leaders Forum, Miami Beach, Florida, February 2020.

"Balancing Unquantified Benefits and Harms Under the Consumer Welfare Standard," The New York State Bar Association Antitrust Law Section, 2019 William Howard Taft Lecture, Commenter to the remarks of The Honorable Douglas H. Ginsburg, New York, New York, September 2019.

Exhibit 7
Page 21

"The Impact on the U.S. Economy of Excluding Huawei from Participation in the U.S. Market for Wireless Network Equipment," Presentation at the Fiscal Year 2019 National Defense Authorization Act, Section 889, Public Meeting of Department of Defense, General Services Administration, and NASA, Washington, D.C., July 19, 2019.

Moderator, "Your Expert Is Your Friend: How to Effectively Deliver Expert Testimony," ABA: The Woman Advocate Committee Regional CLE Program: Raising the Bar, Chicago, Illinois, October 2018.

"Lessons from the Deregulation of the Airline and Telecommunications Industries," ABA Infrastructure and Regulated Industries Section, Dallas, Texas, August 2018.

"Economic Fundamentals: Vertical and Coordinated Effects in Mergers," ABA Section of Antitrust Law, Fundamentals of Antitrust Economics Series, Chicago, Illinois, July 2018.

Panelist, "Considerations for the Economists' Analysis in Opt-Out Relative to Class Action Litigation," ABA 5th Annual Western Regional CLE Program on Class Actions and Mass Torts, San Francisco, California, June 2018.

"Lessons from the Deregulation of the Airline and Telecommunications Industries," ABA Infrastructure and Regulated Industries Section, Fall Council Meeting, Palm Beach, Florida, October 2017.

"Economic Fundamentals: Vertical and Coordinated Effects in Mergers," ABA Section of Antitrust Law, Fundamentals of Antitrust Economics Series, Washington, D.C., May 2016.

Panelist, "Economic Fundamentals: Market Power," ABA Spring Meeting, Washington, D.C., April 2016.

"The Economic Impact of Electricity Price Increases in Puerto Rico," ABA Section of Public Utility, Communications and Transportation Law, Spring Council Meeting, Naples, Florida, March 2016.

Moderator, "Effective Cross-Examination of the Expert Witness: Practical Tips and Video Clips," ABA Annual Meeting, Chicago, Illinois, July 2015.

Moderator, "The Science of Persuasion: Practical Insights from Research on Expert Witness Effectiveness and Jury Decision-Making," ABA Section of Litigation Annual Conference, New Orleans, Louisiana, April 2015.

Panelist, "How to Manage Conversations with Expert Witnesses," ABA Section of Litigation, Environmental, Mass Torts, & Products Liability Litigation Committees' Joint CLE Seminar, Avon, Colorado, January 30, 2014.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," Federal Communications Commission, Washington, D.C., June 11, 2013.

Exhibit 7
Page 22

Panelist, "A Primer: Getting the Most Out of Your Experts — Do's and Don'ts in the Use of Expert Witnesses: Learning from the Experts," ABA Section of Litigation Annual Conference, Chicago, Illinois, April 26, 2013.

"An Empirical Analysis of Regulator Mandates on the Pass Through of Switched Access Fees for In-State Long-Distance Telecommunications in the U.S.," with David E. Burnstein, Ana Danies, and Gerry Keith, Wesleyan University, Middletown, Connecticut, March 27, 2013.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," with Allan Ingraham, The 40th Research Conference on Communication, Information and Internet Policy (TPRC), September 22, 2012.

Panelist, "Two Decades of Daubert: Junk Science Replaced by Junk Rulings?" ABA Section of Litigation Annual Conference, Washington, DC, April 20, 2012.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," with Allan Ingraham, New America Foundation, workshop on Defining and Measuring Meaningful Broadband Adoption, April 11, 2012, Washington, DC.

"Social Welfare Implications of Liability Rules in Major Environmental Damages Cases," with Francis X. Pampush, American Bar Association Sections of Litigation and Criminal Justice Joint Annual Conference, April 15, 2011, Miami, Florida.

"Consumer Benefits of Intrastate Access Rate Reform in Minnesota," Center for Science, Technology and Public Policy, Humphrey School of Public Affairs, University of Minnesota, January 26, 2011.

"An Empirical Analysis of Regulator Mandates on the Pass Through of Switched Access Fees for In-State Long-Distance Telecommunications in the U.S.," with David E. Burnstein, Ana Danies, and Gerry Keith, The 38th Research Conference on Communication, Information and Internet Policy (Telecommunications Policy Research Conference), October 3, 2010, George Mason University Law School, Arlington, Virginia.

"Pricing Principles and Pricing Methodologies for Essential Facilities," The 36th Research Conference on Communication, Information and Internet Policy (TPRC), September 27, 2008.

"Regulatory Policy and the Reverse Cellophane Fallacy," with David E. Burnstein, 17th Biennial International Telecommunications Society Conference, Montréal, Québec, Canada, June 24-27, 2008.

"The Use of Economic Analysis in 'Industry Expert' Testimony," CLE course, XPRT Forum, March 7, 2008.

Exhibit 7
Page 23

Presentations to the New Jersey Board of Public Utilities and to the New Jersey Legislature's Telecommunications Utilities Committee regarding the economic principles for a forward-looking regulatory agenda in light of the facts of competition nationwide and in New Jersey, and the costs of regulation, October – November 2006.

"The Interaction of Regulation with Economics and Financial Analysis in Litigation, Policy, and Strategy Consulting," CLE course, XPRT Forum, October 7, 2006.

"Comments on 'Economic Analysis in FCC Merger Proceedings,'" Conference on Economic Analysis and FCC Decisionmaking, presented by the Federal Communications Bar Association (FCBA) and Stanford Institute for Economic Policy Research (SIEPR), Washington, D.C., March 15, 2006.

"Economic Principles for Consumer Protection Rules," Pri Telecom / Tech Briefing, Santa Clara, California, October 11, 2005.

"The Proper Treatment of Spare Network Capacity in Regulatory Cost Models," Presentation at the Advanced Workshop in Regulation and Competition, Center for Research in Regulated Industries, Skytop, Pennsylvania, May 2005.

"Telecommunications Regulation: What's Obsolete? What Will Become Obsolete?" Presentation at the State and City Telecom Reform Conference, Heartland Institute, Chicago, Illinois, December 2004.

"Trends in Telecommunications Demand & Supply," Presentation at the 46th Annual NARUC Regulatory Studies Program, Michigan State University, August 2004.

"The Economic Costs of Proposed Wireless Regulations in California," Presentation to Commissioners Brown and Kennedy, California Public Utilities Commission, San Francisco, California, April 2004.

"The Economics of UNE Pricing: Presentation to Staff," Ex parte presentation to the staff of the FCC, in FCC WC Docket No. 03-173: Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers, March 2004.Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers, March 2004.

"The High Cost of Proposed New Wireless Regulations," Presentation to the Pacific Research Institute conference "Regulating Wireless in California: Bill of Rights... or Wrongs?," San Francisco, California, April 2003.

"The TELRIC Showdown," Panelist, NARUC Staff Subcommittee on Telecommunications, 2002 Annual Convention, Chicago, Illinois, November 2002.

Exhibit 7
Page 24

Charles River Associates

"Economic Principles for Efficient Pricing of Municipal Rights-of-Way," National Association of Telecommunications Officers and Advisors (NATOA), Chicago, Illinois, September 2002.

"Trends in Voice and Broadband Competition in Telecommunications Markets: Markets, Strategies, and Regulation," 82nd Annual Convention of the Indiana Telecommunications Association, Lexington, Kentucky, June 2002.

"Broadband Deployment in the United States," Emerging Opportunities in Broadband Symposium, Northwestern University, Evanston, Illinois, December 2001.

"Local Competition in Illinois," Illinois Telecommunications Symposium, Northwestern University, Evanston, Illinois, December 2000.

"Licensing and Access to Innovations in Telecommunications and Information Services," Telecommunications Policy Research Conference, Alexandria, Virginia, September 2000.

"Effecting a Price Squeeze Through Bundled Pricing," Federal Communications Commission, Washington, D.C., May 1999.

"Competitive and Strategic Use of Optional Calling Plans and Volume Pricing Plans," The Institute for International Research Conference for Competitive Pricing of Telecommunications Services, Chicago, Illinois, July 1998.

"Effecting a Price Squeeze Through Bundled Pricing," Consortium for Research in Telecommunications Policy Conference, University of Michigan, Ann Arbor, Michigan, June 1998.

"The Pricing of Customer Access in Telecommunications," Conference on Public Policy and Corporate Strategy for the Information Economy, Evanston, Illinois, May 1996.

"Diversification as a Strategic Preemptive Weapon," University of Iowa, Iowa City, Iowa, February 1994.

"Diversification as a Strategic Preemptive Weapon, "University of Buffalo, Buffalo, New York, February 1994.

"Diversification as a Strategic Preemptive Weapon," University of Southern California, Los Angeles, California, December 1993.

"Strategic Pricing," Winter Meetings of the Econometric Society, Discussant, Anaheim, California, December 1993.

Exhibit 7
Page 25

Charles River Associates

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Michigan State University, Lansing, Michigan, November 1993.

"Diversification as a Strategic Preemptive Weapon," Rutgers University, New Brunswick, New Jersey, November 1993.

"Diversification as a Strategic Preemptive Weapon," University of California at Santa Cruz, Santa Cruz, California, November 1993.

"Diversification as a Strategic Preemptive Weapon," Graduate School of Business, Stanford University, Stanford, California, November 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Purdue University, West Lafayette, Indiana, September 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Summer Meetings of the Econometric Society, Boston University, Boston, Massachusetts, June 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," University of California, Department of Economics, Berkeley, California, May 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Stanford University, Graduate School of Business, Stanford, California, May 1993.

"Diversification as a Strategic Preemptive Weapon," Stanford University, Graduate School of Business, Stanford, California, April 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Hoover Institution, Stanford, California, April 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," University of California, Graduate School of Business, Berkeley, California, February 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Stanford University, Department of Economics, Stanford, California, February 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Hoover Institution, Stanford, California, January 1993.

Exhibit 7
Page 26

"Pricing Strategies," Session Discussant, 1992 North American Winter Meeting of The Econometric Society, Anaheim, California, January 1992.

"Diversification as a Strategic Preemptive Weapon," University of Toronto, Toronto, Canada, November 1991.

"Diversification as a Strategic Preemptive Weapon," Queen's University, Kingston, Ontario, Canada, November 1991.

"Bonuses and Penalties as Equilibrium Incentive Devices, with Application to Manufacturing Systems," University of Chicago, Chicago, Illinois, June 1991.

"The Timing of Entry into New Markets," Summer Meetings of the Econometric Society, University of Pennsylvania, Philadelphia, Pennsylvania, June 1991.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," University of Chicago, Chicago, Illinois, April 1991.

"Bonuses and Penalties as Equilibrium Incentive Devices, with Application to Manufacturing Systems," Winter Meetings of the Econometric Society, Washington, D.C., December 1990.

"Corporate Spin-offs in an Agency Framework," University of Washington, Seattle, Washington, October 1990.

"The Timing of Entry Into New Markets," University of British Columbia, Vancouver, British Columbia, October 1990.

"Corporate Spin-offs in an Agency Framework," Texas A&M University, College Station, Texas, April 1990.

"Firm Organization and the Economic Approach to Personnel Management," Winter Meetings of the American Economic Association, New York, New York, December 1989.

"Corporate Spin-offs in an Agency Framework," Western Finance Association Meetings, Seattle, Washington, June 1989.

"Corporate Spin-offs in an Agency Framework," University of Rochester, Rochester, New York, May 1989.

"Corporate Spin-offs in an Agency Framework," North American Summer Meetings of the Econometric Society, Minneapolis, Minnesota, June 1988.

Exhibit 7
Page 27

Charles River Associates

"Competition, Relativism, and Market Choice," North American Summer Meetings of the Econometric Society, Berkeley, California, June 1987.

"Competition, Relativism, and Market Choice," University of Chicago, Chicago, Illinois, April 1987.

"Rate Reform and Competition in Electric Power," Discussant, Conference on Competitive Issues in Electric Power, Northwestern University, Evanston, Illinois, March 1987.

"Worker Reputation and Productivity Incentives," New Economics of Personnel Conference, Arizona State University, Tempe, Arizona, April 1986.

"Ability, Moral Hazard, and Firm Diversification," Various Universities, 1985, 1994, including Yale University, University of Rochester, Stanford University, University of Minnesota, California Institute of Technology, Duke University, Northwestern University, Brown University, Harvard University, University of California - Los Angeles, University of Pennsylvania.

## Academic Journal Refereeing

Dr. Aron has served as a referee for The Rand Journal of Economics, the Journal of Political Economy, the Journal of Finance, the American Economic Review, the Quarterly Journal of Economics, the Journal of Industrial Economics, the Journal of Economics and Business, the Journal of Economic Theory, the Journal of Labor Economics, the Review of Industrial Organization, the European Economic Review, the Journal of Economics and Management Strategy, the International Review of Economics and Business, the Quarterly Review of Economics and Business, Management Science, the Journal of Public Economics, the Journal of Institutional and Theoretical Economics, and the National Science Foundation.

Exhibit 7
Page 28

## Testimony (2011-2021)

Deposition of Debra J. Aron in Jenny Brown, et al. v. DirecTV, LLC, United States District Court Central District of California, Western Division, No. 2:13-cv-01170-DMG-E, June 18, 2021.

Deposition of Debra J. Aron in Robin Breda, et al. v. Cellco Partnership d/b/a Verizon Wireless, United States District Court for the District of Massachusetts, Civil Action No. 1:16-cv-11512-DJC, June 3, 2021.

Deposition of Debra J. Aron in Naomi Gonzales v. Agway Energy Services, LLC, United States District Court for the Northern District of New York, Case No. 5:18-CV-235 (MAD/ATB), October 22, 2020.

Trial Testimony of Debra J. Aron in Sumotext Corp. v. Zoove, Inc. et al., United States District Court, Northern District of California, San Jose Division, Case No. 5:16-cv-01370-BLF-NMCx, March 3, 2020.

Trial Testimony of Debra J. Aron in Motorola Solutions, Inc. et al. v. Hytera Communications Corporation Ltd. et al., United States District Court for the Northern District of Illinois, Eastern Division, Case No. 1:17-cv-01973, February 3-4, 2020.

Hearing Testimony of Debra J. Aron in Order Instituting Rulemaking into the Review of California High Cost Fund-A Program, Before the Public Utilities Commission of the State of California, Rulemaking 11-11-007, January 29-30, 2020.

Prefiled Written Testimony of Debra J. Aron in Order Instituting Rulemaking into the Review of California High Cost Fund-A Program, Before the Public Utilities Commission of the State of California, Rulemaking 11-11-007, November 15, 2019.

Trial Testimony of Debra J. Aron in Hewlett-Packard Co. v. Quanta Storage Inc. et al., United States District Court for the Southern District of Texas, Houston Division, Case No. 4:18-cv-00762, October 21, 2019.

Deposition of Debra J. Aron in Motorola Solutions, Inc. et al. v. Hytera Communications Corporation Ltd. et al., United States District Court for the Northern District of Illinois, Eastern Division, Case No. 1:17-cv-01973, September 20, 2019.

Deposition of Debra J. Aron in Jonathan Coffey et al. v. WCW & Air, Inc. et al., United States District Court, for the Northern District of Florida, Pensacola Division, Case No. 3:17-cv-90-TKW-HTC, September 13, 2019.

Deposition of Debra J. Aron in Sumotext Corp. v. Zoove, Inc. et al., United States District Court, Northern District of California, San Jose Division, Case No. 5:16-cv-01370-BLF-NMCx, August 1, 2019.

Exhibit 7
Page 29

Deposition of Debra J. Aron in Waddell Williams, et al. v. Bluestem Brands, Inc., United States
District Court, Middle District of Florida, Tampa Division, Case No. 8:17-CV-1971-T-27AAS,
September 21, 2018.

Deposition of Debra J. Aron in Robert Hossfeld, et al. v. Compass Bank, N.A., et al., United States
District Court, Northern District of Alabama, Southern Division, Case No. 2:16-CV-2017-ACA,
September 7, 2018.

Deposition of Debra J. Aron in Ventures Edge legal, PLLC, et al. v. GoDaddy.com, LLC, et al.,
United States District Court, District of Arizona, Case No. 2:15-cv-02291-GMS, January 30, 2018.

Deposition of Debra J. Aron in Rajesh Verma, et al. v. Memorial Healthcare Group Inc., et al.,
United States District Court, Middle District of Florida, Jacksonville Division, Case No. 3:16-CV-
00427-HLA-JRK, June 27, 2017.

Trial Testimony of Debra J. Aron in T-Mobile USA, Inc. v. Huawei Device, USA, Inc., et al., In the
United States District Court for the Western District of Washington at Seattle, Case No. C14-1351-
RAJ, May 12, 2017.

Deposition of Debra J. Aron in Re Optical Disk Drive Antitrust Litigation, Hewlett-Packard Company
v. Toshiba Corp., et al., United States District Court, Northern District of California, MDL Docket No.
3:10-MD-02143-RS, Case No. 3:13-cv-05370-RS, March 23, 2017.

Deposition of Debra J. Aron in Peerless Network, Inc., et al. v. AT&T Corp., In the United States
District Court for the Southern District of New York, Case No. 15 CV 870, February 17, 2017.

Trial Testimony of Debra J. Aron in Thomas H. Krakauer, et al. v. Dish Network, L.L.C., In the
United States District Court for the Middle District of North Carolina, Durham Division, Case No.
1:14-CV-333, January 17, 2017.

Deposition of Debra J. Aron in T-Mobile USA, Inc. v. Huawei Device, USA, Inc., et al., In the United
States District Court for the Western District of Washington at Seattle, Case No. C14-1351-RAJ,
September 29, 2016.

Deposition of Debra J. Aron in Southwestern Bell Telephone Co., et al. v. V247 Telecom, LLC, et
al., In the United States District Court for the Northern District of Texas, Dallas Division, Case No.
3:14-CV-01409-M, August 31, 2016.

Hearing Testimony of Dr. Debra J. Aron in Order Instituting Investigation into the State of
Competition Among Telecommunications Providers in California, and to Consider and Resolve
Questions raised in the Limited Rehearing of Decision 08-09-042, Before the Public Utilities
Commission of the State of California, Investigation 15-11-007, July 20, 2016.

Exhibit 7
Page 30

Prefiled Written Rebuttal Testimony of Dr. Debra J. Aron in Order Instituting Investigation into the State of Competition Among Telecommunications Providers in California, and to Consider and Resolve Questions raised in the Limited Rehearing of Decision 08-09-042, Before the Public Utilities Commission of the State of California, Investigation 15-11-007, July 15, 2016.

Prefiled Written Testimony of Dr. Debra J. Aron in Order Instituting Investigation into the State of Competition Among Telecommunications Providers in California, and to Consider and Resolve Questions raised in the Limited Rehearing of Decision 08-09-042, Before the Public Utilities Commission of the State of California, Investigation 15-11-007, June 1, 2016 and March 5, 2016.

Deposition of Debra J. Aron in Ramzy Ayyad, et al. v. Sprint Spectrum, L.P., In the Superior Court of the State of California for the County of Alameda, Case No.: RG03-121510, March 29, 2016.

Deposition of Debra J. Aron in Avnet, Inc. and BSP Software, LLC v. Motio, Inc., In the United States District Court for the Northern District of Illinois, Eastern Division, Case No.: 1:12-cv-2100, March 9, 2016.

Deposition of Debra J. Aron in Lena K. Thodos and David Miller, et al. v. Nicor, Inc., et al., In the Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No.: 1:12-cv-2100, February 22, 2016.

Deposition of Debra J. Aron in Henry Espejo, et al. v. Santander Consumer USA, Inc., In the United States District Court for the Northern District of Illinois, Eastern Division, Case No.: 1:11-cv-08987, January 12, 2016.

Deposition of Debra J. Aron in Rachel Johnson, et al., v. Yahoo!, Inc. and Zenaida Calderin, et al. v. Yahoo!, Inc., in the United States District Court for the Northern District of Illinois, Eastern Division, Case Nos.: 14-cv-2028 and 14-cv-2753 and Rafael David Sherman, et al., v. Yahoo!, Inc., In the United States District Court for the Southern District of California, Case No.: 13-CV-00041-GPC-WVG (Combined), June 23, 2015.

Trial Testimony of Debra J. Aron in Salsgiver Communications, Inc., et al., v. Consolidated Communications Holdings, Inc., et al., In the Court of Common Pleas, Allegheny County, Pennsylvania, Case No. No. GD 08-7616, May 2015.

Trial Testimony of Debra J. Aron in Sprint Communications Company L.P. v. Comcast Cable Communications, LLC, et al., In the United States District Court for the District of Delaware, Case No. 1:12-cv-01013-RGA, February 3-4, 2015.

Deposition of Debra J. Aron in Herbert Chen et al. v. Robert Howard-Anderson et al., In the Court of Chancery of the State of Delaware, Case No. C.A. 5878-VCL, December 16, 2014.

Deposition of Debra J. Aron in Sprint Communications Company L.P. v. Comcast Cable Communications, LLC, et al., In the United States District Court for the District of Delaware, Case No. 1:12-cv-01013-RGA, November 20, 2014.

Exhibit 7
Page 31

Testimony of Debra J. Aron in Bayer CropScience LP v. Albaugh, Inc., et al., Before the American Arbitration Association, Case No. 16-171-Y-00511-12, October 20-21, 2014.

Trial Testimony of Debra J. Aron in Comcast IP Holdings I, LLC v. Sprint Communications Company L.P., et al., In the United States District Court for the District of Delaware, Case No. 12-205-RGA (CJB), October 9, 2014.

Prefiled Written Reply Testimony of Debra J. Aron in The Utility Reform Network v. Pacific Bell Telephone Company, Before the Public Utilities Commission of the State of California, Case No. 13-12-005, October 3, 2014.

Deposition of Debra J. Aron in Amanda Balschmiter, et al., v. TD Auto Finance, LLC, In the United States District Court, Northern District of Illinois, Eastern Division, Case No. 13cv1186, September 10, 2014.

Prefiled Written Testimony of Debra J. Aron in The Utility Reform Network v. Pacific Bell Telephone Company, Before the Public Utilities Commission of the State of California, Case No. 13-12-005, August 22, 2014.

Deposition of Debra J. Aron in Grant Birchmeier, et al., v. Caribbean Cruise Line, Inc., et al., In the United States District Court, Northern District of Illinois, Eastern Division, Case No. 12 CV 4069, July 19, 2014.

Deposition of Debra J. Aron in Comcast IP Holdings I, LLC v. Sprint Communications Company L.P., et al., United States District Court for the District of Delaware, Case No. 12-205-RGA(CJB), July 11, 2014.

Deposition of Debra J. Aron in In re: Methyl Tertiary Butyl Ether Products Liability Litigation, Commonwealth of Puerto Rico, et al., v. Shell Oil Co., et al., In the United States District Court, Southern District of New York, Case No. 07 Civ. 10470, May 27, 2014.

Depositions of Debra J. Aron in In re: Polyurethane Foam Antitrust Litigation, General Motors, L.L.C. v. Carpenter Co., et al., In the United States District Court for the Northern District of Ohio, Western Division, Case No. 3:12-pf-10027-JZ, April 30, 2014 and September 8, 2014.

Trial Testimony of Debra J. Aron in Seth Warnick, et al., v. Dish Network, L.L.C., In the United States District Court, District of Colorado, Civil Action No. 12-cv-01952-WYD, March 20, 2014.

Deposition of Debra J. Aron in Seth Warnick, et al., v. Dish Network, L.L.C., In the United States District Court, District of Colorado, Civil Action No. 12-cv-01952-WYD, September 25, 2013.

Deposition of Debra J. Aron in In re: Methyl Tertiary Butyl Ether ("MTBE") Product Liability Litigation, New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al., In the United States District Court, Southern District of New York, No. 08 Civ. 312, May 29, 2013.

Exhibit 7
Page 32

Charles River Associates

Prefiled Written Testimony and Reply Testimony of Debra J. Aron in <u>In the Matter of the Petition Filed by ALASCOM, INC. d/b/a AT&T ALASKA to be Relieved of its Carrier of Last Resort Responsibilities in Certain Locations in Southwest Alaska</u>, Before the Regulatory Commission of Alaska, Docket No. U-12-127, April 1, 2013 and January 17, 2013.

Deposition of Debra J. Aron in <u>William Douglas Fulghum, et al., v. Embarq Corporation, et al.</u>, In the United States District Court for the District of Kansas, Civil Action No.: 07-CV-2602 (EFM/JPO), November 29, 2011.

Deposition of Debra J. Aron in <u>Southwestern Bell Telephone Company, et al., v. IDT Telecom, Inc., et al.</u>, In the United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3-09-CV-1268-P, November 10, 2011.

Direct and Rebuttal Testimony of Debra J. Aron in the <u>Matter of Petition of Sprint to Reduce Intrastate Switched Access Rates of Incumbent Local Exchange Carriers in North Carolina</u>, Before the North Carolina Utilities Commission, Docket No. P-100, Sub 167, August 18, 2011 and September 27, 2011.

Prefiled Written Testimony and Rebuttal Testimony of Debra J. Aron in the <u>Matter of: An Investigation Into the Intrastate Switched Access Rates of All Kentucky Incumbent and Competitive Local Exchange Carriers</u>, Commonwealth of Kentucky, Before the Public Service Commission, Docket No. 2010-00398, September 30, 2011, and July 8, 2011.

Testimony of Debra J. Aron before the Utilities Committee of the Kansas Legislature regarding the status of competition in telecommunications markets in Kansas, February 2011.

Testimony of Debra J. Aron before the Telecommunications Committee of the Legislature of the state of Washington regarding the consumer benefits and competitive effects of switched access reform, February 2011.

## Professional organizations

Member, American Economic Association

Member, Econometric Society

Associate Member, American Bar Association

Past Member, Telecommunications Policy Research Conference Program Committee

## Honors and awards

Guthman Research Chair, Kellogg Graduate School of Management, Northwestern University, Summer 1994.

Hoover National Fellowship, Hoover Institution, 1992-1993.

Exhibit 7
Page 33

Faculty Research Fellow, National Bureau of Economic Research, 1987-1990.

PepsiCo Research Chair, Northwestern University, 1990.

Kellogg Research Professorship, Northwestern University, 1989.

National Science Foundation Research Grant, 1987-1988.

Buchanan Chair, Kellogg Graduate School of Management, Northwestern University, 1987-1988.

IBM Chair, Kellogg Graduate School of Management, Northwestern University, 1986-1987.

## Teaching

Courses taught: Pricing Strategy; Information, Communication, and Competition (economics of strategy and competition); Intermediate Microeconomic Theory; Managerial Economics (microeconomic theory as applied to business strategy and decision making) at the M.B.A. level, The Economics of Information at the Ph.D. level.

Also qualified to teach: graduate Microeconomic Theory; Industrial Organization and Labor Economics; the Economics of Personnel; Public Finance; Project Evaluation; Applied Game Theory.

## Professional history

| | | |
|---|---|---|
| 2019–Present | *Vice President*, Charles River Associates, Chicago, IL |
| 2018–2019 | *Principal and Senior Managing Director*, Ankura Consulting Group, Chicago, IL |
| 2010-2018 | *Principal and Managing Director*, Navigant Economics, Chicago, IL |
| 2000-2016 | *Adjunct Associate Professor*, Northwestern University, Evanston, IL |
| 1995-2010 | *Managing Director*, LECG, LLC, Evanston, IL |
| 1993-1995 | *Visiting Assistant Professor of Managerial Economics*, Northwestern University, Evanston, IL |
| 1985-1992 | *Assistant Professor of Managerial Economics*, Northwestern University, Evanston, IL |
| 1992-1993 | *National Fellow*, Hoover Institution at Stanford University, Stanford, CA |
| 1983-1984 | *Instructor*, University of Chicago Department of Economics, Chicago, IL |
| 1979-1980 | *Staff Economist*, Civil Aeronautics Board, Office of Economic Analysis, Washington, D.C. |

August 2021

Exhibit 7
Page 34

Exhibit 2

## List of Documents Considered

**Procedural Documents and Exhibits Therein,** *Jenny Brown, et al. v. DIRECTV, LLC,* **In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E**

Expert Report of Dr. Debra J. Aron, *Jenny Brown v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case CV 13-01170-DMG (Ex), May 21, 2021

Expert Report of Christina Peters-Stasiewicz, *Jenny Brown and Carmen Montijo, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Case 13-cv-01170-DMG, May 21, 2021

Subpoena to Testify at a Deposition in a Civil Action to AT&T, Inc., *Jenny Brown, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, October 12, 2020.

Subpoena to Testify at a Deposition in a Civil Action to T-Mobile US, Inc., *Jenny Brown, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, October 12, 2020.

Subpoena to Testify at a Deposition in a Civil Action to Verizon Communications Inc., *Jenny Brown, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, October 12, 2020.

Subpoena to Testify at a Deposition in a Civil Action to AT&T Inc., *Jenny Brown, et al. v. DIRECTV, LLC*, In the United States District Court, Central District of California, Western Division, Case 2:13-cv-01170-DMG-E, March 17, 2021

Declaration of Lisa Likely, *Jenny Brown and Carmen Montijo, et al v. DIRECTV, LLC*, In the United States District Court for the Central District of California, Western Division, Case No. 2:13-cv-01170-DMG-E, August 9, 2021

Declaration of Tami Ware, *Jenny Brown and Carmen Montijo, et al v. DIRECTV, LLC*, In the United States District Court for the Central District of California, Western Division, Case No. 2:13-cv-01170-DMG-E, August 12, 2021

Non-Party AT&T Inc's Objections to Plaintiff's Rule 45 Subpoena, *Jenny Brown, et al. v. DIRECTV, LLC,* In the United States District Court, Central District of California, Case 2:13-cv-01170-DMG-E, October 27, 2020

**Other Legal Documents**

Declaration of Lisa Likely, *Angela Morgan v. Orlando Health, Inc., et al.*, In the United States District Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May 23, 2019

1

Exhibit 7
Page 35

Neil Schmidt, *Angela Morgan v. Orlando Health, Inc., et al.*, In the United States District
Court Middle District of Florida, Orlando Division, Case 6:17-cv-01972-CEM-GJK, May
24, 2019

**Third-Party Documents**

*In the Matter of Implementation of Section 401 of the Repack Airwaves Yielding Better
Access for Users of Modern Services Act of 2018: 2020 Communications Marketplace
Report*, Before the Federal Communications Commission, GN Docket No. 20-60, FCC
20-188 (Released: December 31, 2020)

Nineteenth Report, *In the Matter of Implementation of Section 6002(b) of the Omnibus
Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market
Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*,
Before the Federal Communications Commission, WT Docket No. 16-137, DA 16-1061
(Released: September 23, 2016).

Seventeenth Report, *In the Matter of Implementation of Section 6002(b) of the Omnibus
Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market
Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*,
Before the Federal Communications Commission, WT Docket No. 13-135, DA 14-1862
(Released: December 18, 2014).

"FCC Form 499 Filer Database," Federal Communications Commission,
https://apps.fcc.gov/cgb/form499/499a.cfm (accessed August 16, 2021).

"2021 Telecommunications Reporting Worksheet Instructions," Federal Communications
Commission, November 2020.

**Correspondence**

Email, Dan Marovitch to Hans Germann and Kyle Steinmetz, re: Brown v. DIRECTV,
LLC, No. 2:13-cv-01170 (C.D. Cal.), June 2, 2021

Email, Dan Marovitch to Susan Dziekan, Hans Germann, Kyle Steinmetz, and Rowena
Cabitac, re: Re: Subpoenas/Notice of Depositions - Brown v. DIRECTV, LLC, No. 2:13-
cv-01170 (C.D. Cal.), July 9, 2021

Email, Dan Marovitch to Hans Germann and Kyle Steinmetz, re: Brown v. DIRECTV,
LLC, No. 2:13-cv-01170 (C.D. Cal.), July 14, 2021

Email, Sean Petterson to Hans Germann and Kyle Steinmetz, re: Jenny Brown v.
DIRECTV, LLC, August 24, 2021

**Interviews**

Interview with Emily Westridge Black, Haynes Boone, May 18, 2021.

Exhibit 7
Page 36

**Data**
    Schedule A.csv

**Data Produced by AT&T**
    brown_ctn_data_all_TLG_20210702FINAL (1).xlsb

**Data Produced by Verizon**
    brown_v_dtv__001_redacted.csv
    brown_v_dtv__002_redacted.csv
    brown_v_dtv__003_redacted.csv
    brown_v_dtv__004_redacted.csv
    brown_v_dtv__005_redacted.csv
    brown_v_dtv__006_redacted.csv
    brown_v_dtv__007_redacted.csv
    brown_v_dtv__008_redacted.csv
    brown_v_dtv__009_redacted.csv
    brown_v_dtv__010_redacted.csv
    brown_v_dtv__011_redacted.csv
    brown_v_dtv__012_redacted.csv
    brown_v_dtv__013_redacted.csv
    brown_v_dtv__014_redacted.csv
    brown_v_dtv__015_redacted.csv
    brown_v_dtv__016_redacted.csv
    brown_v_dtv__017_redacted.csv
    brown_v_dtv__018_redacted.csv
    brown_v_dtv__019_redacted.csv
    brown_v_dtv__020_redacted.csv
    brown_v_dtv__021_redacted.csv
    brown_v_dtv__022_redacted.csv
    brown_v_dtv__023_redacted.csv
    brown_v_dtv__024_redacted.csv
    brown_v_dtv__025_redacted.csv
    brown_v_dtv__026_redacted.csv
    brown_v_dtv__027_redacted.csv
    brown_v_dtv__028_redacted.csv
    brown_v_dtv__029_redacted.csv
    brown_v_dtv__030_redacted.csv
    brown_v_dtv__031_redacted.csv
    brown_v_dtv__032_redacted.csv
    brown_v_dtv__033_redacted.csv
    brown_v_dtv__034_redacted.csv
    brown_v_dtv__035_redacted.csv
    brown_v_dtv__036_redacted.csv
    brown_v_dtv__037_redacted.csv
    brown_v_dtv__038_redacted.csv

Exhibit 7
Page 37

brown_v_dtv__039_redacted.csv
brown_v_dtv__040_redacted.csv
brown_v_dtv__041_redacted.csv
brown_v_dtv__042_redacted.csv
brown_v_dtv__043_redacted.csv
brown_v_dtv__044_redacted.csv
brown_v_dtv__045_redacted.csv
brown_v_dtv__046_redacted.csv
brown_v_dtv__047_redacted.csv
brown_v_dtv__048_redacted.csv
brown_v_dtv__049_redacted.csv
brown_v_dtv__050_redacted.csv
brown_v_dtv__051_redacted.csv
brown_v_dtv__052_redacted.csv
brown_v_dtv__053_redacted.csv
brown_v_dtv__054_redacted.csv
brown_v_dtv__055_redacted.csv
brown_v_dtv__056_redacted.csv
brown_v_dtv__057_redacted.csv
brown_v_dtv__058_redacted.csv
brown_v_dtv__059_redacted.csv
brown_v_dtv__060_redacted.csv
brown_v_dtv__061_redacted.csv
brown_v_dtv__062_redacted.csv
brown_v_dtv__063_redacted.csv
brown_v_dtv__064_redacted.csv
brown_v_dtv__065_redacted.csv
brown_v_dtv__066_redacted.csv
brown_v_dtv__001 redacted 2nd release.csv
brown_v_dtv__002.redacted 2nd release.csv
brown_v_dtv__003.redacted 2nd release.csv
brown_v_dtv__004.redacted 2nd release.csv
brown_v_dtv__005.redacted 2nd release.csv
brown_v_dtv__006.redacted 2nd release.csv
brown_v_dtv__007.redacted 2nd release.csv
brown_v_dtv__008.redacted 2nd release.csv
brown_v_dtv__009.redacted 2nd release.csv
brown_v_dtv__010.redacted 2nd release.csv
brown_v_dtv__011.redacted 2nd release.csv
brown_v_dtv__012 redacted 2nd release.csv
brown_v_dtv__013.redacted 2nd release.csv
brown_v_dtv__014.redacted 2nd release.csv
brown_v_dtv__015.redacted 2nd release.csv
brown_v_dtv__016.redacted 2nd release.csv
brown_v_dtv__017.redacted 2nd release.csv
brown_v_dtv__018.redacted 2nd release.csv

4

Exhibit 7
Page 38

brown_v_dtv__019.redacted 2nd release.csv
brown_v_dtv__020.redacted 2nd release.csv
brown_v_dtv__021.redacted 2nd release.csv
brown_v_dtv__022.redacted 2nd release.csv
brown_v_dtv__023.redacted 2nd release.csv
brown_v_dtv__024.redacted 2nd release.csv
brown_v_dtv__025.redact 2nd release.csv
brown_v_dtv__026.redacted 2nd release.csv
brown_v_dtv__027.redacted 2nd release.csv
brown_v_dtv__028.redacted 2nd release.csv
brown_v_dtv__029.redacted 2nd release.csv
brown_v_dtv__030.redacted 2nd release.csv
brown_v_dtv__031.redacted 2nd release.csv
brown_v_dtv__032.redacted 2nd release.csv
brown_v_dtv__033.redacted 2nd release.csv
brown_v_dtv__034.redacted 2nd release.csv
brown_v_dtv__035.redacted 2nd release.csv
brown_v_dtv__036.redacted 2nd release.csv
brown_v_dtv__037.redacted 2nd release.csv
brown_v_dtv__038.redacted 2nd release.csv
brown_v_dtv__039.redacted 2nd release.csv
brown_v_dtv__040.redacted 2nd release.csv
brown_v_dtv__041.redacted 2nd release.csv
brown_v_dtv__042.redacted 2nd release.csv
brown_v_dtv__043.redacted 2nd reslease.csv
brown_v_dtv__044.redacted 2nd release.csv
brown_v_dtv__045.redacted 2nd release.csv
brown_v_dtv__046.redacted 2nd release.csv
brown_v_dtv__047.redacted 2nd release.csv
brown_v_dtv__048.redacted 2nd release.csv
brown_v_dtv__049.redacted 2nd release.csv
brown_v_dtv__050.redacted 2nd release.csv
brown_v_dtv__051.redacted 2nd release.csv
brown_v_dtv__052.redacted 2nd release.csv
brown_v_dtv__053.redacted 2nd release.csv
brown_v_dtv__054.redacted 2nd release.csv
brown_v_dtv__055.redacted 2nd release.csv
brown_v_dtv__056.redacted 2nd release.csv
brown_v_dtv__057.redacted 2nd release.csv
brown_v_dtv__058.redacted 2nd release.csv
brown_v_dtv__059.redacted 2nd release.csv
brown_v_dtv__060.redacted 2nd release.csv
brown_v_dtv__061.redacted 2nd release.csv
brown_v_dtv__062.redacted 2nd release.csv
brown_v_dtv__063.redacted 2nd release.csv
brown_v_dtv__064.redacted 2nd release.csv

5

Exhibit 7
Page 39

brown_v_dtv__065.redacted 2nd release.csv
brown_v_dtv__066.redacted 2nd release.csv
brown_v_dtv__BATCH1_0M_2M.csv
brown_v_dtv__BATCH1_10M_12M.csv
brown_v_dtv__BATCH1_14M_16M.csv
brown_v_dtv__BATCH1_16M_18M.csv
brown_v_dtv__BATCH1_18M_20M.csv
brown_v_dtv__BATCH1_20M_22M.csv
brown_v_dtv__BATCH1_22M_24M.csv
brown_v_dtv__BATCH1_24M_26M.csv
brown_v_dtv__BATCH1_26M_28M.csv
brown_v_dtv__BATCH1_28M_30M.csv
brown_v_dtv__BATCH1_2M_4M.csv
brown_v_dtv__BATCH1_30M_32M.csv
brown_v_dtv__BATCH1_32M_34M.csv
brown_v_dtv__BATCH1_34M_36M.csv
brown_v_dtv__BATCH1_36M_38M.csv
brown_v_dtv__BATCH1_38M_40M.csv
brown_v_dtv__BATCH1_4M_6M.csv
brown_v_dtv__BATCH1_6M_8M.csv
brown_v_dtv__BATCH1_8M_10M.csv
brown_v_dtv__BATCH2_0M_2M.csv
brown_v_dtv__BATCH2_10M_12M.csv
brown_v_dtv__BATCH2_12M_14M.csv
brown_v_dtv__BATCH2_14M_16M.csv
brown_v_dtv__BATCH2_16M_18M.csv
brown_v_dtv__BATCH2_20M_22M.csv
brown_v_dtv__BATCH2_22M_24M.csv
brown_v_dtv__BATCH2_24M_26M.csv
brown_v_dtv__BATCH2_26M_28M.csv
brown_v_dtv__BATCH2_28M_END.csv
brown_v_dtv__BATCH2_2M_4M.csv
brown_v_dtv__BATCH2_4M_6M.csv
brown_v_dtv__BATCH2_6M_8M.csv
brown_v_dtv__BATCH2_8M_10M.csv

6

Exhibit 7
Page 40

CONFIDENTIAL

# Exhibit 3

## Entries in the AT&T Subpoena Response Data That I Conclude Are Not the Names of Individuals

| Full Name[2] | Reseller?[3] |
|---|---|



Exhibit 7
Page 41

Exhibit 3, Page 1 of 3

CONFIDENTIAL

| Full Name[2] | Reseller?[3] |
| --- | --- |



Exhibit 7
Page 42

Exhibit 3, Page 2 of 3

CONFIDENTIAL

| Full Name[2] | Reseller?[3] |
| --- | --- |



Exhibit 7
Page 43

Exhibit 3, Page 3 of 3

CONFIDENTIAL

**Exhibit 4**
**Example Records from the Carrier Subpoena Response Data**
Name Fields Populated with Non-Names for Prepaid Accounts

| Carrier | Telephone Number | Account First Name | Account Last Name | User First Name | User Last Name | Phone Line Type |
|---|---|---|---|---|---|---|

Exhibit 7
Page 44

CONFIDENTIAL

# Exhibit 5
## Example Records from the Carrier Subpoena Response Data
Same Name for Multiple Phone Numbers on Account



| Carrier | Account Number | Telephone Number | Account First Name | Account Last Name | User First Name | User Last Name |
|---|---|---|---|---|---|---|

Notes:

Exhibit 7
Page 45

CONFIDENTIAL

## Exhibit 6
## Example Records from the Carrier Subpoena Response Data
### Non-Identifiable User Names



| Carrier | Telephone Number | Account First Name | Account Last Name | Account Business Name | User First Name | User Last Name |
|---------|------------------|--------------------|--------------------|-----------------------|-----------------|----------------|

Exhibit 7
Page 46

Exhibit 6, Page 1 of 2

CONFIDENTIAL

Exhibit 7
Page 47

Exhibit 6, Page 2 of 2